Document 2 – Complaint

STATE OF NEW YORK
SUPREME COURT  ::  COUNTY OF NIAGARA
_____

CALAMAR CAPITAL SERVICES, LLC
3949 Forest Parkway
Suite 100
Wheatfield, New York 14120

N.A. REALTY FUND II, LLC
3949 Forest Parkway
Suite 100
Wheatfield, New York 14120

INDICAL PARTNERS, LLC
3949 Forest Parkway
Suite 100
Wheatfield, New York 14120

                                        *Plaintiffs*,                    **COMPLAINT**

vs.                                                                      Index No. _____

BCMK INVESTMENT HOLDINGS, LLC
5838 Naples Plaza
Long Beach, California 90803

BRENT E. CAREY
5838 Naples Plaza
Long Beach, California 90803

INDIGO GLOBAL ADVISORS, LLC
5838 Naples Plaza
Long Beach, California 90803

                                        *Defendants.*
_____

Plaintiffs Calamar Capital Services, LLC, N.A. Realty Fund II, LLC and IndiCal

Partners, LLC, as and for their Complaint against Defendants Brent E. Carey, BCMK

Investment Holdings, LLC, and Indigo Global Advisors, LLC, allege as follows:

Case 1:24-cv-00684-JLS   Document 1-3   Filed 07/22/24   Page 3 of 27

## THE PARTIES

1.      Plaintiff Calamar Capital Services, LLC (hereinafter "Calamar") is a New York limited liability company with a principal place of business located at 3949 Forest Parkway, Suite 100, Wheatfield, New York 14120.

2.      Plaintiff N.A. Realty Fund II, LLC (hereinafter "N.A. Realty") is a Delaware limited liability company with a principal place of business located at 3949 Forest Parkway, Suite 100, Wheatfield, New York 14120.

3.      Plaintiff IndiCal Partners, LLC (hereinafter "IndiCal") is a Delaware limited liability company with a principal place of business located at 3949 Forest Parkway, Suite 100, Wheatfield, New York 14120.

4.      Defendant BCMK Investment Holdings, LLC (hereinafter "BCMK") is a Delaware limited liability company with a primary place of business located at 5838 Naples Plaza, Long Beach, California 90803.

5.      Defendant Brent E. Carey (hereinafter "Carey") is an individual with a primary place of business located at 5838 Naples Plaza, Long Beach, California 90803.

6.      Upon information and belief, Carey is a manager, controlling member, or officer of BCMK and other related entities, including Indigo Global Advisors, LLC, Indigo Investment Servicing, LLC, Indigo Private Credit Fund, LP, Indigo Private Credit Fund II, LP Indigo Commercial Funding, LLC and Indigo Master Participation, LP.

7.      Defendant Indigo Global Advisors, LLC (hereinafter "IGA") is a Delaware limited liability company with a primary place of business located at 5838 Naples Plaza, Long Beach, California 90803.

8.      Indigo Investment Servicing, LLC (hereinafter "IIS") is a Delaware limited

2 of 26

liability company with a primary place of business located at 5838 Naples Plaza, Long

Beach, California 90803.

9.      Indigo Opportunities Fund II, LP, now known as Indigo Private Credit

Fund, LP ("Fund II"), is a limited partnership formed under the laws of the State of

Delaware and commenced operations on January 1, 2018.

10.     Indigo Commercial Funding, LLC ("ICF") is a limited liability company

formed under the laws of the State of Delaware and is presently a subsidiary of Indigo

Master Participation, LP.

11.     Indigo Master Participation, LP ("IMP") is a limited partnership formed

under the laws of the State of Delaware on November 19, 2021 and commenced

operations on December 9, 2021.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the parties pursuant to Civil Practice

Law and Rules § 301.

13.     Venue is proper in Niagara County pursuant to Civil Practice Law and

Rules § 503(a) and (c) as Calamar, N.A. Realty Fund and IndiCal reside in Niagara

County.

## FACTUAL ALLEGATIONS

14.     In 2017 and 2018, Defendant Carey came to Calamar's offices in Niagara

County, New York to solicit investors for Fund II.

15.     Defendant Carey was soliciting funds on behalf of Defendants IGA and

BCMK, founders of Fund II.

