# EXHIBIT A

STATE OF NEW YORK
SUPREME COURT  ::  COUNTY OF NIAGARA

_____

CALAMAR CAPITAL SERVICES, LLC
3949 Forest Parkway
Suite 100
Wheatfield, New York 14120

N.A. REALTY FUND II, LLC
3949 Forest Parkway
Suite 100
Wheatfield, New York 14120

INDICAL PARTNERS, LLC
3949 Forest Parkway
Suite 100
Wheatfield, New York 14120

<em>Plaintiffs</em>,

vs.

BCMK INVESTMENT HOLDINGS, LLC
5838 Naples Plaza
Long Beach, California 90803

BRENT E. CAREY
5838 Naples Plaza
Long Beach, California 90803

INDIGO GLOBAL ADVISORS, LLC
5838 Naples Plaza
Long Beach, California 90803

<em>Defendants</em>.

**COMPLAINT**

Index No. _____

_____

Plaintiffs Calamar Capital Services, LLC, N.A. Realty Fund II, LLC and IndiCal Partners, LLC, as and for their Complaint against Defendants Brent E. Carey, BCMK Investment Holdings, LLC, and Indigo Global Advisors, LLC, allege as follows:

1

## THE PARTIES

1.     Plaintiff Calamar Capital Services, LLC (hereinafter "Calamar") is a New York limited liability company with a principal place of business located at 3949 Forest Parkway, Suite 100, Wheatfield, New York 14120.

2.     Plaintiff N.A. Realty Fund II, LLC (hereinafter "N.A. Realty") is a Delaware limited liability company with a principal place of business located at 3949 Forest Parkway, Suite 100, Wheatfield, New York 14120.

3.     Plaintiff IndiCal Partners, LLC (hereinafter "IndiCal") is a Delaware limited liability company with a principal place of business located at 3949 Forest Parkway, Suite 100, Wheatfield, New York 14120.

4.     Defendant BCMK Investment Holdings, LLC (hereinafter "BCMK") is a Delaware limited liability company with a primary place of business located at 5838 Naples Plaza, Long Beach, California 90803.

5.     Defendant Brent E. Carey (hereinafter "Carey") is an individual with a primary place of business located at 5838 Naples Plaza, Long Beach, California 90803.

6.     Upon information and belief, Carey is a manager, controlling member, or officer of BCMK and other related entities, including Indigo Global Advisors, LLC, Indigo Investment Servicing, LLC, Indigo Private Credit Fund, LP, Indigo Private Credit Fund II, LP Indigo Commercial Funding, LLC and Indigo Master Participation, LP.

7.     Defendant Indigo Global Advisors, LLC (hereinafter "IGA") is a Delaware limited liability company with a primary place of business located at 5838 Naples Plaza, Long Beach, California 90803.

8.     Indigo Investment Servicing, LLC (hereinafter "IIS") is a Delaware limited

RECEIVED NYSCEF: 05/22/2024

liability company with a primary place of business located at 5838 Naples Plaza, Long Beach, California 90803.

9.      Indigo Opportunities Fund II, LP, now known as Indigo Private Credit Fund, LP ("Fund II"), is a limited partnership formed under the laws of the State of Delaware and commenced operations on January 1, 2018.

10.     Indigo Commercial Funding, LLC ("ICF") is a limited liability company formed under the laws of the State of Delaware and is presently a subsidiary of Indigo Master Participation, LP.

11.     Indigo Master Participation, LP ("IMP") is a limited partnership formed under the laws of the State of Delaware on November 19, 2021 and commenced operations on December 9, 2021.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the parties pursuant to Civil Practice Law and Rules § 301.

13.     Venue is proper in Niagara County pursuant to Civil Practice Law and Rules § 503(a) and (c) as Calamar, N.A. Realty Fund and IndiCal reside in Niagara County.

## FACTUAL ALLEGATIONS

14.     In 2017 and 2018, Defendant Carey came to Calamar's offices in Niagara County, New York to solicit investors for Fund II.

15.     Defendant Carey was soliciting funds on behalf of Defendants IGA and BCMK, founders of Fund II.

16.     Fund II was formed to syndicate investments in Defendants' debt and lease deals.

17.     Defendants represented that, through various related entities that they own and control, they take the raised capital to invest in special purpose vehicles through the creation or acquisition of secured and/or collateralized loans, performing loans and leases.

18.     Defendants represented and pledged that these investments would generate consistent, absolute returns through payments on loans, cash flow on leases, asset liquidations, and interest paid by borrowers.

19.     As part of Defendants solicitation of Plaintiffs, Defendants assured Plaintiffs that Fund II would provide returns of 8% a year over the life of the fund.

20.     As part of the solicitation, Defendants described Indigo as being founded over a decade before to capitalize on Defendant Carey's success in collateralized loans to lower middle-market commercial and industrial businesses.

21.     Defendants claimed that their management team had significant experience working at GE Capital, Fortress and JP Morgan, including decades of experience in commercial lending, direct asset investing, secondary debt trading and distressed loan management.

22.     Defendants described their investment strategy as an opportunistic investment in commercial loans, with a sole focus in asset-based direct loans backed by commercial collateral.

23.     To entice Plaintiffs into making the investment, Defendants falsely claimed they had special purpose vehicles that would provide annual returns of 8%

and a return of capital, that they had raised over $55,000,000 for the fund and that they were managing more than $250,000,000 in assets.

24.    Defendants claimed that since their inception in 2005, they had only one asset that lost money, and provided numerous examples of transactions that Defendants claimed were profitable.

25.    Defendants claimed their platform was comprised of:

    a.  Direct lending to a range of middle-market commercial and industrial businesses;

    b.  Investments in both seasoned and newly originated loans;

    c.  All loans were backed by hard collateral and accompanied by defined exit strategies in assets valued at lower loan-to-value;

    d.  Active consultation and collaboration with borrowers to resolve loans in the most advantageous manner to the investors;

    e.  Underwriting the investments to a downside case scenario or a liquidation of the collateral to allow investors to recover their capital investment while maintaining the targeted return.

26.    To further entice Calamar to invest, Defendants promised that Calamar would have the ability to roll its investment into a larger fund, would receive greatly reduced fees, and would obtain approximately 30% of the general partnership metrics.

27.    Defendants claimed this would allow Calamar to benefit from additional capital raised by Defendants.

28.     Defendants also claimed that Fund II would be targeting a return on invested capital of over 20%, but since Plaintiffs would own 30% of the general partnership, the returns would be significantly higher.

29.     Calamar created and is the managing member of N.A. Realty Fund, IndiCal and Glacier Point Partners, LLC ("Glacier Point") (another entity owned and controlled by Plaintiffs) to facilitate management of the investment.

30.     As a result of the promises of returns and control, Calamar chose to make an investment, and funded N.A. Realty Fund with an initial investment of $4,000,000.

31.     N.A. Realty Fund is the sole member of IndiCal; Calamar is the manager of IndiCal.

32.     To increase their own returns while transferring the risk to investors, Defendants used separate entities that they own, manage and control to service the special purpose vehicles, including Fund II.

33.     Upon information and belief, Defendants created ICF as a separate bankruptcy-remote special purpose vehicle whose sole purpose is to make investments on behalf of another fund run by Defendants (IMP) and the various feeder funds that Defendants use to invest in IMP.

34.     Fund II was, until December 9, 2021, the owner of all of the membership interests in ICF.

35.     The primary purpose of Fund II, through ICF, was to generate returns through capital appreciation obtained through the creation or acquisition of secured and/or collateralized loans, performing loans and leases.

36.     As a result of the inducement to invest in Defendants' scheme, Defendant Carey, Defendant BCMK and Calamar (through its subsidiary Glacier Point) formed IGI Partners II, LLC ("IGI Partners II") to serve as the general partner of Fund II.

37.     N.A. Realty Fund used the $4,000,000 to fund IndiCal; IndiCal in turn invested the $4,000,000 to become a limited partner in Fund II.

38.     The $4,000,000 investment was made up of the following wires to Fund II: January 9, 2018 - $1,050,000; February 13, 2018 - $1,200,000; March 29, 2018 - $260,000; and September 26 - $1,490,000.

39.     The Class A members of IGI Partners II are Glacier Point, BCMK, and Indigo Senior Executive Holdings, LLC. The Class B members of IGI Partners II are Glacier Point and Kite Capital Holdings, LLC. A true and accurate copy of the Amended and Restated Limited Liability Company Operating Agreement for IGI Partners II is attached as Exhibit A.

40.     Class A members of IGI Partners II are allocated a proportionate share of the net profit and/or the net loss from operations.

41.     Class B members of IGI Partners II are allocated a proportionate share of the net profit and/or net loss from fund investment(s). Furthermore, the obligations of IGI Partners II arising from the investment in Fund II are borne solely by the Class B Members, insulating Defendants Carey and BCMK from financial harm.

42.     Under the terms of the Operating Agreement, IGI Partners II's Management Committee had the following powers:

> (a) To manage the Company's assets, including without limitation, to (i) invest the capital contributions of the Class B Members in one or more pooled investment vehicles, including Fund II or to loan such capital contributions to one or more third parties, one

or more of its Affiliates and/or to Fund II on such terms and in such amounts as determined by the Management Committee in its sole discretion,...

43.    A majority of IGI Partners II's Management Committee is needed to make such an investment.

44.    Under the terms of the Operating Agreement, the following actions required a unanimous vote of the Management Committee:

    (i)     materially changing the terms of Fund II;
    (ii)    changing the Company's service providers or service provider agreements;
    (iii)   materially changing the Company's governance structure;
    (iv)   taking action that could materially affect the revenue sharing arrangement described in the agreement between Indigo Global Advisors, LLC and Glacier Point Partners, LLC;
    (v)    materially changing Fund II 's investment objectives, strategy and/or policies; ...
    (viii)  extending Fund II 's term beyond the fifth anniversary of the Final Closing (as defined in the Partnership Agreement); and
    (ix)   amending the Certificate and/or this Agreement.

45.    IGI Partners II had both fiscal and management responsibility for Fund II, including the sole authority to bind Fund II.

46.    The individual representatives on IGI Partners II's management committee are Damon Wojciechowski and Defendant Carey.

47.    Mr. Wojciechowski is the president of Calamar.

48.    As set forth in the Operating Agreement, Mr. Wojciechowski has control of the management committee in the event of any disagreement with Defendant Carey.

49.    At first, Mr. Wojciechowski would be informed about potential investments and vote to approve or disapprove.

8

50.     This practice eventually ceased, with Defendants ignoring the Operating Agreement and refusing to keep Plaintiffs or Mr. Wojciechowski informed.

51.     As part of the investment scheme, Defendants use several related & controlled entities to work on the investments, charging fees that benefit themselves over the investors.

52.     For example, Indigo Investment Servicing, LLC ("IIS") serves as the servicer of the loans purchased by ICF. Once a loan is purchased or a new loan origination is completed, IIS charges a monthly loan servicing fee that is paid to IIS. The fee is equal to 1% per annum of the principal balance of the loan (or property values where the investment has been foreclosed).

53.     Upon information and belief, ICF incurred $340,915 of servicing fees for the year ending December 31, 2021.

54.     IIS also paid documentation fees on loans that originated through ICF. Upon information and belief, for the fiscal year ending December 31, 2021, IIS earned $73,075 in documentation fees.

55.     Another related entity is Indigo Direct Lending, LLC ("IDL"). IDL is the loan originator for some loans acquired by ICF. Upon information and belief, in 2021, IDL received $495,863 in loan and lease transaction or origination fees from ICF on the loans and leases acquired by or originated by ICF.

56.     Defendant IGA serves as ICF's (and in turn, ICF's owner IGI Partners II) investment manager. When Defendants presented the investment to Plaintiffs, they claimed that IGA's role was to construct and manage private credit portfolios of

9

secured commercial loans with the objective of generating income and preserving capital.

57.    Defendants also claimed that IGA's strategy is focused on building diversified portfolios of high grade commercial mortgages and commercial equipment loans and leases to generate consistent income and gains, with the commercial mortgage strategy centered on Small Business Administration (SBA) 504 qualified loans, and commercial equipment finance strategy focused on loans and leases secured by critical-use, revenue-generating equipment used in core segments of the U.S. economy.