3

16.     Fund II was formed to syndicate investments in Defendants' debt and lease deals.

17.     Defendants represented that, through various related entities that they own and control, they take the raised capital to invest in special purpose vehicles through the creation or acquisition of secured and/or collateralized loans, performing loans and leases.

18.     Defendants represented and pledged that these investments would generate consistent, absolute returns through payments on loans, cash flow on leases, asset liquidations, and interest paid by borrowers.

19.     As part of Defendants solicitation of Plaintiffs, Defendants assured Plaintiffs that Fund II would provide returns of 8% a year over the life of the fund.

20.     As part of the solicitation, Defendants described Indigo as being founded over a decade before to capitalize on Defendant Carey's success in collateralized loans to lower middle-market commercial and industrial businesses.

21.     Defendants claimed that their management team had significant experience working at GE Capital, Fortress and JP Morgan, including decades of experience in commercial lending, direct asset investing, secondary debt trading and distressed loan management.

22.     Defendants described their investment strategy as an opportunistic investment in commercial loans, with a sole focus in asset-based direct loans backed by commercial collateral.

23.     To entice Plaintiffs into making the investment, Defendants falsely claimed they had special purpose vehicles that would provide annual returns of 8%

4

and a return of capital, that they had raised over $55,000,000 for the fund and that they were managing more than $250,000,000 in assets.

24.     Defendants claimed that since their inception in 2005, they had only one asset that lost money, and provided numerous examples of transactions that Defendants claimed were profitable.

25.     Defendants claimed their platform was comprised of:

    a.  Direct lending to a range of middle-market commercial and industrial businesses;

    b.  Investments in both seasoned and newly originated loans;

    c.  All loans were backed by hard collateral and accompanied by defined exit strategies in assets valued at lower loan-to-value;

    d.  Active consultation and collaboration with borrowers to resolve loans in the most advantageous manner to the investors;

    e.  Underwriting the investments to a downside case scenario or a liquidation of the collateral to allow investors to recover their capital investment while maintaining the targeted return.

26.     To further entice Calamar to invest, Defendants promised that Calamar would have the ability to roll its investment into a larger fund, would receive greatly reduced fees, and would obtain approximately 30% of the general partnership metrics.

27.     Defendants claimed this would allow Calamar to benefit from additional capital raised by Defendants.

Case 1:24-cv-00684-JLS   Document 1-3   Filed 07/22/24   Page 7 of 27

28.     Defendants also claimed that Fund II would be targeting a return on invested capital of over 20%, but since Plaintiffs would own 30% of the general partnership, the returns would be significantly higher.

29.     Calamar created and is the managing member of N.A. Realty Fund, IndiCal and Glacier Point Partners, LLC ("Glacier Point") (another entity owned and controlled by Plaintiffs) to facilitate management of the investment.

30.     As a result of the promises of returns and control, Calamar chose to make an investment, and funded N.A. Realty Fund with an initial investment of $4,000,000.

31.     N.A. Realty Fund is the sole member of IndiCal; Calamar is the manager of IndiCal.

32.     To increase their own returns while transferring the risk to investors, Defendants used separate entities that they own, manage and control to service the special purpose vehicles, including Fund II.

33.     Upon information and belief, Defendants created ICF as a separate bankruptcy-remote special purpose vehicle whose sole purpose is to make investments on behalf of another fund run by Defendants (IMP) and the various feeder funds that Defendants use to invest in IMP.

34.     Fund II was, until December 9, 2021, the owner of all of the membership interests in ICF.

35.     The primary purpose of Fund II, through ICF, was to generate returns through capital appreciation obtained through the creation or acquisition of secured and/or collateralized loans, performing loans and leases.

Case 1:24-cv-00684-JLS   Document 1-3   Filed 07/22/24   Page 8 of 27

36.     As a result of the inducement to invest in Defendants' scheme, Defendant Carey, Defendant BCMK and Calamar (through its subsidiary Glacier Point) formed IGI Partners II, LLC ("IGI Partners II") to serve as the general partner of Fund II.

37.     N.A. Realty Fund used the $4,000,000 to fund IndiCal; IndiCal in turn invested the $4,000,000 to become a limited partner in Fund II.

38.     The $4,000,000 investment was made up of the following wires to Fund II: January 9, 2018 - $1,050,000; February 13, 2018 - $1,200,000; March 29, 2018 - $260,000; and September 26 - $1,490,000.