58.    Defendants also claimed that IGA carefully manages risk exposure through prudent selection, comprehensive credit underwriting, diversification, and systematic portfolio rotation to shorten duration.

59.    In actuality, IGA did not use any restrictions on credit quality for the investments.

60.    To induce Plaintiff's investment in IGI Partners II (and in turn, Fund II), Defendants intentionally misrepresented, intentionally deceived and failed to disclose to Plaintiffs material facts concerning the investments and IGI Partners II, including:

   a. Intentionally failing to disclose to Plaintiffs their plan to use Plaintiffs' investment for other related Indigo entities that Plaintiffs were not participating or involved in;

   b. Operating IGI Partners II in a manner that renders the goals of the Operating Agreement false, deceptive, and misleading;

c. Intentionally omitting from the presentation and Operating Agreement the significant "soft costs" that come out of the investment and flow directly to related entities of the Defendants, including legal, accounting, servicing, origination, and management fees;

d. Intentionally misrepresenting that the Rate of Return for Plaintiffs' investment would be at least 8% annually;

e. Intentionally misrepresenting that Plaintiffs would realize and receive budgeted distributions from their investments and from operating profits;

f. Intentionally misrepresenting that the Plaintiffs' investment would be in a diversified investment to minimize risk, and instead overloading the investment in a single, high-risk vehicle;

g. That Defendants intended to cause and arrange for IGI Partners II to divest itself of its entire investment in Fund II, without any return on investment for Plaintiffs;

h. Intentionally failing to disclose that Defendants were going to operate IGI Partners II in breach of the Operating Agreement to benefit themselves, as Defendants did not have the authority to divest IGI Partners II's interest in Fund II without the consent and approval of the Management Committee, thereby rendering the divestment legally unenforceable and non-binding; and

i. Making management decisions without Plaintiffs' consent and in breach of Section 6 of the Operating Agreement, and enabling Defendants to

11

surreptitiously, deceptively and without Plaintiff's consent use and spend Plaintiff's investment to support other Indigo Entities and illicitly gain fees for services.

61.    As of December 31, 2020, the total committed capital of Fund II was $6,175,000, including the $4,000,000 investment from Plaintiffs.

62.    For its investments, Fund II used the direct finance method of accounting to record leases and related interest income. At inception of a lease, Fund II records the lease as an asset, the aggregate future minimum lease payments as a receivable, plus the estimated residual value of the leased equipment, if any. Residual values are established at lease inception based on our estimate of the expected fair value of the equipment at the end of the lease term, based on industry data, management's experience, and historical performance.

63.    As of December 31, 2020, the leases being held as assets of Fund II were identified to Plaintiffs as: Charles Deweese Construction, Inc., DHA: Package One, PWSC, STL Truckers, Clear Align LLC, CS America, Inc, Royal Express, Inc, Metal Services, LLC, and Shadow Systems, LLC. Defendants informed Plaintiffs that the future minimum lease payments receivable for the direct financing leases totaled $7,526,072 through 2025.

64.    Fund II also invested in loans. As of December 31, 2020, the loans being held as assets by Fund II included Peak Oil Holdings, LLC, SLF - KC Towers, LLC - Lien 2, 3510 N Broadway, 2927 Market St BCB, LLC, Harry R. Dodge, Highnet LLC, 15319 Wyandotte Street LLC and Coda Holdings, LLC.

65.     As of December 31, 2020, the assets of Fund II were $21,977,512, including $12,703,202 investment value in performing loans, $150,000 in non-performing loans, and $7,526,072 in leases.

66.     Out of the $12,703,202 in the performing loans held as investments by Fund II, the investment value of the loan to Peak Oil Holdings, LLC ("Peak") was $4,000,000.

67.     Peak is an oil company in California. The loan to Peak was collateralized with oil wells and equipment necessary to drill oil wells.

68.     Upon information and belief, at the time that Defendants authorized and provided the loan to Peak, the County of Ventura had refused to allow Peak's requests for zoning clearances, which in turn prevented Peak from drilling. This effectively forced Peak Oil Holdings to cease operations.

69.     Upon information and belief, despite knowing about the cessation of operation, Defendants used the capital provided by Plaintiffs to fund the loan.

70.     Upon information and belief, there was a theft at Peak that resulted in an approximate $1,800,000 payout on an insurance claim.

71.     Upon information and belief, Defendants' failure to obtain and enforce adequate collateral for the $4,000,000 loan resulted in the insurance payment being lost.

72.     In June of 2021, Mr. Wojciechowski requested that Defendant Carey ensure the loans (that collateralized the investment) were being paid.

73.     Defendant Carey informed Mr. Wojciechowski that the loan proceeds were being reinvested to serve as collateral for additional loans.

13

74.     Upon information and belief, on December 9, 2021, Fund II was restructured.

75.     Neither Mr. Wojciechowski nor the Plaintiffs were informed of Fund II's restructuring.

76.     Neither Mr. Wojciechowski nor the Plaintiffs approved of Fund II's restructuring.

77.     On the same day (December 9, 2021), Fund II, the sole owner of ICF, contributed its full interest (with the exception of one of ICF's investments) in ICF to IMP.

78.     Neither Plaintiffs nor Mr. Wojciechowski were informed about the assignment of Fund II's interest to IMP.

79.     Neither Plaintiffs nor Mr. Wojciechowski approved the assignment of its interest in ICF to IMP.

80.     The restructuring resulted in ICF becoming 100% owned by IMP, Defendants newly formed entity.

81.     Because ICF became 100% owned by IMP, Fund II lost all of its ownership in ICF for no consideration.

82.     As of December 31, 2021, the assets of Fund II were $5,633,734, with the sole loan being the Peak loan, then valued at $2,966,976 & described as "performing" but with no payments made in over a year.

83.     Rather than comply with their purported investment strategy, Defendants left the largest risk item as the sole remaining loan in Fund II's portfolio.

14

84.    Upon information and belief, at the time of the transfer Defendants knew or should have known that the Peak loan was unperforming and that Peak had been effectively shut down by the County of Ventura.

85.    As of December 31, 2021, pursuant to the audited financial statements, there were no future lease payments.

86.    According to the financial statements provided by Defendants, Fund II lost $16,343,778 in assets from December 31, 2020 to December 31, 2021 through the uncompensated transfer of its assets to ICF.

87.    Some of the assets simply disappeared, such as the loans identified as SLF - KC Towers, LLC - Lien 2, 3510 N Broadway, 2927 Market St BCB, LLC, Harry R. Dodge, Highnet LLC, and 15319 Wyandotte Street LLC. These loans appear as assets on the Fund II 2020 financial statements, but not on the 2021 Fund II financial statements, the 2021 IMP financial statements, or the 2021 ICF financial statements.

88.    Defendants did not, and cannot, explain where these investments went.

89.    Defendants also did not explain why the leases in Charles Deweese Construction, Inc., DHA: Package One, PWSC, STL Truckers, Clear Align LLC, CS America, Inc, Royal Express, Inc, Metal Services, LLC, and Shadow Systems, LLC were no longer in Fund II's asset portfolio or how much was paid for those assets, despite the leases going through 2025.

90.    Defendants also did not explain why the leases PWSC, STL Truckers, Clear Align LLC, CS America, Inc, Royal Express, Inc, Metal Services, LLC, and Shadow Systems, LLC were transferred to ICF without consideration.

15

91.     In effect, Defendants distributed $16,343,778 in Fund II's assets to their related entities without authority or consideration, leaving the bad, unperforming loan in Peak as Fund II's sole asset.

92.     Defendant IGA is the investment manager for IMP.

93.     Upon information and belief, Indigo Master Participation GP, LLC, an entity related to and controlled by Defendants is the general partner of IMP.

94.     IGI Partners II is not an owner, partner or beneficiary of IMP.

95.     Upon information and belief, ownership of IMP was determined in accordance with capital contributions made by Indigo Private Credit Fund I, LP and Indigo PC-III Private Account 1, LP.

96.     Plaintiffs are not owners, managers, partners or beneficiaries in Indigo Private Credit Fund I, LP.

97.     Plaintiffs are not owners, managers, partners or beneficiaries in Indigo PC-III Private Account 1, LP.

98.     Upon information and belief, Fund II contributed the book value of its business in the amount of $2,093,963, while Indigo PC-III Private Account 1, LP contributed $3,000,000 in cash.

99.     As of December 31, 2021, IMP held a 100% ownership interest in ICF.

100.    Plaintiffs and Mr. Wojciechowski have asked for documentation from Defendants regarding the restructuring of Fund II and the sale or transfer of its assets.

101.    Defendants have failed and refused to provide any documentation regarding the restructuring of Fund II.

102. Defendants have failed and refused to provide any documentation regarding Plaintiffs role or benefit from the restructuring of Fund II.

103. The investment structure of IMP is significantly different than that of IGI Partners II. For example,

   a. Approximately 97.1% of IMP's net assets consist of an investment in a bankruptcy remote SPV;

   b. The value of the investment in the SPV has uses the net asset value of IMP's ownership interest in capital of the SPV;

   c. IMP has no right to redeem a partial or complete interest in this investment; and

   d. distributions will be received as the underlying investments in the fund are liquidated.

104. In effect, once Defendants contributed Fund II's full interest in ICF to IMP, Plaintiffs lost all control over their investment to the benefit of Defendants.

105. Defendants, in various financial statements, have also claimed that ICF was owned 100% by Indigo Private Credit Fund I, LP, not Fund II.

106. Upon information and belief, in the same time period, Fund II made an investment in Indigo Commercial Funding I-C, LLC.

107. Neither Plaintiffs nor Mr. Wojciechowski were informed about this investment.

108. Upon information and belief, Indigo Commercial Funding I-C, LLC does not exist.

109.    Plaintiffs and Mr. Wojciechowski have asked for documentation from Defendants regarding the purported Indigo Commercial Funding I-C, LLC investment.

110.    Defendants have failed and refused to provide any documentation regarding this transaction.

111.    Upon information and belief, the investment in Indigo Commercial Funding I-C, LLC was a subterfuge to channel Plaintiffs' investments to related Indigo entities.

112.    By Defendants engineering the contribution of FundII's interest in ICF to IMP, they devalued all of Plaintiffs' investment in IGI Partners II.

113.    By Defendants engineering the contribution of Fund II's interest in ICF to IMP, they removed Plaintiffs' ability to control its investments.

114.    Defendants Carey, BCMK, and IGA's representations regarding the investment of IGI Partners II's capital were intentionally deceitful and false.

115.    Defendants Carey, BCMK, and IGA's actions in taking IGI Partners II's capital investment without the knowledge or consent of the Management Committee were intentionally deceitful and false.

116.    Defendants Carey, BCMK, and IGA knew the statements were false and misleading when they made representations to the Plaintiffs and took the actions divesting the Plaintiffs of their capital investment.

117.    Upon information and belief, Defendants Carey, BCMK, and IGA willfully, wrongfully, recklessly, and deceitfully induced Plaintiffs to make investments in order to obtain capital for other Indigo funds and to generate service, orientation and management fees for Indigo Entities that they control and derive income from.

18

118.    Plaintiffs justifiably relied on the representations of Defendants Carey, BCMK and IGA. If not for such representations and omissions, Plaintiffs would not have been induced to make an investment in IGI Partners II and Fund II.

119.    By reason of all of the foregoing, Plaintiffs' investments have been rendered worthless, and Plaintiffs have neither received any return on their investment nor any documentation as to where their investment is currently. Plaintiffs have been injured and damaged and demand restitution and damages in the amount of their investment.

120.    After Plaintiffs' entry into the IGI Partners II's Operating Agreement and becoming investors in Fund II, Defendants Carey, BCMK and IGA have grossly, willfully and intentionally engaged in deceitful conduct in violation of the terms of the Operating Agreement, have recklessly mismanaged IGI Partners II, appropriated millions of dollars of capital to fund other Indigo Entities, and have willfully and wrongfully engaged in acts and conduct in breach of their duty and obligations as Management Committee members and their duty as fiduciaries to IGI Partners II and Plaintiffs.

121.    Continuing their shell game and subterfuge, in January of 2023 Defendants provided a "Wind Down Plan" for Fund II. Notably, the "Wind Down Plan" identified lease assets that were on Fund II's 2020 financials but not its 2021 financials (Clear Align LLC, Royal Express, Inc., Metal Services, LLC, and Shadow Systems, LLC) and also lease assets that were not on either the 2020 or 2021 Fund II financials (Metal Services, LLC 2, Shadow Systems, LLC 2, Shadow Systems, LLC 3, and Core Scientific) but were identified on ICF's 2021 financial statements.