39.     The Class A members of IGI Partners II are Glacier Point, BCMK, and Indigo Senior Executive Holdings, LLC. The Class B members of IGI Partners II are Glacier Point and Kite Capital Holdings, LLC. A true and accurate copy of the Amended and Restated Limited Liability Company Operating Agreement for IGI Partners II is attached as Exhibit A.

40.     Class A members of IGI Partners II are allocated a proportionate share of the net profit and/or the net loss from operations.

41.     Class B members of IGI Partners II are allocated a proportionate share of the net profit and/or net loss from fund investment(s). Furthermore, the obligations of IGI Partners II arising from the investment in Fund II are borne solely by the Class B Members, insulating Defendants Carey and BCMK from financial harm.

42.     Under the terms of the Operating Agreement, IGI Partners II's Management Committee had the following powers:

> (a) To manage the Company's assets, including without limitation, to (i) invest the capital contributions of the Class B Members in one or more pooled investment vehicles, including Fund II or to loan such capital contributions to one or more third parties, one

7

or more of its Affiliates and/or to Fund II on such terms and in such amounts as determined by the Management Committee in its sole discretion,...

43.     A majority of IGI Partners II's Management Committee is needed to make such an investment.

44.     Under the terms of the Operating Agreement, the following actions required a unanimous vote of the Management Committee:

    (i)     materially changing the terms of Fund II;
    (ii)    changing the Company's service providers or service provider agreements;
    (iii)   materially changing the Company's governance structure;
    (iv)   taking action that could materially affect the revenue sharing arrangement described in the agreement between Indigo Global Advisors, LLC and Glacier Point Partners, LLC;
    (v)    materially changing Fund II 's investment objectives, strategy and/or policies; ...
    (viii)  extending Fund II 's term beyond the fifth anniversary of the Final Closing (as defined in the Partnership Agreement); and
    (ix)   amending the Certificate and/or this Agreement.

45.     IGI Partners II had both fiscal and management responsibility for Fund II, including the sole authority to bind Fund II.

46.     The individual representatives on IGI Partners II's management committee are Damon Wojciechowski and Defendant Carey.

47.     Mr. Wojciechowski is the president of Calamar.

48.     As set forth in the Operating Agreement, Mr. Wojciechowski has control of the management committee in the event of any disagreement with Defendant Carey.

49.     At first, Mr. Wojciechowski would be informed about potential investments and vote to approve or disapprove.

8

50.     This practice eventually ceased, with Defendants ignoring the Operating Agreement and refusing to keep Plaintiffs or Mr. Wojciechowski informed.

51.     As part of the investment scheme, Defendants use several related & controlled entities to work on the investments, charging fees that benefit themselves over the investors.

52.     For example, Indigo Investment Servicing, LLC ("IIS") serves as the servicer of the loans purchased by ICF. Once a loan is purchased or a new loan origination is completed, IIS charges a monthly loan servicing fee that is paid to IIS. The fee is equal to 1% per annum of the principal balance of the loan (or property values where the investment has been foreclosed).

53.     Upon information and belief, ICF incurred $340,915 of servicing fees for the year ending December 31, 2021.

54.     IIS also paid documentation fees on loans that originated through ICF. Upon information and belief, for the fiscal year ending December 31, 2021, IIS earned $73,075 in documentation fees.

55.     Another related entity is Indigo Direct Lending, LLC ("IDL"). IDL is the loan originator for some loans acquired by ICF. Upon information and belief, in 2021, IDL received $495,863 in loan and lease transaction or origination fees from ICF on the loans and leases acquired by or originated by ICF.

56.     Defendant IGA serves as ICF's (and in turn, ICF's owner IGI Partners II) investment manager. When Defendants presented the investment to Plaintiffs, they claimed that IGA's role was to construct and manage private credit portfolios of

9

secured commercial loans with the objective of generating income and preserving capital.

57.     Defendants also claimed that IGA's strategy is focused on building diversified portfolios of high grade commercial mortgages and commercial equipment loans and leases to generate consistent income and gains, with the commercial mortgage strategy centered on Small Business Administration (SBA) 504 qualified loans, and commercial equipment finance strategy focused on loans and leases secured by critical-use, revenue-generating equipment used in core segments of the U.S. economy.

58.     Defendants also claimed that IGA carefully manages risk exposure through prudent selection, comprehensive credit underwriting, diversification, and systematic portfolio rotation to shorten duration.