122.   Of note, the non-performing Peak loan was included as an asset on the "Wind Down Plan," with an investment balance as of September 30, 2022 of $3,939,767 (the same amount as in the 2020 and 2021 financials).

123.   When asked to explain the "Wind Down Plan," Defendants were unable to explain where the investments came from, the basis for their value, or why Defendants failed to maximize the value before selling the assets.

124.   In 2023, Plaintiffs requested a withdrawal of all of its capital account in IGI Partners II.  The request was to withdraw the capital account in an orderly manner, due to the Defendants' unilateral implementation of a material change to Fund II's investment objective and/or strategy and the Defendants material breach by IGI Partners II's investment policies.

125.   Plaintiffs' request has been ignored, and its capital investment has not been returned.

126.   Upon information and belief, Plaintiffs' capital investment has not been returned because IGI Partners II has no assets and because Defendants are using it as collateral for the credit facility of another loan from Cadence Bank.

127.   In further breach of their contractual obligations and also in breach of their statutory duties and their fiduciary duties in their capacities as members of the Management Committee and IGI Partners II's financial wellbeing, and as inside individuals of IGI Partners II, and with superior knowledge and access to financial and other data unavailable to Plaintiffs, Defendants Carey, BCMK and IGA, on information and belief, falsely represented the transaction to Cadence Bank (ICF's commercial credit facility) to obtain an extension and increase in IMP's credit facility.

128.    The breaches and misconduct by Defendants Carey, BCMK and IGA as described above are wrongful, willful, intentional, deceitful, and not in good faith, and constitute willful misconduct under the Operating Agreement.

129.    As a result of their willful misconduct, Defendants Carey and BCMK are therefore not entitled to indemnification under the Operating Agreement and the court should restrain and prohibit Defendants Carey, BCMK and any related entity from obtaining indemnification or any similar payments from IGI Partners II or under the IGI Partners II's Operating Agreement, or from any affiliate of the IGI Partners II.

## AS AND FOR A FIRST CAUSE OF ACTION
### Breach of Contract

130.    Plaintiffs repeat paragraphs 1 through 129.

131.    Defendants Carey and BCMK, as members of the Management Committee, have breached their contractual obligations and participated in breaches of the Operating Agreement as set forth above.

132.    Plaintiffs have performed all of the terms of the Operating Agreement on their part required to be performed.

133.    Plaintiffs have suffered loss of their investment by reason of such breaches and have been damaged in the sum of not less than $4,000,000, plus interest as set forth above, and additionally have been damaged the loss of value of their investments and the loss of value in IGI Partners II and Fund II, as alleged above, and demand restitution and damages of $4,000,000 plus interest at the highest amount allowed by law.

## AS AND FOR A SECOND CAUSE OF ACTION

134.    Plaintiffs repeat paragraphs 1 through 133.

21

135.    Defendant IGA, as the investment manager for IGI Partners II, owed IGI Partner II a duty to recommend viable investment options and to obtain consent from IGI Partners II's Management Committee.

136.    Upon information and belief, IGA intentionally and willfully facilitated the transfer of IGI Partners II's capital investment for no consideration, resulting in a total loss of the Plaintiffs' investment.

137.    Defendant IGA breached its duty to IGI Partners II and the Plaintiffs by facilitating the transfer of IGI Partners II capital to a different Indigo entity under the control of Defendants Carey, BCML and IGA.

138.    Plaintiffs have suffered loss of their investment by reason of such breach and have been damaged in the sum of not less than $4,000,000, and additionally have been damaged the loss of value of their investments and the loss of value in IGI Partners II and Fund II, as alleged above, and demand restitution and damages of $4,000,000 plus interest at the highest amount allowed by law.

### AS AND FOR A THIRD CAUSE OF ACTION
#### BREACH OF FIDUCIARY DUTY

139.    Plaintiffs repeat paragraphs 1 through 138.

140.    Plaintiffs had a confidential relationship with Defendants.

141.    Defendants had a fiduciary duty to Plaintiffs in connection with the investments and other transactions with respect to the Plaintiffs' investment.

142.    Defendants' representations and guarantees regarding the investments were false when made.

143.    Plaintiffs reasonably relied upon the representations to their detriment.

22

144. Defendants made the representations with the intent to deceive Plaintiffs and for the purpose of inducing Plaintiffs to invest.

145. As a result of Defendants' breach of fiduciary duty, Plaintiffs have sustained money damages in a sum to be determined by the trier of fact, exceeding $4,000,000.

## AS AND FOR A FOURTH CAUSE OF ACTION
### CONVERSION

146. Plaintiffs repeat paragraphs 1 through 145.

147. Plaintiffs invested in the Indigo securities in the Private Offering due to Carey, BCMK and others' misrepresentations.

148. Plaintiffs have demanded that Defendants return the invested funds to Plaintiffs.

149. To date, none of the invested funds has been returned.

150. Defendants have retained Plaintiffs' capital investment and used it for their own purposes.

151. Plaintiffs have been deprived of their money.

152. Plaintiffs have suffered damages in an amount to be determined at trial, but no less than $4,000,000.

153. As a result of Defendants' conversion, Plaintiffs have sustained money damages in a sum to be determined by the trier of fact, exceeding $4,000,000.

## AS AND FOR A FIFTH CAUSE OF ACTION
### MONIES HAD AND RECEIVED

154. Plaintiffs repeat paragraphs 1 through 153.

23

155.    Defendants took $4,000,000 in capital from Plaintiffs to invest in their own funds.

156.    Defendants used the $4,000,000 in capital from Plaintiffs to induce Cadence Bank to increase and extend their credit facility, with no benefit to Plaintiffs.

157.    Plaintiffs have demanded that the $4,000,000 in capital be returned.

158.    Defendants have refused to return the $4,000,000 in capital.

159.    Defendants are liable for monies had and received.

160.    As a result of defendants' wrongful conduct, Plaintiffs have sustained money damages in a sum to be determined by the trier of fact, exceeding $4,000,000.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Fraud In the Inducement

161.    Plaintiffs repeat paragraphs 1 through 160.

162.    Plaintiffs have been injured and damaged by the aforesaid intentional, willful and reckless acts, inducement and conduct of Defendants Carey, BCMK, and IGA. If not for such acts by defendants, Plaintiffs would not have become investors in IGI Partners II and Fund II.  Plaintiffs demand rescission of the Operating Agreement and restitution and damages of $4,000,000, plus interest.

163.    Such conduct was and is intentionally wrongful, willful, deceitful and constitutes willful misconduct under the Operating Agreement and Plaintiffs additionally demand punitive damages from Defendants Carey, BCMK, and IGA as a penalty for and deterrent against such egregious, wantonly dishonest, and harmful conduct implicating fraudulent motive and criminal indifference to their civil contractual and fiduciary obligations.

164. Based on the facts set forth above, Defendants have been unjustly enriched at the expense of Plaintiffs.

165. As a result of defendants' wrongful conduct, Plaintiffs have sustained money damages in a sum to be determined by the trier of fact, exceeding $4,000,000.

**WHEREFORE**, Plaintiffs Calamar Capital Services, LLC, N.A. Realty Fund II, LLC and IndiCal Partners, LLC, respectfully demand judgment against Defendants as follows:

i. On their first cause of action, monetary damages to be determined at trial in an amount not less than $4,000,000;

ii. On their second cause of action, monetary damages to be determined at trial in an amount not less than $4,000,000;

iii. On their third cause of action, monetary damages to be determined at trial in an amount not less than $4,000,000;

iv. On their fourth cause of action, monetary damages to be determined at trial in an amount not less than $4,000,000;

v. On their fifth cause of action, monetary damages to be determined at trial in an amount not less than $4,000,000;

vi. On their sixth cause of action, monetary damages to be determined at trial in an amount not less than $4,000,000;

vii. Such other and further relief as this Court deems just, proper, and equitable.

DATED:      Buffalo, New York          Respectfully submitted,
            May 22, 2024

                                       _____
                                       Anthony J. Colucci, III
                                       Paul G. Joyce
                                       COLUCCI & GALLAHER, P.C.
                                       *Attorneys for Plaintiffs*
                                       Office and Post-Office Address
                                       800 Main Place Tower
                                       350 Main Street
                                       Buffalo, New York 14202
                                       ajc3@cgbuffalo.com
                                       pjoyce@cgbuffalo.com
                                       (716) 853-4800

RECEIVED NYSCEF: 05/22/2024

# EXHIBIT A

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY**

**OPERATING AGREEMENT**

**OF**

**IGI PARTNERS II, LLC**

**As of**

**September 1, 2018**

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ................................................................................ 1

ARTICLE II GENERAL ..................................................................................... 6

    2.1    Name ................................................................................................. 6
    2.2    Term ................................................................................................. 6
    2.3    Registered Office and Agent ........................................................... 6
    2.4    Business of the Company ................................................................. 6
    2.5    Limitation of Liability ..................................................................... 7
    2.6    Treatment of Company .................................................................... 7

ARTICLE III CAPITAL CONTRIBUTIONS ..................................................... 7

    3.1    Capital Contributions ...................................................................... 7
    3.2    Capital Accounts ............................................................................. 7
    3.3    No Interest ....................................................................................... 8
    3.4    Withdrawal of Capital ..................................................................... 8

ARTICLE IV MEMBERSHIP; MEETINGS ....................................................... 8

    4.1    Admission of Additional Members .................................................. 8
    4.2    Admission of New Members ............................................................ 8
    4.3    Representations and Warranties ...................................................... 8
    4.4    Expenses of the Company ............................................................... 8
    4.5    Management of Business ................................................................. 8
    4.6    Dissociation of a Member ............................................................... 9
    4.7    Rights of Dissociated Member ........................................................ 9
    4.8    Reserved ........................................................................................ 10
    4.9    Place of Meetings .......................................................................... 10
    4.10   Meetings; Notice ........................................................................... 10
    4.11   Quorum ......................................................................................... 11
    4.12   Waiver of Notice ........................................................................... 11
    4.13   Action by a Class A Member without a Meeting ......................... 11
    4.14   Members May Participate in Other Activities .............................. 12
    4.15   Confidentiality .............................................................................. 12

ARTICLE V TRANSFER AND ASSIGNMENT OF INTERESTS .................... 12

    5.1    Restrictions on Transfer; Substitution of Members ...................... 12
    5.2    Consent Necessary to Transfer of Interests .................................. 12
    5.3    Conditions of Transfer .................................................................. 13
    5.4    Effect of Transfer without Approval .............................................. 13
    5.5    Liability for Breach ....................................................................... 13

ARTICLE VI MANAGEMENT........................................................................................ 13

   6.1    Management Committee........................................................................... 13
   6.2    Management Committee Members........................................................... 13
   6.3    Management Committee Approvals ......................................................... 14
   6.4    Vacancies; Resignations ......................................................................... 15
   6.5    Action by the Management Committee; Reliance by Third Parties ...................... 16
   6.6    Management Committee Members May Engage in Activities Which Compete
        with the Company..................................................................................... 16
   6.7    Devotion of Time ..................................................................................... 16
   6.8    Indemnification ....................................................................................... 16

ARTICLE VII ALLOCATIONS OF NET PROFIT AND NET LOSS AND DISTRIBUTIONS
.................................................................................................................................. 16

   7.1    Allocations of Net Profits and Net Losses............................................... 16
   7.2    Tax Allocations....................................................................................... 18
   7.3    Determinations of Allocations of Profits and Losses ............................. 19
   7.4    Distributions........................................................................................... 19
   7.5    Deficit Capital Accounts......................................................................... 21

ARTICLE VIII BOOKS AND RECORDS ....................................................................... 21

   8.1    Records and Reports ............................................................................... 21
   8.2    Returns and Other Elections ................................................................... 22
   8.3    Partnership Representative...................................................................... 22

ARTICLE IX DISSOLUTION AND WINDING UP ....................................................... 23

   9.1    Dissolution ............................................................................................. 23
   9.2    Winding-up ............................................................................................. 23
   9.3    Distribution of Assets on Dissolution ..................................................... 23
   9.4    Distributions in Kind............................................................................... 24
   9.5    Certificate of Cancellation ...................................................................... 24

ARTICLE X MISCELLANEOUS PROVISIONS............................................................. 24

   10.1   Notices ................................................................................................... 24
   10.2   Application of Law .................................................................................. 25
   10.3   No Action for Partition ........................................................................... 25
   10.4   Headings and Sections ........................................................................... 25
   10.5   Amendments ........................................................................................... 25
   10.6   Number and Gender................................................................................ 25
   10.7   Binding Effect......................................................................................... 25
   10.8   Counterparts........................................................................................... 25
   10.9   Arbitration.............................................................................................. 25
   10.10  Severability ............................................................................................ 26
   10.11  Entire Agreement ................................................................................... 26

ii

10.12  Insurance ................................................................................ 26

<u>EXHIBIT A</u> CLASS A MEMBERS AND CLASS B MEMBERS
<u>EXHIBIT B</u> MANAGEMENT COMMITTEE

## AMENDED AND RESTATED LIMITED LIABILITY COMPANY
## OPERATING AGREEMENT OF IGI PARTNERS II, LLC

This Amended and Restated Limited Liability Company Operating Agreement (as further amended, restated or supplemented from time to time in accordance with the terms hereof, the "Agreement") of IGI Partners II, LLC (the "Company") is made as of September 1, 2018 (the "Effective Date") by and among the individuals and/or entities admitted to the Company as members (the "Members").