59.     In actuality, IGA did not use any restrictions on credit quality for the investments.

60.     To induce Plaintiff's investment in IGI Partners II (and in turn, Fund II), Defendants intentionally misrepresented, intentionally deceived and failed to disclose to Plaintiffs material facts concerning the investments and IGI Partners II, including:

   a. Intentionally failing to disclose to Plaintiffs their plan to use Plaintiffs' investment for other related Indigo entities that Plaintiffs were not participating or involved in;

   b. Operating IGI Partners II in a manner that renders the goals of the Operating Agreement false, deceptive, and misleading;

10

c. Intentionally omitting from the presentation and Operating Agreement the significant "soft costs" that come out of the investment and flow directly to related entities of the Defendants, including legal, accounting, servicing, origination, and management fees;

d. Intentionally misrepresenting that the Rate of Return for Plaintiffs' investment would be at least 8% annually;

e. Intentionally misrepresenting that Plaintiffs would realize and receive budgeted distributions from their investments and from operating profits;

f. Intentionally misrepresenting that the Plaintiffs' investment would be in a diversified investment to minimize risk, and instead overloading the investment in a single, high-risk vehicle;

g. That Defendants intended to cause and arrange for IGI Partners II to divest itself of its entire investment in Fund II, without any return on investment for Plaintiffs;

h. Intentionally failing to disclose that Defendants were going to operate IGI Partners II in breach of the Operating Agreement to benefit themselves, as Defendants did not have the authority to divest IGI Partners II's interest in Fund II without the consent and approval of the Management Committee, thereby rendering the divestment legally unenforceable and non-binding; and

i. Making management decisions without Plaintiffs' consent and in breach of Section 6 of the Operating Agreement, and enabling Defendants to

11

Case 1:24-cv-00684-JLS   Document 1-3   Filed 07/22/24   Page 13 of 27

surreptitiously, deceptively and without Plaintiff's consent use and spend Plaintiff's investment to support other Indigo Entities and illicitly gain fees for services.

61.     As of December 31, 2020, the total committed capital of Fund II was $6,175,000, including the $4,000,000 investment from Plaintiffs.

62.     For its investments, Fund II used the direct finance method of accounting to record leases and related interest income. At inception of a lease, Fund II records the lease as an asset, the aggregate future minimum lease payments as a receivable, plus the estimated residual value of the leased equipment, if any. Residual values are established at lease inception based on our estimate of the expected fair value of the equipment at the end of the lease term, based on industry data, management's experience, and historical performance.

63.     As of December 31, 2020, the leases being held as assets of Fund II were identified to Plaintiffs as: Charles Deweese Construction, Inc., DHA: Package One, PWSC, STL Truckers, Clear Align LLC, CS America, Inc, Royal Express, Inc, Metal Services, LLC, and Shadow Systems, LLC. Defendants informed Plaintiffs that the future minimum lease payments receivable for the direct financing leases totaled $7,526,072 through 2025.

64.     Fund II also invested in loans. As of December 31, 2020, the loans being held as assets by Fund II included Peak Oil Holdings, LLC, SLF - KC Towers, LLC - Lien 2, 3510 N Broadway, 2927 Market St BCB, LLC, Harry R. Dodge, Highnet LLC, 15319 Wyandotte Street LLC and Coda Holdings, LLC.

65.    As of December 31, 2020, the assets of Fund II were $21,977,512, including $12,703,202 investment value in performing loans, $150,000 in non-performing loans, and $7,526,072 in leases.

66.    Out of the $12,703,202 in the performing loans held as investments by Fund II, the investment value of the loan to Peak Oil Holdings, LLC ("Peak") was $4,000,000.

67.    Peak is an oil company in California. The loan to Peak was collateralized with oil wells and equipment necessary to drill oil wells.

68.    Upon information and belief, at the time that Defendants authorized and provided the loan to Peak, the County of Ventura had refused to allow Peak's requests for zoning clearances, which in turn prevented Peak from drilling. This effectively forced Peak Oil Holdings to cease operations.

69.    Upon information and belief, despite knowing about the cessation of operation, Defendants used the capital provided by Plaintiffs to fund the loan.

70.    Upon information and belief, there was a theft at Peak that resulted in an approximate $1,800,000 payout on an insurance claim.