## RECITALS

WHEREAS, the Company was formed under the laws of the State of Delaware pursuant to a Certificate of Formation, which was filed on January 10, 2017 with the Office of the Secretary of State of the State of Delaware, and pursuant to a limited liability company operating agreement dated March 28, 2017 ("Original Agreement"); and

WHEREAS, the parties desire to amend and restate the Original Agreement in its entirety as hereinafter set forth to provide for the governance and operation of the Company on the terms set forth herein.

NOW, THEREFORE, in consideration of the mutual promises and agreements herein set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree that the Original Agreement shall be amended and restated in its entirety to read as follows:

## ARTICLE I
## DEFINITIONS

The following terms used in this Agreement will have the meanings set forth below, unless the context otherwise requires:

| | |
|---|---|
| *Act* | The Delaware Limited Liability Company Act, as amended. |
| *Adjusted Capital Account Deficit* | With respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Period, after giving effect to the following adjustments: (a) credit to such Capital Account any amounts that such Member is obligated to restore or is deemed to be obligated to restore pursuant to the Treasury Regulations under Section 704 of the Code and (b) debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith. |

1

| | |
|---|---|
| *Affiliate* | With respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person, whether through the ownership of voting securities, by contract or otherwise, or any other Person who is an officer, director, general partner or manager of, or the record and beneficial owner of 10% or more of the equity interests in, any other Person. |
| | For purposes of this definition "*control*" (including with correlative meanings, the terms "*controlling*," "*controlled by*," and "*under common control with*") as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person. |
| *Agreement* | This Amended and Restated Limited Liability Company Operating Agreement, as it may be amended from time to time. |
| *Assignee* | A Person that is assigned a Class A Interest and/or a Class B Interest, as applicable, but is not admitted as a Class A Member or a Class B Member, as applicable, and has no right to vote or to participate in the management of the business and affairs of the Company but shall be allocated Net Profit from Operations and/or Net Loss from Operations, if assigned a Class A Interest, or allocated Net Profit from Fund Investment(s) and/or Net Loss from Fund Investment(s), if assigned a Class B Interest, unless otherwise provided herein. |
| *Business Day* | Any day excluding Saturday, Sunday and any day on which the New York Stock Exchange and the Nasdaq Stock Market are closed. |
| *Capital Account* | The account established for each Member maintained in a manner that the Management Committee determines is in accordance with Treasury Regulations Sections 1.704-1(b) and 1.704-2. |
| *Carried Interest* | All amounts distributable to the Company by Fund II pursuant to Sections 3.5(b)(iii), 3.5(b)(iv)(A), 3.6 and 103 of the Partnership Agreement. |
| *Certificate* | The Company's Certificate of Formation. |
| *Class A Interest* | The Class A limited liability company membership interests of the Company. |
| *Class A Member* | Each Member who holds a Class A Interest. Each Class A Member shall be allocated a proportionate share of the Net Profit from Operations and a proportionate share of the Net Loss from Operations. |
| *Class B Interest* | The Class B limited liability company membership interests of the Company. |

2

| | |
|---|---|
| *Class B Member* | Each Member who holds a Class B Interest. Each Class B Member shall be allocated a proportionate share of the Net Profit from Fund Investment(s) and a proportionate share of the Net Loss from Fund Investment(s). Any obligations of the Company arising from its investment in Fund II shall be borne solely by the Class B Members. The Class B Members shall jointly and severally indemnify the Class A Members from and against any claims, liabilities and expenses of the Company arising out of the Company's investment in Fund II. |
| *Code* | The Internal Revenue Code of 1986, as amended (or any corresponding provision of succeeding law). |
| *Company* | IGI Partners II, LLC, a Delaware limited liability company. |
| *Dissociated Member* | Has the meaning provided for in Section 4.6 hereof. |
| *Dissociated Member Event* | Has the meaning provided for in Section 4.7 hereof. |
| *Fiscal Period* | The calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Period shall be the period that conforms to its taxable year. |
| *Fund II* | Indigo Opportunities Fund II, L.P. |
| *Hypothetical Tax Amount* | With respect to each Member, an amount equal to the hypothetical tax payable by each Member with respect to items of Company income, gain, loss, deduction and expense allocated for tax purposes to such Member, determined by taking into account the maximum combined United States federal, state and local tax rates applicable to any Member on ordinary incomes and net short-term capital gain or on net long-term capital gain, as applicable, and taking into account the deductibility of state and local income taxes for United States federal income tax purposes and such other reasonable assumptions as the Partnership Representative determines in good faith (all of which assumptions shall be applied equally to each Member regardless of its status). |
| *Indemnitee* | Has the meaning provided for in Section 6.8 hereof. |
| *Interest* | The Class A Interest and/or Class B Interest, as the context requires, and all rights and liabilities associated therewith, at any particular time, including, without limitation, rights to distributions (liquidating or otherwise), allocations, information and to consent to or approve of various matters related to the Company, as provided in this Agreement. |

3

| | |
|---|---|
| *Interest Percentage* | With respect to any class, group or series of Interests, the proportion of Interests of such class, group or series held by one or more specified holders of such Interests over the total number of Interests of such class, group or series. |
| *Management Committee* | The committee established to manage the day-to-day operations of the Company. |
| *Management Committee Members* | The individuals set forth on <u>Exhibit B</u>. |
| *Member* | Each Person designated as a Member on <u>Exhibit A</u>. |
| *Net Loss from Fund Investment(s)* | The net loss incurred by the Company with respect to its capital contributions to Fund II. |
| *Net Loss from Operations* | The net loss of the Company (e.g., the extent to which the Company's Operating Expenses exceed Carried Interest received by the Company from Fund II) with respect to a Fiscal Period, excluding any Net Loss from Fund Investment(s) during such Fiscal Period. |
| *Net Profit from Fund Investment(s)* | The net income received by the Company with respect to its capital contributions to Fund II. |
| *Net Profit from Operations* | The net income of the Company (e.g., the extent to which Carried Interest received by the Company from Fund II exceeds the Company's Operating Expenses) with respect to a Fiscal Period, excluding any Net Profit from Fund Investment(s) during such Fiscal Period. |
| *Nonrecourse Deductions* | Has the meaning set forth m Treasury Regulations Section 1.704-2(b)(1). |
| *Nonrecourse Liability* | Has the meaning set forth in Treasury Regulations Sections 1.704-2(b)(3) and 1.752-1(a)(2). |
| *Partnership Minimum Gain* | Has the meaning set forth in Treasury Regulations Sections 1.704-2(b)(2) and 1.704-2(d). |
| *Partner Nonrecourse Debt* | Has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4). |
| *Partner Nonrecourse Debt Minimum Gain* | An amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulation Section 1.704-2(i)(3). |

4

| | |
|---|---|
| *Partner Nonrecourse Deductions* | Has the meaning set forth in Treasury Regulations Section 1.704-2(i). |
| *Partnership Representative* | Has the meaning given in Section 8.3(a) hereof. |
| *Pass-Thru Member* | Has the meaning set forth in Section 8.3(a) hereof. |
| *Operating Expenses* | All operating expenses of the Company including without limitation (a) legal, audit and accounting fees; (b) the cost of insurance as required in connection with the business of the Company; (c) the expenses of revising, amending or modifying this Agreement or terminating the Company; (d) reasonable expenses in connection with preparing and mailing reports required to be furnished to Members for investor, tax reporting or other purposes, or other reports to the Members that are deemed to be in the best interest of the Company; (e) costs incurred in connection with any litigation in which the Company is involved, as well as in any examination, investigation, or other proceedings conducted by any regulatory agency with jurisdiction over the Company, including legal and accounting fees incurred in connection therewith; (f) compensation of consultants to the Company; and (g) the compensation, benefits, or guaranteed payments to Company employees, staff, managers or members (irrespective of whether such items could be classified as salary, bonus, incentive compensation, or profit participations or distributions). The Company's Operating Expenses for any Fiscal Period will be sent forth in an operating budget that is subject to the prior approval of the Management Committee. |
| *Partnership Agreement* | The Amended and Restated Limited Partnership Agreement of Indigo Opportunities Fund II, L.P., as further amended and/or restated. |
| *Permanent Disability* | The inability of a Management Committee Member, due to a physical or mental disability, for a period of ninety (90) days to perform the essential functions of the Management Committee Member contemplated under this Agreement, with or without reasonable accommodations. |
| *Person* | An individual, corporation, partnership, limited liability company, association, joint-stock company, trust, unincorporated organization, or a government or political subdivision thereof. |
| *Regulatory Allocations* | Has the meaning set forth in Section 7.1(c) hereof. |
| *Retained Earnings* | Has the meaning provided for in Section 7.4(c) hereof. |

5

| | |
|---|---|
| *Super Majority in Interest of the Class A Members* | Class A Members whose Class A Interests represent more than seventy-five percent (75%) of the Class A Interests. |
| *Revised Partnership Audit Provision* | Sections 6221 through 6241 of the Code as originally enacted in P.L. 114-74, and as may be amended, and including any Treasury Regulations or other administrative guidance promulgated by the Internal Revenue Service thereunder or successor provisions and any comparable provision of non-U.S. or U.S. state or local law. |
| *Transfer* | Or derivations thereof, of an Interest means, as a noun, the sale, assignment, exchange, pledge, hypothecation or other disposition of an Interest, or any part thereof, directly or indirectly, or the sale, assignment, exchange, pledge, hypothecation, or other disposition of a controlling interest in the equity securities of a Member, and as a verb, voluntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of. |
| *Treasury Regulations* | The income tax regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding income tax regulations). |
| *Valuation Date* | Valuation Date has the meaning provided for in Section 4.7(c) hereof. |

## ARTICLE II
## GENERAL

2.1    Name.  The name of the Company will be "IGI Partners II, LLC." The Company may conduct business under that name or any other name as determined by the Management Committee.

2.2    Term.  The term of existence of the Company will be perpetual, unless the Company is earlier dissolved in accordance with this Agreement, the Certificate or the Act.

2.3    Registered Office and Agent.  The registered office of the Company will be the office of the initial registered agent named in the Certificate or such other office selected by the Management Committee from time to time.  The registered agent of the Company is the initial registered agent named in the Certificate or another Person or Persons selected by the Management Committee from time to time.

2.4    Business of the Company.  The Company may engage in any lawful act or activity for which limited liability companies may be organized under the Act.  The Company shall have any and all lawful powers necessary or desirable to carry out the purposes and business of the Company.

2.5    Limitation of Liability.  No Member shall be liable for the debts, obligations or liabilities of the Company, including without limitation under any judgment, decree or order of a court.

2.6    Treatment of Company.  The Members intend that the Company be treated as a partnership, rather than as an association taxable as a corporation, for federal income tax purposes. No Member may cause the Company to elect to be taxed as an association under Treasury Regulations Section 301.7701-3(c).