71.    Upon information and belief, Defendants' failure to obtain and enforce adequate collateral for the $4,000,000 loan resulted in the insurance payment being lost.

72.    In June of 2021, Mr. Wojciechowski requested that Defendant Carey ensure the loans (that collateralized the investment) were being paid.

73.    Defendant Carey informed Mr. Wojciechowski that the loan proceeds were being reinvested to serve as collateral for additional loans.

13

74.     Upon information and belief, on December 9, 2021, Fund II was restructured.

75.     Neither Mr. Wojciechowski nor the Plaintiffs were informed of Fund II's restructuring.

76.     Neither Mr. Wojciechowski nor the Plaintiffs approved of Fund II's restructuring.

77.     On the same day (December 9, 2021), Fund II, the sole owner of ICF, contributed its full interest (with the exception of one of ICF's investments) in ICF to IMP.

78.     Neither Plaintiffs nor Mr. Wojciechowski were informed about the assignment of Fund II's interest to IMP.

79.     Neither Plaintiffs nor Mr. Wojciechowski approved the assignment of its interest in ICF to IMP.

80.     The restructuring resulted in ICF becoming 100% owned by IMP, Defendants newly formed entity.

81.     Because ICF became 100% owned by IMP, Fund II lost all of its ownership in ICF for no consideration.

82.     As of December 31, 2021, the assets of Fund II were $5,633,734, with the sole loan being the Peak loan, then valued at $2,966,976 & described as "performing" but with no payments made in over a year.

83.     Rather than comply with their purported investment strategy, Defendants left the largest risk item as the sole remaining loan in Fund II's portfolio.

14

84.     Upon information and belief, at the time of the transfer Defendants knew or should have known that the Peak loan was unperforming and that Peak had been effectively shut down by the County of Ventura.

85.     As of December 31, 2021, pursuant to the audited financial statements, there were no future lease payments.

86.     According to the financial statements provided by Defendants, Fund II lost $16,343,778 in assets from December 31, 2020 to December 31, 2021 through the uncompensated transfer of its assets to ICF.

87.     Some of the assets simply disappeared, such as the loans identified as SLF - KC Towers, LLC - Lien 2, 3510 N Broadway, 2927 Market St BCB, LLC, Harry R. Dodge, Highnet LLC, and 15319 Wyandotte Street LLC. These loans appear as assets on the Fund II 2020 financial statements, but not on the 2021 Fund II financial statements, the 2021 IMP financial statements, or the 2021 ICF financial statements.

88.     Defendants did not, and cannot, explain where these investments went.

89.     Defendants also did not explain why the leases in Charles Deweese Construction, Inc., DHA: Package One, PWSC, STL Truckers, Clear Align LLC, CS America, Inc, Royal Express, Inc, Metal Services, LLC, and Shadow Systems, LLC were no longer in Fund II's asset portfolio or how much was paid for those assets, despite the leases going through 2025.

90.     Defendants also did not explain why the leases PWSC, STL Truckers, Clear Align LLC, CS America, Inc, Royal Express, Inc, Metal Services, LLC, and Shadow Systems, LLC were transferred to ICF without consideration.

15

91.     In effect, Defendants distributed $16,343,778 in Fund II's assets to their related entities without authority or consideration, leaving the bad, unperforming loan in Peak as Fund II's sole asset.

92.     Defendant IGA is the investment manager for IMP.

93.     Upon information and belief, Indigo Master Participation GP, LLC, an entity related to and controlled by Defendants is the general partner of IMP.

94.     IGI Partners II is not an owner, partner or beneficiary of IMP.

95.     Upon information and belief, ownership of IMP was determined in accordance with capital contributions made by Indigo Private Credit Fund I, LP and Indigo PC-III Private Account 1, LP.

96.     Plaintiffs are not owners, managers, partners or beneficiaries in Indigo Private Credit Fund I, LP.

97.     Plaintiffs are not owners, managers, partners or beneficiaries in Indigo PC-III Private Account 1, LP.

98.     Upon information and belief, Fund II contributed the book value of its business in the amount of $2,093,963, while Indigo PC-III Private Account 1, LP contributed $3,000,000 in cash.

99.     As of December 31, 2021, IMP held a 100% ownership interest in ICF.

100.    Plaintiffs and Mr. Wojciechowski have asked for documentation from Defendants regarding the restructuring of Fund II and the sale or transfer of its assets.