## ARTICLE III
## CAPITAL CONTRIBUTIONS

3.1    Capital Contributions.  Each Class A Member and each Class B Member has made a contribution to the capital of the Company in the amount shown opposite the Class B Member's name on Exhibit A.  No Class A Member or Class B Member will be required to make any other contributions to the capital of the Company.  Subject to the prior approval of the Management Committee, the capital contributions of the Class B Members may be used as an advance or loan pursuant to Section 6.1(a), which may or may not generate interest payments or be secured by any collateral.  Any net income or net loss from such advance or loan shall be treated as Net Profit from Investment(s) or Net Loss from Investment(s), as applicable.

3.2    Capital Accounts.  The Company will establish a Capital Account for each Member.  The Company will determine and maintain each Capital Account in accordance with Treasury Regulations Sections 1.704-1(b) and 1.704-2, including the following:

(a)    Each Class A Member's Capital Account shall be increased by: (i) the amount of Net Profit from Operations (and/or items thereof) allocated to such Class A Member; and (ii) any other increases required by the Treasury Regulations. Each Class B Member's Capital Account shall be increased by: (i) the amount of such Class B Member's Capital Contributions; (ii) the amount of Net Profit from Investment(s) (and/or items thereof) allocated to such Class B Member; and (iii) any other increases required by the Treasury Regulations.

(b)    Each Class A Member's Capital Account shall be decreased by the amount of Net Loss from Operations (and/or items thereof) allocated to such Class A Member. Each Class B Member's Capital Account shall be decreased by the amount of Net Loss from Investment(s) (and/or items thereof) allocated to such Class B Member. Each Member's Capital Account shall be decreased by (i) all amounts paid or distributed to such Member pursuant to this Agreement, other than any amount required to be treated as a payment for property or services for federal income tax purposes; (ii) the fair market value of any property distributed in kind to such Member (net of any liabilities secured by such distributed property that such Member is considered to assume or take subject to for purposes of Section 752 of the Code); and (iii) any other decreases required by the Treasury Regulations.

(c)    All provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with the Code and Treasury Regulations thereunder and shall be interpreted and applied in a manner consistent with such law. The Partnership Representative shall determine    whether    to    adjust    Capital    Accounts    under    Treasury    Regulation

7

Section 1.704-1(b)(2)(iv)(f) to reflect the revaluation of Company property. The Partnership shall make any necessary modifications to this Section 3.2 in the event unanticipated events occur that might otherwise cause this Agreement not to comply with such law or any changes thereto.

     3.3     <u>No Interest</u>. The Company will not pay any interest on capital contributions.

     3.4     <u>Withdrawal of Capital</u>. A Member shall not be entitled to withdraw any part of such Member's Capital Account or to receive any distribution from the Company, except as provided in this Agreement, <u>provided, however,</u> that the Class B Member shall be entitled to withdraw some or all of its Capital Account in an orderly manner in the event any of the following occurs: (i) a material change to Fund II's investment objective and/or strategy other than in accordance with Section 6.3(b)(v); (ii) a material breach by Indigo Global Advisors, LLC of Fund II's investment policies; (iii) an enforcement action is brought against Indigo Global Advisors, LLC by any US securities regulator; (iv) the Class B Member (or any of its Affiliate(s)) is able to establish with reasonable certainty that it (or its Affiliate(s)) would suffer material reputational risk as a result of the Class B Member's capital contribution to the Company; or (v) Indigo Global Advisors, LLC (or any of its Affiliate(s)) or Fund II knowingly engages in any transaction with any country or individual in violation of applicable U.S. anti-money laundering rules and regulations.

# ARTICLE IV
# MEMBERSHIP; MEETINGS

     4.1     <u>Admission of Additional Members</u>. Except as provided in Section 4.2 and Article V, the Members listed on <u>Exhibit A</u>, as of the Effective Date, shall be the sole Members of the Company and no additional Members may be admitted to the Company.

     4.2     <u>Admission of New Members</u>. The Management Committee may admit new Members into the Company, subject to a vote of the Super Majority in Interest of the Class A Members.

     4.3     <u>Representations and Warranties</u>. Each Member hereby represents and warrants to the Company and to the other Members that (a) the Member has full power and authority to execute and agree to this Agreement and to perform his obligations under this Agreement, and that all actions necessary for the due authorization, execution, delivery and performance of this Agreement have been duly taken; (b) the Member has duly executed and delivered this Agreement; and (c) the Member's authorization, execution, delivery and performance of this Agreement does not conflict with any other agreement or arrangement to which the Member is a party or by which the Member is bound.

     4.4     <u>Expenses of the Company</u>. Expenses of the Company, such as its organizational expenses and its Operating Expenses, shall be allocated to the Class A Members pro rata in proportion to their Class A Interest Percentage.

     4.5     <u>Management of Business</u>. No Member (other than a Member acting in the capacity of Management Committee Member or an officer, employee or agent of the Company) shall take part in the operation, management or control (within the meaning of the Act) of the Company's

business, transact any business in the Company's name or have the power to sign documents for or otherwise bind the Company.

4.6     Dissociation of a Member.  The death, incapacity or bankruptcy of a Member (i) will cause such Member to be dissociated from the Company (a "Dissociated Member"), and (ii) will terminate the continued membership of such Member in the Company.

4.7     Rights of Dissociated Member.  In the event any Member becomes a Dissociated Member ("Dissociated Member Event"):

(a)     The Company shall have the right to repurchase the Interest of the Dissociated Member from the Dissociated Member or its legal representative.  The Company shall exercise such right by delivery to the legal representative of notice of its election to purchase such Interest within sixty (60) days of the date on which the Company learns of the event causing such dissociation.  The repurchase price shall be an amount equal to (i) the mutually agreed upon present value estimate of the amounts calculated under Section 4.7(b) of this Agreement, or (ii) if no mutual agreement can be reached, then pursuant to the provisions of Section 4.7(b) of this Agreement.

(b)     If the Company does not agree to repurchase the Interest pursuant to Section 4.7(a), the Dissociated Member or its legal representative shall be entitled to continue in the status of an Assignee, but shall only be entitled to receive the following:

(i)     100% of the allocations of Net Profit from Operations and Net Loss from Operations, if a Class A Member, or Net Profit from Investment(s) and Net Loss from Investment(s), if a Class B Member, allocable to its Class A Interest or Class B Interest, as applicable, during the first twelve (12)-month period after the Dissociated Member Event;

(ii)     75% of the allocations of Net Profit from Operations and Net Loss from Operations, if a Class A Member, or Net Profit from Investment(s) and Net Loss from Investment(s), if a Class B Member, allocable to its Class A Interest or Class B Interest, as applicable, during the second twelve (12)-month period after the Dissociated Member Event;

(iii)     50% of the allocations of Net Profit from Operations and Net Loss from Operations, if a Class A Member, or Net Profit from Investment(s) and Net Loss from Investment(s), if a Class B Member, allocable to its Class A Interest or Class B Interest, as applicable, during the third twelve (12)-month period after the Dissociated Member Event;

(iv)     25% of the allocations of Net Profit from Operations and Net Loss from Operations, if a Class A Member, or Net Profit from Investment(s) and Net Loss from Investment(s), if a Class B Member, allocable to its Class A Interest or Class B Interest, as applicable, during the fourth twelve (12)-month period after the Dissociated Member Event; and

(v)     0% of the allocations of Net Profit from Operations and Net Loss from Operations, if a Class A Member, or Net Profit from Investment(s) and Net Loss from Investment(s), if a Class B Member, allocable to its Class A Interest or Class B Interest, as

9

applicable, after the fourth twelve (12)-month period after the Dissociated Member Event; and

provided, that any portion of the allocations of Net Profit from Operations and Net Loss from Operations, if a Class A Member, or Net Profit from Investment(s) and Net Loss from Investment(s), if a Class B Member, allocable to its Class A Interest or Class B Interest, as applicable, that it (or its legal representative) is not entitled to shall be reallocated among the other Class A Members and/or Class B Members pro rata as though the Dissociated Member's Interest Percentage with respect to the Class A Interest or Class B Interest, as applicable, was zero percent (0%), provided, further, that this Agreement may not be amended without the Consent of the legal representative of the Dissociated Member if such amendment would materially and adversely affect such legal representative's rights under this Section 4.7(b).

(c)     In the event the Interest of a Dissociated Member is purchased under this Section 4.7, interest shall accrue from the date on which the Interest is valued (the "Valuation Date") to the date on which full payment for the Interest is made. The interest rate shall be the short-term applicable federal rate, compounded monthly, for the month which includes the Valuation Date (as published by the Internal Revenue Service).

4.8     Reserved.

4.9     Place of Meetings. No annual or regular meetings of the Members are required. However, for purposes of discussing and voting on any action stated in Section 6.3, the Class A Members shall meet at any place within or outside California as may be designated from time to time by a Super Majority in Interest of the Class A Members. In the absence of such designation, the meeting shall be held at the principal executive office of the Company. Alternatively, the Class A Members may discuss and vote on any action stated in Section 6.3 through use of telephones or similar communications equipment, provided that the Class A Members can communicate with and hear each other.

4.10     Meetings; Notice.

(a)     Meetings of the Class A Members to discuss and vote on any action stated in Section 6.3, or for any purpose or purposes, may be called at any time by any Class A Member. Notice of the time and place of meetings shall be delivered personally; by electronic mail, or facsimile transmission; or by first-class mail, charges prepaid, and addressed to the other Class A Members at his address as it appears in the records of the Company. In case such notice is mailed, it shall be deposited in the United States mail at least seven (7) days prior to the time of the holding of the meeting. In case such notice is delivered personally, by facsimile or electronic mail, it shall be so delivered at least one (1) Business Day prior to the time of the meeting. The notice need not specify the purpose of the meeting.

(b)     Only Persons whose names are listed as Class A Members on the records of the Company at the close of business on the Business Day immediately preceding the day on which notice of the meeting is given or, if such notice is waived, at the close of business on the Business Day immediately preceding the day on which the meeting is held (except that the record date for Class A Members entitled to give consent to action without a meeting shall be determined in

accordance with Section 4.13) shall be entitled to receive notice of and to vote at such meeting, and such day shall be the record date for such meeting. Any such vote may be *viva voce* or by ballot.

**4.11    Quorum.** The presence at any meeting in person or by proxy of a Class A Member or Class A Members representing a Super Majority in Interest of the Class A Members shall constitute a quorum for the transaction of business at such meeting. The Class A Members present at a duly called or held meeting at which a quorum is present may not continue to transact business (other than to call for and to adjourn such meeting), from and after the time of the withdrawal of a sufficient number of Class A Members to leave less than a quorum.

**4.12    Waiver of Notice.** The actions of any meeting of the Class A Members, however called and noticed, and wherever held, shall be as valid as if taken at a meeting duly held after regular call and notice, if a quorum be present either in person or by proxy, and if, either before or after the meeting, each person entitled to vote, not present in person or by proxy, signs a written waiver of notice or a consent to a holding of the meeting, or an approval of the minutes thereof. The waiver of notice, consent or approval need not specify either the business to be transacted or the purpose of any regular or special meeting of the Class A Members, except that if action is taken or proposed to be taken for approval of any of those matters specified in Section 6.3, the waiver of notice, consent or approval shall state the general nature of such proposal. All such waivers, consents or approvals shall be filed with the Company records and made a part of the minutes of the meeting. Attendance of a Class A Member at a meeting shall also constitute a waiver of notice of and presence at such meeting, except when the Class A Member expressly objects to the transaction of any business because the meeting is not lawfully called or convened, and except that attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be included in the notice but not so included, if such objection is expressly made at the meeting.

**4.13    Action by a Class A Member without a Meeting.** Any action which, under any provision of the Act or this Agreement, may be taken at a meeting of the Class A Members, may be taken without a meeting, and without notice except as hereinafter set forth, if a consent in writing, setting forth the action so taken, is signed by the Class A Member or Class A Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which the all Class A Members entitled to vote thereon were present and voted. All such consents shall be filed with the Company and shall be maintained in the Company's records. Unless the consents of all the Class A Members entitled to vote have been solicited in writing, prompt notice shall be given of the taking of any action approved by the Class A Members without a meeting by less than unanimous written consent to those Class A Members entitled to vote who have not consented in writing. The record date for such determination shall be the day on which the first written consent is given. Any Class A Member giving a written consent, or the Class A Member's proxyholders, or a personal representative of the Class A Member or their respective proxyholders, may revoke the consent by a writing received by the Management Committee prior to the time that written consents of the number of votes required to authorize the proposed action have been filed with the Management Committee, but may not do so thereafter. Such revocation is effective upon its receipt by the Management Committee.