101.    Defendants have failed and refused to provide any documentation regarding the restructuring of Fund II.

16

102.    Defendants have failed and refused to provide any documentation regarding Plaintiffs role or benefit from the restructuring of Fund II.

103.    The investment structure of IMP is significantly different than that of IGI Partners II.  For example,

    a.  Approximately 97.1% of IMP's net assets consist of an investment in a bankruptcy remote SPV;

    b.   The value of the investment in the SPV has uses the net asset value of IMP's ownership interest in capital of the SPV;

    c.  IMP has no right to redeem a partial or complete interest in this investment; and

    d.  distributions will be received as the underlying investments in the fund are liquidated.

104.    In effect, once Defendants contributed Fund II's full interest in ICF to IMP, Plaintiffs lost all control over their investment to the benefit of Defendants.

105.    Defendants, in various financial statements, have also claimed that ICF was owned 100% by Indigo Private Credit Fund I, LP, not Fund II.

106.    Upon information and belief, in the same time period, Fund II made an investment in Indigo Commercial Funding I-C, LLC.

107.    Neither Plaintiffs nor Mr. Wojciechowski were informed about this investment.

108.    Upon information and belief, Indigo Commercial Funding I-C, LLC does not exist.

109.    Plaintiffs and Mr. Wojciechowski have asked for documentation from Defendants regarding the purported Indigo Commercial Funding I-C, LLC investment.

110.    Defendants have failed and refused to provide any documentation regarding this transaction.

111.    Upon information and belief, the investment in Indigo Commercial Funding I-C, LLC was a subterfuge to channel Plaintiffs' investments to related Indigo entities.

112.    By Defendants engineering the contribution of FundII's interest in ICF to IMP, they devalued all of Plaintiffs' investment in IGI Partners II.

113.    By Defendants engineering the contribution of Fund II's interest in ICF to IMP, they removed Plaintiffs' ability to control its investments.

114.    Defendants Carey, BCMK, and IGA's representations regarding the investment of IGI Partners II's capital were intentionally deceitful and false.

115.    Defendants Carey, BCMK, and IGA's actions in taking IGI Partners II's capital investment without the knowledge or consent of the Management Committee were intentionally deceitful and false.

116.    Defendants Carey, BCMK, and IGA knew the statements were false and misleading when they made representations to the Plaintiffs and took the actions divesting the Plaintiffs of their capital investment.

117.    Upon information and belief, Defendants Carey, BCMK, and IGA willfully, wrongfully, recklessly, and deceitfully induced Plaintiffs to make investments in order to obtain capital for other Indigo funds and to generate service, orientation and management fees for Indigo Entities that they control and derive income from.

118.    Plaintiffs justifiably relied on the representations of Defendants Carey, BCMK and IGA. If not for such representations and omissions, Plaintiffs would not have been induced to make an investment in IGI Partners II and Fund II.

119.    By reason of all of the foregoing, Plaintiffs' investments have been rendered worthless, and Plaintiffs have neither received any return on their investment nor any documentation as to where their investment is currently. Plaintiffs have been injured and damaged and demand restitution and damages in the amount of their investment.

120.    After Plaintiffs' entry into the IGI Partners II's Operating Agreement and becoming investors in Fund II, Defendants Carey, BCMK and IGA have grossly, willfully and intentionally engaged in deceitful conduct in violation of the terms of the Operating Agreement, have recklessly mismanaged IGI Partners II, appropriated millions of dollars of capital to fund other Indigo Entities, and have willfully and wrongfully engaged in acts and conduct in breach of their duty and obligations as Management Committee members and their duty as fiduciaries to IGI Partners II and Plaintiffs.

121.    Continuing their shell game and subterfuge, in January of 2023 Defendants provided a "Wind Down Plan" for Fund II. Notably, the "Wind Down Plan" identified lease assets that were on Fund II's 2020 financials but not its 2021 financials (Clear Align LLC, Royal Express, Inc., Metal Services, LLC, and Shadow Systems, LLC) and also lease assets that were not on either the 2020 or 2021 Fund II financials (Metal Services, LLC 2, Shadow Systems, LLC 2, Shadow Systems, LLC 3, and Core Scientific) but were identified on ICF's 2021 financial statements.