11

4.14    Members May Participate in Other Activities.  This Agreement shall not prevent any Member, either individually or with others, from participating in other business activities and ventures of any kind, whether or not such other business activities and ventures compete with the Company.  No Member, acting in the capacity of a Member, shall be obligated to offer to the Company or to any other Member any opportunity to participate in any such other business activity or venture.  Neither the Company nor any other Member shall have any right to any income or profit derived from any such other business activity or venture of a Member.

4.15    Confidentiality.  Each Member agrees not to disclose, communicate, use to the detriment of the other Members or any of its Affiliates, or for the benefit of any other Person, or misuse in any way any confidential information or trade secrets of the other Members, including without limitation personnel information, processes, proprietary information developed by or on behalf of the Company, customer, investor or client lists or other information, investment and hedging strategies, quantitative analysis, investment analyses and research, marketing plans, pricing, formulas, and other data.  Each Member acknowledges and agrees that, except as herein contemplated or permitted, all such confidential information and trade secrets received or to be received by such Member from the other Members was or will be received in confidence.  Nothing in this Section 4.15 shall affect the rights of a Member with respect to any information of the other Members after it becomes generally available to the public for reasons other than such other Members' breach of this Section 4.15 or to disclose information in accordance with the requirements of any applicable law or court or administrative order.  The Members acknowledge and agree that damages would not adequately compensate a Member if the representations contained in this Section 4.15 were breached by another Member.  Consequently, notwithstanding Section 10.9, each Member agrees that in the event of any such breach, the non-breaching Members shall be entitled to enforce any or all of the representations contained in this Section 4.15 by an injunction or other equitable relief, in addition to (and not in limitation of) any other remedies, and without being required to post any bond or other security.

**ARTICLE V**
**TRANSFER AND ASSIGNMENT OF INTERESTS**

5.1    Restrictions on Transfer; Substitution of Members.  No Member may Transfer all or any part of such Member's Interest except in accordance with the terms and conditions set forth in this Article V.

5.2    Consent Necessary to Transfer of Interests.

(a)    Subject to the additional restrictions provided for in Section 5.3, a Member may only Transfer such Member's Interest (or portion thereof) with the prior written consent of the Management Committee, which shall not be unreasonably withheld.  A Member shall provide the Management Committee with at least ten (10) days prior written notice of the Member's intention to Transfer his Interest.

(b)    A Member may not Transfer all or any part of such Member's Interest unless such Transfer will not (and, at the discretion of the Management Committee, such Member obtains from counsel selected by such Member and reasonably acceptable to the Management Committee, an opinion that such Transfer will not): (i) violate any applicable federal or state

12

securities laws or regulations, nor subject the Company to registration as an investment company or election as a "business development company" under the Investment Company Act of 1940, as amended, (ii) require any Member, any Management Committee Member or any Affiliate of a Member or Management Committee Member to register as an investment adviser under the Investment Advisers Act of 1940, as amended, or any comparable state law, (iii) violate any other federal, state or local laws, (iv) cause the Company to be treated as an association taxable as a corporation for federal income tax purposes or as a publicly traded partnership, (v) cause the Company, any Member or any Management Committee Member, to the extent not currently treated as an ERISA fiduciary, to be treated as an ERISA fiduciary or (vi) otherwise violate this Agreement.

5.3     Conditions of Transfer.  In the event the requirements of Section 5.2 are met, the Management Committee shall execute a written consent to such Transfer.  Upon receipt of such written consent, the transferring Member has a right to Transfer to the proposed transferee the portion of such Member's Interest specified in such consent, subject to the following conditions:

(a)     Such Transfer is consummated within sixty (60) days from the date of such approval;

(b)     The transferee executes a copy of this Agreement and agrees to be bound hereby, or otherwise becomes subject to this Agreement by such other means as are reasonably satisfactory to the Management Committee;

(c)     Such Transfer is made strictly in accordance with the terms of the proposed Transfer and in compliance with the requirements of Section 5.2; and

(d)     The transferor and/or the transferee pays any reasonable expenses incurred by the Company in connection with the transfer.

5.4     Effect of Transfer without Approval.  Any purported Transfer of all or any part of a Member's Interest which is not in compliance with this Article V shall be void and, except as provided in Section 5.5, shall be of no effect.

5.5     Liability for Breach.  Notwithstanding anything to the contrary in this Article V, any Member purporting to Transfer such Member's Interest or any part thereof in violation of this Article V shall be liable to the Company and the other Members for all liabilities, obligations, damages, losses, costs and expenses (including reasonable attorneys' fees and court costs) arising as a direct or consequential result of such noncomplying transfer, attempted transfer or purported transfer, including specifically, any additional cost or taxes created by non-compliance with any of the requirements and conditions provided for in this Article V.

**ARTICLE VI
MANAGEMENT**

6.1     Management Committee.  Subject to the provisions of the Act, the business and affairs of the Company shall be managed and all its powers shall be exercised by the Management Committee.  Without prejudice to such general powers, it is hereby expressly declared that the Management Committee shall have the following powers:

13

(a)     To manage the Company's assets, including without limitation, to (i) invest the capital contributions of the Class B Members in one or more pooled investment vehicles, including Fund II or to loan such capital contributions to one or more third parties, one or more of its Affiliates and/or to Fund II on such terms and in such amounts as determined by the Management Committee in its sole discretion, and (iii) establish cash reserves that are reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company;

(b)     To conduct, manage and control the business and affairs of the Company and to make such rules and regulations therefor not inconsistent with law or with this Agreement, as the Management Committee shall deem to be in the best interests of the Company;

(c)     To appoint and remove at the pleasure of the Management Committee the agents of the Company, to prescribe their duties and to fix their compensation;

(d)     To borrow money and incur indebtedness for the purposes of the Company and to cause to be executed and delivered therefor, in the Company's name, promissory notes, bonds, debentures, deeds of trust, mortgages, pledges, hypothecations or other evidences of debt and securities therefor; and

(e)     To acquire property, arrange financing, enter into contracts and complete all other arrangements needed to effectuate the business of the Company.

6.2     <u>Management Committee Members</u>.  At all times there shall be two Management Committee Members.  One of the Management Committee Members shall at all times be the delegate of, or appointed by, Glacier Point Partners, LLC and one of the Management Committee Members shall at all times be the delegates of, or appointed by, Indigo Global Advisors, LLC.  The voting rights of the Management Committee Members will be weighted in the manner and to the extent indicated in Exhibit B attached hereto, with the effect that in the event of a disagreement between the Management Committee Members, the decision of the Management Committee Member appointed by Glacier Point Partners, LLC will prevail.

6.2     <u>Management Committee Approvals</u>.

(a)     <u>Generally</u>.  Any Management Committee meetings may be held by telephone conference and any and all actions, decisions and/or approvals of the Management Committee may be taken and made by written consent of the Management Committee Members in lieu of a meeting. The quorum for any meeting of the Management Committee shall be a majority of the Management Committee Members. The Management Committee may establish such other rules of procedure as a majority of the Management Committee Members shall agree upon.  No fees shall be paid by the Company to the Management Committee Members, but any Management Committee Members shall be entitled to reimbursement by the Company for their reasonable out-of-pocket expenses incurred in the performance of their responsibilities in their capacities as Management Committee Members; provided, however, that the Company shall bear no costs associated with Management Committee Member travel or other incidental expenses related to attendance of any Management Committee meeting.

14

(b)    Major Decisions.  Notwithstanding the provisions of Section 6.3(a), the following Management Committee actions, decisions and/or approvals require the unanimous vote of the Management Committee Members:

(i)    materially changing the terms of Fund II;

(ii)    changing the Company's service providers or service provider agreements;

(iii)    materially changing the Company's governance structure;

(iv)    taking action that could materially affect the revenue sharing arrangement described in the agreement between Indigo Global Advisors, LLC and Glacier Point Partners, LLC;

(v)    materially changing Fund II's investment objectives, strategy and/or policies;

(vi)    accepting non-US limited partners into Fund II;

(vii)    accepting capital commitments from limited partners in Fund II of $5 million or more;

(viii)    extending Fund II's term beyond the fifth anniversary of the Final Closing (as defined in the Partnership Agreement); and

(ix)    amending the Certificate and/or this Agreement.

6.3    Vacancies; Resignations.

(a)    A vacancy shall be deemed to exist in case of a Management Committee Member's death or resignation, removal by the party which appointed such Management Committee Member, declaration of bankruptcy under the laws of any jurisdiction, mental incompetence adjudged by a court of competent jurisdiction in any state or country (including, without limitation, any territory, dependency or possession of the United States of America), Permanent Disability or conviction by any court in any state or country (including, without limitation, any territory, dependency or possession of the United States of America) of any felony. Except as otherwise expressly provided for herein, such Management Committee Member shall cease to be a Management Committee Member effective immediately upon the occurrence of any such event.

(b)    Any Management Committee Member may resign effective upon giving thirty (30) days written notice to the Management Committee, unless the notice specifies a later time for the effectiveness of such resignation.

(c)    In the case of any vacancy or resignation of a Management Committee Member that is a delegate of, or appointed by, Glacier Point Partners, LLC or Indigo Global Advisors, LLC, as applicable and in accordance with Section 6.2, Glacier Point Partners, LLC or

15

NYSCEF DOC. NO. 3

Indigo Global Advisors, LLC, as applicable, shall be entitled to designate a replacement or successor Management Committee Member.

      6.4    <u>Action by the Management Committee; Reliance by Third Parties</u>. Persons dealing with the Company are entitled to rely conclusively upon the power and authority of Management Committee and/or any Management Committee Member, provided that any such Management Committee Member acts for and on behalf of the Management Committee.

      6.5    <u>Management Committee Members May Engage in Activities Which Compete with the Company</u>. A Management Committee Member, either singly or with others, shall have the right to participate in other business activities and ventures of every kind, whether or not such other business activities and ventures compete with the Company; provided, however, that such Management Committee Member will comply with any restrictions on competing activities contained in the organizational documents of investment vehicles managed by the Company. A Management Committee Member shall not be obligated to offer to the Company or to the Members any opportunity to participate in any such other business activity or venture. Neither the Company nor the Members shall have any right to any income or profit derived from any such other business activity or venture of a Management Committee Member.

      6.6    <u>Devotion of Time</u>. Except as otherwise provided in this Agreement (or in any written agreement between the Company and the Management Committee), the Management Committee Members will devote as much of their time and effort to the operations and investment activities of the Company as the Management Committee deems necessary.

      6.7    <u>Indemnification</u>. To the fullest extent permitted by applicable law, each of the Management Committee Members and officers of the Company (each an "<u>Indemnitee</u>") will be indemnified and held harmless by the Company to the extent that the Company's assets are sufficient therefor, from and against all claims, liabilities, and expenses arising out of any management of the affairs of the Company, but excluding those caused by gross negligence or willful misconduct of the Indemnitee. These indemnification rights are in addition to any rights that the Indemnitee may have against third parties.

## ARTICLE VII
## ALLOCATIONS OF NET PROFIT AND NET LOSS AND DISTRIBUTIONS

      7.1    <u>Allocations of Net Profits and Net Losses</u>.

        (a)    <u>General Rule</u>. Except as provided in this Agreement, Net Profit from Operations (and/or items thereof) and Net Loss from Operations (and/or items thereof) shall be allocated among the Class A Members pro rata in accordance with the Interest Percentages set forth on <u>Exhibit A</u>, and Net Profit from Investment(s) (and/or items thereof) and Net Loss from Investment(s) (and/or items thereof) shall be allocated among the Class B Members pro rata in accordance with the Interest Percentages set forth on <u>Exhibit A</u>, <u>provided</u>, <u>however</u>, that the Company's independent accountants or administrators may adjust any allocations under this paragraph as they deem necessary or appropriate in order to effectuate the intended economic sharing arrangement of the Members. For purposes of this Section 7.1(a), Net Profit from Operations (and/or items thereof), Net Loss from Operations (and/or items thereof), Net Profit

16

from Investment(s) (and/or items thereof) and Net Loss from Investment(s) (and/or items thereof) shall be computed in accordance with the Treasury Regulations under Section 704 of the Code for purposes of maintaining Capital Accounts.