19

Case 1.24-cv-00684-JLS  Document 1-3  Filed 07/22/24  Page 21 of 27

122.    Of note, the non-performing Peak loan was included as an asset on the "Wind Down Plan," with an investment balance as of September 30, 2022 of $3,939,767 (the same amount as in the 2020 and 2021 financials).

123.    When asked to explain the "Wind Down Plan," Defendants were unable to explain where the investments came from, the basis for their value, or why Defendants failed to maximize the value before selling the assets.

124.    In 2023, Plaintiffs requested a withdrawal of all of its capital account in IGI Partners II.  The request was to withdraw the capital account in an orderly manner, due to the Defendants' unilateral implementation of a material change to Fund II's investment objective and/or strategy and the Defendants material breach by IGI Partners II's investment policies.

125.    Plaintiffs' request has been ignored, and its capital investment has not been returned.

126.    Upon information and belief, Plaintiffs' capital investment has not been returned because IGI Partners II has no assets and because Defendants are using it as collateral for the credit facility of another loan from Cadence Bank.

127.    In further breach of their contractual obligations and also in breach of their statutory duties and their fiduciary duties in their capacities as members of the Management Committee and IGI Partners II's financial wellbeing, and as inside individuals of IGI Partners II, and with superior knowledge and access to financial and other data unavailable to Plaintiffs, Defendants Carey, BCMK and IGA, on information and belief, falsely represented the transaction to Cadence Bank (ICF's commercial credit facility) to obtain an extension and increase in IMP's credit facility.

20

128.    The breaches and misconduct by Defendants Carey, BCMK and IGA as described above are wrongful, willful, intentional, deceitful, and not in good faith, and constitute willful misconduct under the Operating Agreement.

129.    As a result of their willful misconduct, Defendants Carey and BCMK are therefore not entitled to indemnification under the Operating Agreement and the court should restrain and prohibit Defendants Carey, BCMK and any related entity from obtaining indemnification or any similar payments from IGI Partners II or under the IGI Partners II's Operating Agreement, or from any affiliate of the IGI Partners II.

AS AND FOR A FIRST CAUSE OF ACTION
BREACH OF CONTRACT

130.    Plaintiffs repeat paragraphs 1 through 129.

131.    Defendants Carey and BCMK, as members of the Management Committee, have breached their contractual obligations and participated in breaches of the Operating Agreement as set forth above.

132.    Plaintiffs have performed all of the terms of the Operating Agreement on their part required to be performed.

133.    Plaintiffs have suffered loss of their investment by reason of such breaches and have been damaged in the sum of not less than $4,000,000, plus interest as set forth above, and additionally have been damaged the loss of value of their investments and the loss of value in IGI Partners II and Fund II, as alleged above, and demand restitution and damages of $4,000,000 plus interest at the highest amount allowed by law.

AS AND FOR A SECOND CAUSE OF ACTION

134.    Plaintiffs repeat paragraphs 1 through 133.

21

135.   Defendant IGA, as the investment manager for IGI Partners II, owed IGI Partner II a duty to recommend viable investment options and to obtain consent from IGI Partners II's Management Committee.

136.   Upon information and belief, IGA intentionally and willfully facilitated the transfer of IGI Partners II's capital investment for no consideration, resulting in a total loss of the Plaintiffs' investment.

137.   Defendant IGA breached its duty to IGI Partners II and the Plaintiffs by facilitating the transfer of IGI Partners II capital to a different Indigo entity under the control of Defendants Carey, BCML and IGA.

138.   Plaintiffs have suffered loss of their investment by reason of such breach and have been damaged in the sum of not less than $4,000,000, and additionally have been damaged the loss of value of their investments and the loss of value in IGI Partners II and Fund II, as alleged above, and demand restitution and damages of $4,000,000 plus interest at the highest amount allowed by law.

## AS AND FOR A THIRD CAUSE OF ACTION
### Breach of Fiduciary Duty

139.   Plaintiffs repeat paragraphs 1 through 138.

140.   Plaintiffs had a confidential relationship with Defendants.

141.   Defendants had a fiduciary duty to Plaintiffs in connection with the investments and other transactions with respect to the Plaintiffs' investment.

142.   Defendants' representations and guarantees regarding the investments were false when made.

143.   Plaintiffs reasonably relied upon the representations to their detriment.

22

144.   Defendants made the representations with the intent to deceive Plaintiffs and for the purpose of inducing Plaintiffs to invest.