(b)     Regulatory and Related Allocations.  Notwithstanding any other provision in this Agreement to the contrary, the following special allocations shall be made in the following order:

(i)     Minimum Gain Chargeback.  Except as otherwise provided in Treasury Regulations Section 1.704-2, if there is a net decrease in Partnership Minimum Gain during any Fiscal Period, each Member shall be specially allocated items of Company income and gain for such Fiscal Period (and, if necessary, subsequent Fiscal Periods) in an amount equal to such Member's share of the net decrease in such Partnership Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to the Members pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2. This Section 7.1(b)(i) is intended to comply with the minimum gain chargeback requirements in such Treasury Regulations and shall be interpreted consistently therewith.

(ii)     Member Minimum Gain Chargeback.  Except as otherwise provided in Treasury Regulation Section 1.704-2, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to Partner Nonrecourse Debt during any Fiscal Period, each Member shall be specially allocated items of Company income and gain for such Fiscal Period (and, if necessary, subsequent Fiscal Periods) in an amount equal to such Member's share, if any, of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Member's Partner Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2. This Section 7.1(b)(ii) is intended to comply with the minimum gain chargeback requirements in such Treasury Regulations and shall be interpreted consistently therewith.

(iii)     Qualified Income Offset.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) with respect to such Member's Capital Account, items of Company income and gain shall be specially allocated to ouch such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible; provided, however, that an allocation pursuant to this Section 7.1(b)(iii) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article VII have been tentatively made as if this Section 7.1(b)(iii) were not in this Agreement. This Section 7.1(b)(iii) is intended to constitute a "qualified income offset" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

17

(iv)    Gross Income Allocation. In the event any Member has an Adjusted Capital Account Deficit, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such Member's Adjusted Capital Account Deficit as quickly as possible; provided, however, that an allocation pursuant to this Section 7.1(b)(iv) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 7.1 have been tentatively made as if this Section 7.1(b)(iv) were not in this Agreement.

(v)    Loss Allocation Limitation. No allocation of Net Loss (or items thereof) shall be made to any Member to the extent that such allocation would create or increase an Adjusted Capital Account Deficit with respect to such Member.

(vi)    Nonrecourse Deductions. Any Nonrecourse Deductions for any Fiscal Period shall be allocated to the Members in accordance with their respective Capital Contributions.

(vii)    Partner Nonrecourse Deductions. Any Partner Nonrecourse Deductions for any Fiscal Period shall be allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2.

(viii)    Section 754 Adjustments. Items of income, gain, loss, and deductions shall be specifically allocated to the Members to comply with Treasury Regulation Section 1.704-1(b)(2)(iv)(m).

(c)    Curative Allocations. The allocations set forth in Section 7.1(b) (the "Regulatory Allocations") are intended to comply with certain requirements of Treasury Regulations under Section 704 of the Code. Notwithstanding any other provision of this Article VII (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other Company items of income, gain, loss, deduction and expense among the Members so that, to the extent possible, the net amount of such allocations of other Company items and the Regulatory Allocations shall be equal to the net amount that would have been allocated to the Members pursuant to Section 7.1 if the Regulatory Allocations had not occurred.

(d)    Transfer of or Change in Interests. The Partnership Representative is authorized to adopt any convention or combination of conventions which it reasonably believes would be upheld for federal income tax purposes regarding the allocation and/or special allocation of items of Company income, gain, loss, deduction and expense with respect to a newly issued Interest, a transferred Interest and a redeemed Interest. Upon admission as a Substitute Member, a transferee of an Interest shall succeed to the Capital Account of the transferor Member to the extent it relates to the transferred interest.

7.2    Tax Allocations.

(a)    Items of Company income, gain, loss, deduction and expense shall be allocated, for federal, state and local income tax purposes, among the Class A Members and Class

18

B Members, as applicable, in the same manner as the Net Profit from Operations (and/or items thereof) and Net Profit from Investment(s) (and/or items thereof), as applicable, and Net Loss from Operations (and/or items thereof) and Net Loss from Investment(s) (and/or items thereof), as applicable, were allocated pursuant to Section 7.1; provided, however, that solely for federal, state and local income tax purposes, allocations shall be made in accordance with Section 704(c) of the Code and the Treasury Regulations promulgated thereunder, to the extent so required thereby. Such allocations shall be made in such manner and utilizing such permissible tax elections as determined by the Partnership Representative.

(b)     Allocations pursuant to this Section 7.2 are solely for federal, state and local tax purposes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of the Net Profit from Operations (and/or items thereof), Net Profit from Investment(s) (and/or items thereof), Net Loss from Operations (and/or items thereof) and Net Loss from Investment(s) (and/or items thereof).

(c)     The Members are aware of the tax consequences of the allocations made by this Section 7.2 and hereby agree to be bound by the provisions of this Section 7.2 in reporting their shares of items of Company income, gain, loss, deduction and expense.

7.3     Determinations of Allocations of Profit and Loss.  Subject to compliance with the provisions of this Article VII, all matters concerning the computation of Capital Accounts, the allocation of the Net Profit from Operations (and/or items thereof), Net Loss from Operations (and/or items thereof), Net Profit from Investment(s) (and/or items thereof) and Net Loss from Investment(s) (and/or items thereof), the allocation of items of Company income, gain, loss, deduction and expense for tax purposes and the adoption of any accounting procedures not expressly provided for by the terms of this Agreement shall be determined by Company's independent accountants or administrators. Such determination shall be final and conclusive as to all the Members. Notwithstanding anything expressed or implied to the contrary in this Agreement, in the event the Company's independent accountants or administrators determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to effectuate the intended economic sharing arrangement of the Members as reflected in Section 7.4, the Company's independent accountants or administrators may make such modification.

7.4     Distributions.

(a)     No Member shall have the right to withdraw or demand distributions of any amount in its Capital Account, except as expressly provided in this Section 7.4.

(b)     Except as otherwise provided in this Agreement, the Company may make distributions to the Members in accordance with Section 7.4(c) at such times as may be determined in the sole and absolute discretion of the Management Committee. The Management Committee intends to distribute the majority of any Net Profit from Operations and Net Profit from Investment(s), as applicable, as soon as reasonably practicable after such amounts are allocated to the Members' Capital Accounts.  The undistributed portion of any amount allocated to the Members' Capital Accounts ("Retained Earnings"), shall remain in the Members' Capital Accounts to cover, among other things, such Members' pro rata share of any Net Loss from

19

Operations and Net Loss from Investment(s), as applicable, or until such Retained Earnings are distributed pursuant to Section 7.4(c).

(c) Subject to Section 7.4(b), distributions of cash and other property (other than distributions in connection with the dissolution of the Company, which shall be governed by Section 9.3, and distributions of Retained Earnings) shall be made to the Members pro rata in accordance with each Member's Interest Percentage on Exhibit A and, to the extent the Management Committee elects to distribute any Retained Earnings, such Retained Earnings shall be distributed to the Members pro rata in accordance with the positive balances in their respective Capital Accounts as of the date of distribution, provided, however, that the Management Committee may adjust any distributions under this paragraph as they deem necessary or appropriate in order to effectuate the intended economic sharing arrangement of the Members.

(d) The Management Committee may make distributions in kind if, a disposition of the assets at the time of distribution would be in the best interests of the Members. For all purposes of this Agreement, (i) any property (other than United States dollars) that is distributed in kind to one or more Members with respect to a Fiscal Period (including any in-kind distribution upon the dissolution and winding-up of the Company) shall be deemed to have been sold for cash (in United States dollars) equal to its fair market value as determined in good faith by the Management Committee, (ii) the unrealized gain or loss inherent in such property shall be treated as recognized gain or loss for purposes of determining the Net Profit from Operations (and/or items thereof), Net Loss from Operations (and/or items thereof), Net Profit from Investment(s) (and/or items thereof) and Net Loss from Investment(s) (and/or items thereof), (iii) such gain or loss shall be allocated to the Members' Capital Accounts pursuant to Sections 7.1-7.3 for such Fiscal Period, and (iv) such in-kind distribution shall be made after giving effect to such allocation pursuant to Sections 7.1-7.3.

(e) Notwithstanding anything expressed or implied to the contrary in this Agreement, the Company shall not be required to make a distribution to any Member on account of such Member's Interest if such distribution would violate the Act or other applicable law.

(f) Notwithstanding anything expressed or implied to the contrary in this Agreement, the Partnership Representative is authorized to take any action that it determines to be necessary or appropriate to cause the Company to comply with any federal, state, local and foreign withholding requirement with respect to any payment, allocation or distribution by the Company to any Member or other Person. To the extent the Partnership Representative determines that the Partnership is required by law to withhold or to make tax or any other payments on behalf of any Member (or direct or indirect shareholder, member, or other owner of such Member), including withholding taxes, state unincorporated business taxes, and payments made by the Company pursuant to the Revised Partnership Audit Provisions, the Partnership Representative may withhold such amounts and make such tax payments as so required. All amounts so withheld or made shall be treated as distributions to the applicable Members under the applicable provisions of this Agreement. If any such withholding or payment requirement with respect to any Member exceeds the amount distributable to such Member under this Agreement, or if any such withholding or payment requirement was not satisfied with respect to any item previously allocated, paid or distributed to such Member, such Member or any successor or assignee with respect to such Member's Interest hereby indemnifies and agrees to hold harmless the Partnership Representative,

the other Members and the Company for such excess amount or such amount required to be withheld or paid, as the case may be, together with any applicable interest, additions or penalties thereon. A Member's obligation to pay or indemnify for a tax or payment (and related interest and penalties) shall survive the Member selling or otherwise disposing of its interest in the Company and the termination, dissolution, liquidation, or winding up of the Company.

(g)     As soon after the close of each Fiscal Period as is practicable and after taking into account any distributions made pursuant to the other provisions of this Section 7.4, the Company shall make a cash distribution to each Member in an amount equal to the excess, if any, of (i) the Hypothetical Tax Amount with respect to such Fiscal Period over (ii) the amount of any distributions made pursuant to Section 7.4 with respect to such Fiscal Period.

(h)     The foregoing provisions of this Section 7.4 to the contrary notwithstanding, no distribution shall be made (a) if such distribution would violate any contract or agreement to which the Company is then a party or any law, rule, regulation, order or directive of any governmental authority then applicable to the Company or (b) other than distributions pursuant to Section 7.4(g), to the extent that the Management Committee determine that any amount otherwise distributable should be retained by the Company to pay, or to establish a reserve for the payment of, any liability or obligation of the Company, whether liquidated, fixed, contingent or otherwise, or (c) to the extent that the Management Committee determines that the cash available to the Company is insufficient to permit such distribution.

7.5     <u>Deficit Capital Accounts</u>. Notwithstanding anything to the contrary contained in this Operating Agreement, and notwithstanding any custom or rule of law to the contrary, no Member shall be required to restore any deficit balance in their Capital Account upon dissolution of the Company or otherwise, such deficit shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

## ARTICLE VIII
## BOOKS AND RECORDS

8.1     <u>Records and Reports</u>. At the expense of the Company, the Management Committee or its designee will maintain records and accounts of all operations and expenditures of the Company. At a minimum, the Company will keep at its principal place of business the following records:

(a)     A current list that states: (i) the name and mailing address of each Member and (ii) each Class A Member's Class A Interest Percentage and each Class B Member's Class B Interest Percentage;

(b)     Copies of the federal, state and local information or income tax returns for each of the Company's six (6) most recent tax years (or such shorter period that the Company has been in existence);

(c)     A copy of the Certificate and this Agreement, all amendments or restatements thereof, executed copies of any powers of attorney, and copies of any document that

21

NYSCEF DOC. NO. 3     RECEIVED NYSCEF: 05/22/2024

creates, in the manner provided by the Certificate or this Agreement, classes or groups of Members;

        (d)     Correct and complete books and records of account of the Company; and

        (e)     Any other books, records or documents required by this Agreement, the Certificate, the Act or other applicable law.

8.2    <u>Returns and Other Elections</u>.