145.   As a result of Defendants' breach of fiduciary duty, Plaintiffs have sustained money damages in a sum to be determined by the trier of fact, exceeding $4,000,000.

## AS AND FOR A FOURTH CAUSE OF ACTION
### CONVERSION

146.   Plaintiffs repeat paragraphs 1 through 145.

147.   Plaintiffs invested in the Indigo securities in the Private Offering due to Carey, BCMK and others' misrepresentations.

148.   Plaintiffs have demanded that Defendants return the invested funds to Plaintiffs.

149.   To date, none of the invested funds has been returned.

150.   Defendants have retained Plaintiffs' capital investment and used it for their own purposes.

151.   Plaintiffs have been deprived of their money.

152.   Plaintiffs have suffered damages in an amount to be determined at trial, but no less than $4,000,000.

153.   As a result of Defendants' conversion, Plaintiffs have sustained money damages in a sum to be determined by the trier of fact, exceeding $4,000,000.

## AS AND FOR A FIFTH CAUSE OF ACTION
### MONIES HAD AND RECEIVED

154.   Plaintiffs repeat paragraphs 1 through 153.

23

155.    Defendants took $4,000,000 in capital from Plaintiffs to invest in their own funds.

156.    Defendants used the $4,000,000 in capital from Plaintiffs to induce Cadence Bank to increase and extend their credit facility, with no benefit to Plaintiffs.

157.    Plaintiffs have demanded that the $4,000,000 in capital be returned.

158.    Defendants have refused to return the $4,000,000 in capital.

159.    Defendants are liable for monies had and received.

160.    As a result of defendants' wrongful conduct, Plaintiffs have sustained money damages in a sum to be determined by the trier of fact, exceeding $4,000,000.

## AS AND FOR A SIXTH CAUSE OF ACTION
### FRAUD IN THE INDUCEMENT

161.    Plaintiffs repeat paragraphs 1 through 160.

162.    Plaintiffs have been injured and damaged by the aforesaid intentional, willful and reckless acts, inducement and conduct of Defendants Carey, BCMK, and IGA. If not for such acts by defendants, Plaintiffs would not have become investors in IGI Partners II and Fund II.  Plaintiffs demand rescission of the Operating Agreement and restitution and damages of $4,000,000, plus interest.

163.    Such conduct was and is intentionally wrongful, willful, deceitful and constitutes willful misconduct under the Operating Agreement and Plaintiffs additionally demand punitive damages from Defendants Carey, BCMK, and IGA as a penalty for and deterrent against such egregious, wantonly dishonest, and harmful conduct implicating fraudulent motive and criminal indifference to their civil contractual and fiduciary obligations.

164.    Based on the facts set forth above, Defendants have been unjustly enriched at the expense of Plaintiffs.

165.    As a result of defendants' wrongful conduct, Plaintiffs have sustained money damages in a sum to be determined by the trier of fact, exceeding $4,000,000.

**WHEREFORE**, Plaintiffs Calamar Capital Services, LLC, N.A. Realty Fund II, LLC and IndiCal Partners, LLC, respectfully demand judgment against Defendants as follows:

i.   On their first cause of action, monetary damages to be determined at trial in an amount not less than $4,000,000;

ii.  On their second cause of action, monetary damages to be determined at trial in an amount not less than $4,000,000;

iii. On their third cause of action, monetary damages to be determined at trial in an amount not less than $4,000,000;

iv.  On their fourth cause of action, monetary damages to be determined at trial in an amount not less than $4,000,000;

v.   On their fifth cause of action, monetary damages to be determined at trial in an amount not less than $4,000,000;

vi.  On their sixth cause of action, monetary damages to be determined at trial in an amount not less than $4,000,000;

vii. Such other and further relief as this Court deems just, proper, and equitable.

DATED:    Buffalo, New York        Respectfully submitted,
           May 22, 2024

                                          _____

                                          Anthony J. Colucci, III
                                          Paul G. Joyce
                                        COLUCCI & GALLAHER, P.C.
                                          *Attorneys for Plaintiffs*
                                        Office and Post-Office Address
                                          800 Main Place Tower
                                        350 Main Street
                                        Buffalo, New York 14202
                                        ajc3@cgbuffalo.com
                                        pjoyce@cgbuffalo.com
                                        (716) 853-4800

26