        (a)     The Management Committee will cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Copies of the returns, or pertinent information therefrom, shall be furnished to the Members within one hundred and twenty (120) days after the end of each fiscal year. All elections permitted to be made by the Company under federal or state laws will be made by the Management Committee (including with respect to the Revised Partnership Audit Provisions).

        (b)     Each Member shall furnish to the Company all pertinent information in its possession relating to the Member or the Company's operations that is reasonably necessary to enable the Company's tax returns to be timely prepared and filed. Each Member shall provide any forms (including an IRS Form W-9 or applicable IRS Form W-8) reasonably requested by the Company to allow the Company to determine the amount, if any, that is required to be withheld with respect to such Member under applicable tax laws.

8.3    <u>Partnership Representative</u>.

        (a)     Brent E. Carey shall be designated as the Partnership Representative of the Company (the "<u>Partnership Representative</u>") as provided in Section 6223(a) of the Code, with all of the rights, duties and powers provided for under the Revised Partnership Audit Provisions. Each Person (for purposes of this provision a "<u>Pass-Thru Member</u>") that holds or controls an Interest on behalf of, or for the benefit of another Person or Persons, or which Pass-Thru Member is beneficially owned (directly or indirectly) by another Person or Persons shall, within 30 days following receipt from the Partnership Representative of a notice or document, convey such notice or other document in writing to all holders of beneficial interests in the Company holding such interest through such Pass-Thru Member. In the event the Company shall be the subject of an income tax audit by any federal, state or local authority, including administrative settlement and judicial review, the Partnership Representative shall be authorized to act for, and its decision shall be final and binding upon, the Company and each Member. All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Company.

        (b)     The Partnership Representative and Company may make any elections in connection with the Revised Partnership Audit Provision to reduce or eliminate any taxes imposed on the Company under Code Section 6225 (including, at the reasonable discretion of the Partnership Representative, making an election under Code Section 6226). All Members (and former Members) agree to cooperate with, and to take all reasonable actions requested by the Partnership Representative and the Company, to avoid or reduce any tax imposed under Code Section 6225, including cooperating with any election under Code Section 6226, or to otherwise

RECEIVED NYSCEF: 05/22/2024

allow the Company and the Partnership Representative to comply with the Revised Partnership Audit Provisions. All Members shall cooperate in good faith to amend this Section 8.3(b) or other provisions of this Agreement as necessary to reflect any statutory amendments or the promulgation of Treasury Regulations or other administrative authority promulgated under the Revised Partnership Audit Provisions to, to the extent possible, preserve the relative rights, duties, and obligations of the Members hereunder. The obligations of a Member under this Section 8.3(b) shall survive a Member's sale or other disposition of its interests in the Company and the termination, dissolution, liquidation, or winding up of the Company. Notwithstanding the foregoing, absent the approval of a Super Majority in Interest of the Class A Members, the Partnership Representative is not authorized to file any election which causes the Company to be treated as an entity other than a partnership for Federal and State income tax purposes.

## ARTICLE IX
## DISSOLUTION AND WINDING UP

9.1 <u>Dissolution</u>. The Company will be dissolved and its affairs will be wound up upon the first to occur of the following:

(a) At the election of the Management Committee;

(b) On the vote of a Super Majority in Interest of the Class A Members to dissolve the Company;

(c) The entry of a decree of judicial dissolution under the Act; and

(d) The Act so requires and the requirement is not validly varied by the Certificate or this Agreement.

9.2 <u>Winding-up</u>.

(a) On dissolution of the Company, the business and affairs of the Company will terminate, and the assets of the Company will be liquidated and the Company's affairs will be wound up under this Article IX.

(b) Dissolution of the Company is effective as of the day on which the event giving rise to the dissolution occurs, but the Company shall not terminate until there has been a winding up of the Company's business and affairs and the Company's assets have been distributed as provided in Section 9.3. The Class A Members shall continue to share in Net Profit from Operations and Net Loss from Operations and the Class B Members shall continue to share in Net Profit from Investment(s) and Net Loss from Investment(s).

9.3 <u>Distribution of Assets on Dissolution</u>. In settling accounts after dissolution, the assets of the Company will be paid in the following order:

(a) First, to creditors of the Company, in the order of priority as provided by law, who are not Members;

23

(b)     Second, to creditors of the Company, in the order of priority as provided by law, who are Members; and

(c)     Thereafter, (i) the assets of the Company other than assets related to investments or loans made with funds provided by the Class B Members will be distributed to the Class A Members or their legal representatives in accordance with the positive balances in their respective Capital Accounts, as determined after taking into account all adjustments to those Capital Accounts for all periods, and thereafter pro rata in accordance with each Class A Member's respective Interest Percentage of the Class A Interest; and (ii) the assets of the Company relating to investments or loans made with funds provided by the Class B Members will be distributed to the Class B Members or their legal representatives in accordance with the positive balances in their respective Capital Accounts, as determined after taking into account all adjustments to those Capital Accounts for all periods., and thereafter pro rata in accordance with each Class B Member's respective Interest Percentage of the Class B Interest.

9.4     Distributions in Kind.  Assets of the Company, other than assets related to investment(s) in Fund II, may be distributed to the Class A Members entitled thereto as tenants-in-common in the same proportions as the Class A Members would have been entitled to cash distributions if the property had been sold for cash and the net proceeds distributed to the Class A Members.  Assets of the Company related to investment(s) in Fund II may be distributed to the Class B Members entitled thereto as tenants-in-common in the same proportions as the Class B Members would have been entitled to cash distributions if the property had been sold for cash and the net proceeds distributed to the Class B Members.  If distributions in kind are made to the Members on dissolution and winding up of the Company, the Capital Account balances of those Members will be adjusted to reflect the Members' allocable share of gain or loss that would have resulted if the distributed property had been sold at its fair market value.

9.5     Certificate of Cancellation.  When all liabilities and obligations of the Company have been paid or discharged, or adequate provision has been made therefor, and all of the remaining property and assets of the Company, if any, have been distributed to the Members according to their respective rights and interests, a certificate of cancellation shall be executed on behalf of the Company by the Management Committee or an authorized Member and shall be filed with the Office of the Secretary of State of the State of Delaware, and the Members shall execute, acknowledge and file any and all other instruments necessary or appropriate to reflect the dissolution and the completion of the winding up of the Company.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

10.1     Notices.

(a)     Any notice, notification, demand or request provided or permitted to be given under this Agreement must be in writing and will have been deemed to have been properly given, unless explicitly stated otherwise, if sent by (i) Federal Express or other comparable overnight courier, (ii) registered or certified mail, postage prepaid, return receipt requested, or (iii) electronic mail or facsimile with voice confirmation during normal business hours to the place of business of the recipient.

(b)    For purposes of all notices, the addresses, facsimile numbers, and electronic mail addresses of the Members are set forth on Exhibit A.

(c)    Except as otherwise provided in this Agreement, all notices, notifications, demands or requests so given will be deemed given and received (i) if mailed, seven (7) days after being deposited in the mail; (ii) if sent via overnight courier, the next Business Day after being deposited; or (iii) if sent via facsimile or electronic mail, the Business Day in which voice confirmation is received by the recipient.

10.2    Application of Law.  This Agreement and the application or interpretation hereof, shall be governed exclusively by the laws of the State of Delaware and, specifically, the Act.

10.3    No Action for Partition.  No Member may maintain any action for partition with respect to the property of the Company.

10.4    Headings and Sections.  The headings in this Agreement are inserted for convenience only and do not describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof. Unless the context requires otherwise, all references in this Agreement to Sections or Articles will be deemed to mean and refer to Sections or Articles of this Agreement.

10.5    Amendments.  The Certificate and this Agreement, including the exhibits hereto, may be amended, supplemented, or restated pursuant to Section 6.3(b)(ix).

10.6    Number and Gender.  Where the context so indicates, the masculine includes the feminine and the neuter, the neuter includes the masculine and feminine, and the singular includes the plural.

10.7    Binding Effect.  Except as otherwise provided, this Agreement will be binding upon and inure to the benefit of the Members, their distributees, heirs, legal representatives, executors, administrators, successors and assigns.

10.8    Counterparts.  This Agreement may be executed in multiple counterparts, each of which is considered an original and will be binding upon the Member who executed the same, but all of such counterparts will constitute the same agreement.

10.9    Arbitration.

(a)    Except as otherwise provided in this Agreement, any controversy with respect to this Agreement or the Company, whether arising before or after this Agreement, between or among any Member will be resolved by arbitration. Any arbitration under this Agreement will be conducted in accordance with the rules, then applying, of JAMS. Any arbitration panel appointed by JAMS will consist of at least three (3) individuals, one of whom will have experience in the securities business. Any arbitration proceeding will be held in Los Angeles, California. The award of the arbitrators will be final and binding on the parties, and judgment upon the award rendered may be entered in any court, state or federal, having jurisdiction.

25

   (b) This agreement to arbitrate does not entitle any Member to arbitrate claims that would be barred by the applicable statute of limitations if such claims were brought in a court of competent jurisdiction. If at the time a demand for arbitration is made, the claims sought to be arbitrated would have been barred by the relevant statute of limitations or other time bar, any Member may assert the limitations as a bar to the arbitration by applying to any court of competent jurisdiction. The failure to assert such bar by application to a court, however, will not preclude its assertion before the arbitrators.

   (c) The Member(s) involved in the arbitration hereby agree to use all deliberate speed to attempt resolution of any dispute through the arbitration process within ninety (90) days from the date it is submitted to arbitration.

  10.10 <u>Severability.</u> If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, the legality, validity, and enforceability of the remaining provisions of this Agreement shall not be affected thereby, and in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be legal, valid, and enforceable.

  10.11 <u>Entire Agreement.</u> This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement between the parties relating to the subject matter hereof, and supersedes all previous contracts and agreements between the parties hereto, both oral and written. This Agreement will not be construed as a contract between the Company and a Member regarding employment, the provision of services to the Company or any other subject other than the terms set forth in this Agreement.

  10.12 <u>Insurance.</u> The Company may purchase and maintain insurance on behalf of any Person who is or was a Member, Management Committee Member, officer, employee or agent of the Company or who is or was serving at the request of the Company as an officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary or another Person against any liability.

   [THE REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK.]

The undersigned, being the initial and sole Members of the Company, do hereby ratify, confirm and approve the adoption of this Agreement as of the date set forth on the cover page, as the Agreement of the Company, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, do hereby assume and agree to be bound by and to perform all of the terms and provisions set forth in this Agreement.

**MEMBERS:**

**BCMK INVESTMENT HOLDINGS LLC**

By: _____
    Name: Brent E. Carey
    Title: Managing Member

**GLACIER POINT PARTNERS, LLC**

By: _____
    Name: Kenneth M. Franasiak
    Title:  Manager

**Exhibit A**

### CLASS A MEMBERS

**Updated as of September 1, 2018**

| Member Name | Capital Contributions | Interest Percentage | Contact Information |
|---|---|---|---|
| BCMK Investment Holdings LLC | $65 | 65% | 5838 Naples Plaza, Long Beach, CA 90803 |
| Indigo Senior Executive Holdings, LLC | $5 | 5% | 5838 Naples Plaza, Long Beach, CA 90803 |
| Glacier Point Partners, LLC | $30 | 30% | 3949 Forest Parkway, Suite 100, Wheatfield, NY 14120 |
| Total | $100 | 100% | |

### CLASS B MEMBERS

**Updated as of September 1, 2018**

| Member Name | Capital Contribution | Interest Percentage | Contact Information |
|---|---|---|---|
| Glacier Point Partners, LLC | $300,000 | 85.714% | 3949 Forest Parkway, Suite 100, Wheatfield, NY 14120 |
| Kite Capital Holdings, LLC | $50,000 | 14.286% | 2 Renata Newport Coast, CA 92657 |
| Total | $350,000 | 100% | |

**Exhibit B**

**MANAGEMENT COMMITTEE MEMBERS**

**Updated as of September 1, 2018**

| Name | Appointed/Delegated By | Delegated Management Committee Votes (per Section 6.2) | Contact information |
|---|---|---|---|
| Brent E. Carey | BCMK Investment Holdings LLC | 2 | 5838 Naples Plaza, Long Beach, CA 90803 |
| Damon Wojciechowski | Glacier Point Partners, LLC | 3 | 3949 Forest Parkway, Suite 300, Wheatfield, NY 14120 |

B-1

NYSCEF DOC. NO. 3