# EXHIBIT B

INDIGO OPPORTUNITIES FUND II, L.P.

———————————————

AMENDED AND RESTATED

LIMITED PARTNERSHIP AGREEMENT

———————————————

THE LIMITED PARTNERSHIP INTERESTS (THE "INTERESTS") OF INDIGO OPPORTUNITIES FUND II, L.P. (THE "PARTNERSHIP") HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OR ANY OTHER APPLICABLE SECURITIES LAWS IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. SUCH INTERESTS MUST BE ACQUIRED FOR INVESTMENT ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH (I) THE SECURITIES ACT, ANY APPLICABLE STATE SECURITIES LAWS, AND ANY OTHER APPLICABLE SECURITIES LAWS; AND (II) THE TERMS AND CONDITIONS OF THIS AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT (THIS "AGREEMENT"). THE INTERESTS MAY NOT BE TRANSFERRED OF RECORD EXCEPT IN COMPLIANCE WITH SUCH LAWS AND THIS AGREEMENT. THEREFORE, PURCHASERS OF SUCH INTERESTS WILL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

# TABLE OF CONTENTS

**Page**

ARTICLE I General Provisions ............................................................................................ 1
   1.1  Continuation ............................................................................................................ 1
   1.2  Name ........................................................................................................................ 1
   1.3  Organizational Certificates and Other Filings ...................................................... 2
   1.4  Purpose .................................................................................................................... 2
   1.5  Principal Office ....................................................................................................... 3
   1.6  Registered Office and Registered Agent ................................................................ 3
   1.7  Term ........................................................................................................................ 3
   1.8  Reliance by Third Parties ....................................................................................... 3
   1.9  Fiscal Year .............................................................................................................. 3
  1.10  Definitions ............................................................................................................ 3

ARTICLE II Initial Closing; Other Closings ..................................................................... 3
   2.1  Initial Closing .......................................................................................................... 3
   2.2  Subsequent Closings ............................................................................................... 4
   2.3  After Final Closing ................................................................................................. 5

ARTICLE III Capital Contributions and Distributions ..................................................... 5
   3.1  Capital Contributions ............................................................................................. 5
   3.2  Withdrawal and Cancellation ................................................................................. 6
   3.3  Defaults ................................................................................................................... 7
   3.4  Distributions; General Principles ........................................................................... 8
   3.5  Amounts and Priority of Distributions ................................................................. 11
   3.6  Tax Distributions .................................................................................................. 11
   3.7  Limitation on Distributions .................................................................................. 12
   3.8  Clawback ............................................................................................................... 12

ARTICLE IV Fees and Expenses ...................................................................................... 13
   4.1  The Management Fee ............................................................................................ 13
   4.2  General Partner Expenses ..................................................................................... 14
   4.3  Partnership Expenses ............................................................................................ 14

ARTICLE V Capital Accounts and Allocations ............................................................... 15
   5.1  Capital Accounts ................................................................................................... 15
   5.2  Allocations of Profits and Losses ......................................................................... 15
   5.3  Special Allocation Provisions .............................................................................. 16
   5.4  Tax Allocations .................................................................................................... 17
   5.5  Other Allocation Provisions ................................................................................. 17

ARTICLE VI General Partner ........................................................................................... 17
   6.1  Powers of the General Partner .............................................................................. 17
   6.2  Restrictions and Limitations ................................................................................. 19
   6.3  Holding Entities .................................................................................................... 19
   6.4  Limitation on Liability .......................................................................................... 20
   6.5  Indemnification ..................................................................................................... 20
   6.6  General Partner as Limited Partner ....................................................................... 22

i

6.7    Other Activities ..................................................................................................... 23
6.8    Valuation ............................................................................................................... 23
6.9    Investment Opportunities ...................................................................................... 24
6.10   Early Termination of Investment Period ................................................................ 25
6.11   Investment Management Agreement ...................................................................... 25
6.12   Key Person Event .................................................................................................. 25

ARTICLE VII Limited Partners ............................................................................................. 26
7.1    No Participation in Management ........................................................................... 26
7.2    Liabilities of the Limited Partners ........................................................................ 27
7.3    Limited Partners' Outside Activities ..................................................................... 28
7.4    Advisory Committee .............................................................................................. 28
7.5    Investment Representations of the Limited Partners .............................................. 32
7.6    Qualifications of the Limited Partners ................................................................... 32
7.7    Provision of Withholding Documentation .............................................................. 32

ARTICLE VIII Books and Records;  Reports to Partners; Meetings and Consents ................. 32
8.1    Books and Records ................................................................................................ 32
8.2    Income Tax Information ......................................................................................... 33
8.3    Reports .................................................................................................................. 33
8.4    Partnership Meetings ............................................................................................ 35
8.5    Written Consents .................................................................................................. 35

ARTICLE IX Transfers and Withdrawals ............................................................................... 36
9.1    Transfer and Withdrawal of the General Partner ................................................... 36
9.2    Transfers or Substitutions by Limited Partners ..................................................... 40
9.3    Further Actions ..................................................................................................... 42
9.4    Admissions and Withdrawals Generally ................................................................ 42

ARTICLE X Term and Dissolution of the Partnership ........................................................... 42
10.1   Term ...................................................................................................................... 42
10.2   Winding-up ........................................................................................................... 43
10.3   Final Distribution ................................................................................................. 43

ARTICLE XI Miscellaneous .................................................................................................. 43
11.1   Confidentiality ...................................................................................................... 43
11.2   Power of Attorney ................................................................................................. 45
11.3   Amendments; Voting ............................................................................................ 46
11.4   Consents and Approvals ........................................................................................ 47
11.5   Notices .................................................................................................................. 48
11.6   Computation of Time ............................................................................................ 48
11.7   Entire Agreement .................................................................................................. 48
11.8   Severability ........................................................................................................... 49
11.9   Governing Law ...................................................................................................... 49
11.10  Successors and Assigns ......................................................................................... 49
11.11  Counterparts ......................................................................................................... 49
11.12  Interpretation ........................................................................................................ 50
11.13  Headings; Internal References ............................................................................... 50
11.14  Partnership Status ................................................................................................. 50

11.15   Counsel to the Partnership ........................................................................ 50
11.16   Partnership Name ..................................................................................... 50
11.17   Discretion .................................................................................................. 50
11.18   No Waiver .................................................................................................. 51
11.19   Waiver of Partition and Accounting ......................................................... 51
11.20   No Appraisal Rights .................................................................................. 51
11.21   Tax Information; Related Matters .............................................................. 51
11.22   Notice of Certain Proceedings .................................................................. 52
11.23   Compliance with Anti-Money Laundering Requirements .......................... 52

ANNEXES AND EXHIBITS

Annex A          Definitions
Annex B          Limited Partners

AMENDED AND RESTATED
LIMITED PARTNERSHIP AGREEMENT
OF
INDIGO OPPORTUNITIES FUND II, L.P.

This AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT (including annexes hereto and as it may be modified from time to time, this "Agreement") of INDIGO OPPORTUNITIES FUND II, L.P., a limited partnership formed under the laws of the State of Delaware (the "Partnership"), is entered into on January 1, 2018, by and among IGI PARTNERS II, LLC, a Delaware limited liability company, as General Partner, the Initial Limited Partner and each party listed as a "limited partner" in the books and records of the Partnership.

WITNESSETH:

WHEREAS, a limited partnership agreement was entered into by IGI Partners II, LLC, as the General Partner, and the Initial Limited Partner, on January 1, 2018 (the "Initial Agreement"), and a limited partnership was formed under the name Indigo Opportunities Fund II, L.P. pursuant to the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. §§ 17-101 et seq. (as in effect from time to time, the "Act") by the filing of the Certificate of Limited Partnership of the Partnership in the Office of the Secretary of State, in the State of Delaware ("Certificate");

WHEREAS, the parties hereto desire to enter into this Agreement to amend and restate in its entirety the Initial Agreement, to permit the admission of the Limited Partners as limited partners of the Partnership and further to provide for the rights, powers, duties and obligations of the Partners and the management and activities of the Partnership, as hereinafter set forth; and

WHEREAS, immediately following the admission of the first Limited Partner on the date hereof, the Initial Limited Partner automatically shall cease to be a partner of the Partnership and shall have his original capital contribution returned to him and shall have no further rights in or obligations to the Partnership or under this Agreement or claims against the Partnership, with respect to his interest as the Initial Limited Partner:

NOW, THEREFORE, in consideration of the mutual promises and agreements made herein and intending to be legally bound hereby, the parties hereto agree as follows:

ARTICLE I

General Provisions

1.1     Continuation. The parties to this Agreement hereby continue the Partnership in accordance with the Act.

1.2     Name. The name of the Partnership shall be "Indigo Opportunities Fund II, L.P." The General Partner is authorized to make any variations in the Partnership's name which the General Partner may deem necessary or advisable; provided, that: (a) such name shall contain the words "Limited Partnership" or the abbreviation "L.P." or "LP" or the equivalent translation thereof; (b) such name shall not contain the name of any Limited Partner without the consent of

such Limited Partner; and (c) the General Partner shall give notice of any such variation to the Limited Partners. The General Partner hereby grants to the Partnership a non-exclusive, royalty free license to use (but not sublicense or assign) the name "Indigo" or one or more derivatives thereof in the Partnership's name until the earlier to occur of: (i) the termination, winding up and dissolution of the Partnership; and (ii) the date an Affiliate of Indigo ceases to be the General Partner of the Partnership.

1.3     Organizational Certificates and Other Filings. If requested by the General Partner, the Limited Partners shall promptly execute all certificates and other documents consistent with the terms of this Agreement necessary for the General Partner to accomplish all filing, recording, publishing and other acts as may be appropriate to comply with all requirements for (a) the formation and operation of a limited partnership under the laws of the State of Delaware, (b) if the General Partner deems it advisable, the operation of the Partnership as a limited partnership, or partnership in which the Limited Partners have limited liability, in all jurisdictions where the Partnership proposes to operate and (c) all other filings required to be made by the Partnership.

1.4     Purpose.

(a)     Subject to the terms and conditions set forth in this Agreement, the primary purpose of the Partnership is a balanced total return generated by income and capital appreciation obtained primarily through the acquisition or creation of secured and/or collateralized loans ("Portfolio Loans"), that generate consistent absolute returns primarily through coupon payments on loans, short-term capital gains, long-term investments gains, asset liquidations, interest paid by borrowers and gains realized upon either the termination or disposition of any non-performing loans, all of which shall be held by certain subsidiaries of the fund (each, a "Portfolio Investment" and in aggregate, the "Portfolio Investments"). In connection therewith, the Partnership may: (i) acquire, hold, sell and exchange, either directly or indirectly, Portfolio Loans; (ii) exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Portfolio Investments held or owned by the Partnership; (iii) enter into, make and perform all contracts and other undertakings related or incidental to the foregoing; (iv) engage in any other lawful act or activity for which limited partnerships may be formed under the Act; and (v) engage in all activities and transactions as may be necessary, advisable or desirable to carry out the foregoing.

(b)     In furtherance of the purpose specified in Section 1.4(a), the Partnership shall have all of the rights and powers permitted a limited partnership under the Act, subject only to the express terms and conditions of this Agreement. Without limiting the generality of the foregoing, the Partnership shall have full power and authority to acquire, purchase, hold, sell, exchange, transfer, mortgage, pledge or otherwise deal with Portfolio Investments and other property and assets and exercise all rights, powers, privileges and other incidents of ownership with respect thereto. The Partnership may maintain one or more offices and engage personnel for the conduct of the Partnership's activities. The General Partner (including its duly authorized agents and delegates), on behalf of the Partnership, may enter into and perform contracts, agreements and undertakings of all kinds as may be necessary, advisable or incidental to the carrying out of the Partnership's purpose. Any amendment to this Section 1.4 shall require the consent of seventy-five percent (75%) in Interest of the Limited Partners.

2

1.5     Principal Office. The Partnership shall maintain its principal office at 5838 E Naples Plaza, Long Beach, CA 90803, or such place or places as the General Partner may decide in its sole discretion. The General Partner shall promptly notify the Limited Partners of any such changes.

1.6     Registered Office and Registered Agent. The address of the Partnership's registered office in the State of Delaware is 3500 S. Dupont Hwy, Dover, Delaware 19901. The name and address of the Partnership's registered agent for service of process in the State of Delaware is Incorporating Services, Ltd., 3500 S. Dupont Hwy, Dover, Delaware 19901. The registered office and registered agent may be changed by the General Partner from time to time in its sole discretion. The General Partner shall promptly notify the Limited Partners of any such changes.

1.7     Term. The term of the Partnership commenced upon the filing for record of the Certificate in the office of the Secretary of State of the State of Delaware and, unless earlier dissolved and terminated pursuant to Section 10.1, shall continue through the close of business on the fifth anniversary of the Final Closing; provided, that the General Partner may extend the term for up to a one (1) year period.

1.8     Reliance by Third Parties. Persons dealing with the Partnership are entitled to rely conclusively upon the power and authority of the General Partner as herein set forth.

1.9     Fiscal Year. The fiscal year ("Fiscal Year") of the Partnership shall be the calendar year or, in the case of the first and last fiscal years of the Partnership, the fraction thereof commencing on the date of registration of the Partnership as set out on its Certificate or ending on the date on which the winding up of the Partnership is completed, as the case may be. The taxable year of the Partnership shall be determined under Section 706 of the Code. The General Partner shall have the authority to change the ending date of the Fiscal Year if the General Partner determines in its sole discretion that such change is necessary or appropriate; provided, that the General Partner shall promptly give notice of any such change to the Limited Partners.

1.10    Definitions. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in Annex A.

ARTICLE II

Initial Closing; Other Closings

2.1     Initial Closing. Each Person whose subscription for a limited partner interest has been accepted by the General Partner on the date of this Agreement (the "Initial Closing Date" and such closing, the "Initial Closing") shall be admitted to the Partnership as a Limited Partner and shall be shown as such on the books and records of the Partnership upon execution (either directly or through a power of attorney) and delivery to the General Partner of a counterpart signature page of this Agreement or adherence to this Agreement. Annex B to this Agreement shows the name, address and Capital Commitment of each such Limited Partner on the date of this Agreement. Immediately upon admission of the first Limited Partner on the date hereof, the Initial Limited Partner shall immediately be deemed to have withdrawn from the Partnership for an amount equal to his capital contribution (if any), receipt of which is hereby acknowledged, and the Initial Limited Partner shall have no further rights in or obligations to the Partnership or under this Agreement, or

claims against the Partnership. Annex B shall be amended by the General Partner from time to time in accordance with the terms of this Agreement to reflect the transfer of any Interest, the admission of any Partner, the change in any Capital Commitments and other alterations in the matters set forth therein and otherwise as provided herein, and each Limited Partner hereby consents to such amendment.

      2.2    <u>Subsequent Closings</u>. At any time and from time to time during the period commencing upon the Closing Date and ending on or before the last day of the month that is twelve (12) months after the Closing Date of first Limited Partner who is not affiliated with the General Partner (the "<u>Subscription Period</u>") (provided, that the Subscription Period may be extended (for an additional six (6) months) or reduced by the General Partner, in its sole discretion), the General Partner may, in its sole discretion, but subject to the following provisions of this <u>Section 2.2</u>, admit one or more Persons to the Partnership as additional Limited Partners or allow any Limited Partner to increase their Capital Commitment (each closing after the Closing Date of first Limited Partner who is not affiliated with the General Partner that occurs during the Subscription Period, a "<u>Subsequent Closing</u>," and the last Subsequent Closing of the Subscription Period, the "<u>Final Closing</u>"). Each such Limited Partner shall be required at the time of its making an additional Capital Commitment or admission to the Partnership to contribute to the Partnership the sum of: (i) an amount equal to such Limited Partner's proportionate share (determined by its percentage of total Capital Commitments (or increase therein) after giving effect to such Subsequent Closing) of the previously admitted Partners' contributions to the Partnership's capital used for Portfolio Investments as of the date of such admission or additional Capital Commitment (as applicable); (ii) its proportionate share, determined in a similar manner, of Partnership Expenses (other than amounts representing the Management Fee) theretofore paid by the Limited Partners; and (iii) the portion of the Management Fee attributable to the new Capital Commitment; together with an interest equivalent on the amounts determined under clauses (i), (ii) and (iii) at a rate equal to the Preferred Return (the "<u>Subsequent Closing Interest Charge</u>") assessed from the date the amounts referred to in such clauses would have been required to have been contributed by such Limited Partner to the Partnership if its Capital Commitment (or increase therein) as of such Subsequent Closing had been its Capital Commitment as of the Closing Date of first Limited Partner who is not affiliated with the General Partner. The amounts contributed pursuant to clauses (i) and (ii), and the Subsequent Closing Interest Charge thereon, will be refunded to previously admitted Partners pro rata in proportion to their Capital Contributions made (or deemed, pursuant to this <u>Section 2.2</u>, to have been made) prior to the date of such Limited Partner's admission to the Partnership and, to the extent representing a return of Capital Contributions, will be restored to their Unpaid Capital Commitments. Amounts contributed pursuant to clause (iii), and the Subsequent Closing Interest Charge thereon, will be paid to the General Partner or its designee. Each Limited Partner that is issued a Limited Partner interest after the Closing Date of first Limited Partner who is not affiliated with the General Partner shall be deemed to have made Capital Contributions to the Partnership in an amount equal to the amount determined in accordance with clauses (i), (ii) and (iii) above (but excluding any Subsequent Closing Interest Charge thereon), at the times and in the amounts used for purposes of determining the Subsequent Closing Interest Charge thereon under this <u>Section 2.2</u>. For purposes of this Agreement and for all accounting and tax reporting purposes, the Capital Contributions that are distributed to Partners shall, in accordance with Section 707(a) of the Code, be treated as the purchase of whole or fractional units of Limited Partner interests. Nothing in this <u>Section 2.2</u> shall require the approval of any Limited Partner.

2.3     After Final Closing.  After the Final Closing, no additional Limited Partners shall be admitted to the Partnership, except as substituted Limited Partners as provided in Article IX hereof, and, except as provided in Section 3.2 and Section 3.3, no additional Capital Commitments shall be accepted from any Partner and no reductions in Capital Commitments shall be made with respect to any Partner.

ARTICLE III

Capital Contributions and Distributions

3.1     Capital Contributions.

(a)     Subject to Section 3.2, each Partner shall contribute to the capital of the Partnership, at such time or times as the General Partner may direct, by wire transfer in immediately available funds, denominated in United States dollars, such amount, not in excess of such Partner's Unpaid Capital Commitment, as the General Partner may direct on no less than ten (10) Business Days' prior notice to the Partners (a "Capital Call") in accordance with Section 11.5 hereof.  Capital Calls shall be made by the General Partner to acquire a Portfolio Investment or to pay, satisfy or discharge (including reimbursing the General Partner for paying) Partnership Expenses.  The notice shall specify the amount of the Capital Call with respect to the Partner receiving the Capital Call, the day on which the Capital Call is to be paid (a "Payment Date") and the procedure for payment and the use for which the Partnership expects to apply the Capital Contributions to be made in response to the Capital Call, including: (i) with respect to amounts being used for investment: (x) subject to applicable confidentiality and securities laws limitations, a brief description of the proposed Portfolio Investment, including the amount to be invested and a representation that such investment will not violate the investment restrictions set forth herein; and (y) the nature and amount of any investment-related expenses (whether included in the purchase price or incurred separately); (ii) with respect to amounts being used for the Management Fee, a reasonably detailed breakdown of the calculation thereof; and (iii) in connection with any Limited Partner clawback, a description of the reasons for such clawback.  The portion of any Capital Call not applied to fund a Portfolio Investment or to pay, satisfy or discharge any taxes, fees, expenses or other obligations of the Partnership within sixty (60) days of the date specified for payment of such Capital Call shall be returned pro rata to the Partners contributing to such Capital Call without interest and shall thereafter be available for subsequent Capital Calls as a portion of such Partner's Unpaid Capital Commitment; provided, if the General Partner reasonably determines that all or a portion of the amount required to be so returned will be subject to a Capital Call within the thirty (30) calendar days following such distribution, then in lieu of such distribution and recontribution the General Partner may retain so much of such amount as it reasonably determines would be so distributed and recontributed (and the amount retained for such purpose shall be treated for all purposes of this Agreement as contributed on the date originally so contributed and shall not be treated as distributed and recontributed) and the General Partner shall promptly notify the Limited Partners of any such determination and the amounts so treated.  In addition to the foregoing, the portion of each Partner's Capital Contribution used to acquire a Portfolio Investment (but not the profit thereon) which is completely disposed of for cash at a gain (taking into account the total amount invested and total amount received with respect to such Portfolio Investment) prior to the expiration of the Investment Period may, if and when distributed to such Partner, be added to the amount of such Partner's Unpaid Capital Commitment and again made subject to a Capital Call, at the sole discretion of the General Partner; provided, that the aggregate amount subject to recall

with respect to a Partner, shall not exceed twenty percent (20%) of such Partner's aggregate Capital Commitment.

    (b)   <u>Procedures for Capital Calls</u>.

        (i)   <u>Capital Calls in General</u>.  The General Partner shall make Capital Calls only as funds are reasonably anticipated to be needed by the Partnership.  Except as otherwise expressly provided herein, each Capital Call (other than a Capital Call with respect to the Management Fee, as provided in <u>Section 3.1(b)(ii)</u>, below) shall be made to all Partners on a pro rata basis in proportion to their relative Capital Commitments.

        (ii)   <u>Capital Calls for Management Fees</u>.  Except as otherwise expressly provided in <u>Section 2.2</u> hereof, each Capital Call to provide funds for the payment of Management Fees shall be made to all Limited Partners on a pro rata basis in proportion to their relative Capital Commitments.

    (c)   Any Unpaid Capital Commitment outstanding after the end of the Investment Period (other than any portion of an Unpaid Capital Commitment outstanding as a result of the Default of a Partner in making a payment on a Capital Call required hereunder) shall be released other than for the purpose of: (i) paying, satisfying or discharging Partnership Expenses, including the Management Fee; (ii) consummating the acquisition of Follow-Up Investments; and (iii) making Follow-On Investments, <u>provided</u> that not more than twenty percent (20%) of total Capital Commitments may be invested in Follow-On Investments after the expiration of the Investment Period.  Within thirty (30) days following the expiration of the Investment Period the General Partner shall provide the Limited Partners with a list of all of the Follow-Up Investments as of the end of the Investment Period.

    (d)   <u>General Partner, its Principals and/or Affiliate(s)' Commitment</u>.  The General Partner, its principals and/or Affiliate(s) shall cause the aggregate Capital Commitments of the General Partner, its principals and/or Affiliate(s) to the Partnership, as the General Partner and/or as a Limited Partner, at all times to be greater than or equal to the greater of five percent (5%) of the aggregate Capital Commitments or $2,500,000.

    3.2   <u>Withdrawal and Cancellation</u>.

    (a)   A Limited Partner may be required to withdraw from the Partnership if in the reasonable judgment of the General Partner a significant delay, extraordinary expense or material adverse effect on the Partners (taken as a whole), the Partnership, any Portfolio Investment is likely to result from such Limited Partner's continued participation; <u>provided</u>, that any such Limited Partner shall remain liable to the Partnership to the extent of any breach of a representation or covenant made by such Limited Partner to the Partnership or the General Partner arising out of or relating to such withdrawal.  Any such withdrawal shall occur in accordance with the processes and procedures set forth in <u>Section 3.2(b)</u>, below.

    (b)   In the event of any withdrawal from the Partnership pursuant to <u>Section 3.2(a)</u>, the General Partner shall offer such Limited Partner's interest in the Partnership to the other Limited Partners, pro rata in proportion to their Capital Commitments, for purchase in cash at a price equal to its Liquidating Share (or such other amount as the withdrawing Limited Partner may agree upon with the General Partner).  If a Limited Partner's interest in the Partnership is not so purchased,

the General Partner shall pay the withdrawing Limited Partner in withdrawal of its interest an amount equal to its Liquidating Share, either in cash or, at the discretion of the General Partner, in the form of a non-interest bearing promissory note payable in cash to mature upon the final liquidating distribution to the Partners and to be prepaid with the actual amount that would have been distributed to the withdrawing Limited Partner had such Limited Partner maintained an Interest in the Partnership equivalent to the portion of such Limited Partner's interest not previously withdrawn for cash. Such promissory note shall provide that the General Partner shall not be liable for payment or performance thereof.

(c)     The General Partner at any time may cancel the obligation of all Partners to make Capital Contributions for Portfolio Investments (other than as necessary to meet the ongoing contractual obligations of the Partnership, if determined appropriate by the General Partner and the Advisory Committee in good faith) if: (i) the Partnership has reached Full Investment; (ii) in the good faith judgment of the General Partner, applicable law, regulation, case law, judicial or administrative order or decree or governmental license or permit, or any interpretation thereof by any governmental or regulatory authority or court of competent jurisdiction, generally make such cancellation necessary or advisable; or (iii) for no reason with the consent of the Advisory Committee or a Majority in Interest of the Limited Partners.

3.3     Defaults.

(a)     If for any reason a Limited Partner shall fail to make any payment on a Capital Call payable by such Limited Partner as and when due and such failure is not cured within ten (10) Business Days after receipt of notice of the default (a "Default"), such defaulting Partner (the "Defaulting Partner") shall remain liable in respect of such Capital Call and any additional amount of its Unpaid Capital Commitment, except as provided below with respect to a Terminated Partner, and the General Partner, in its sole discretion and to the extent permitted by applicable law, may take any one or more of the following actions, to which each Limited Partner hereby consents: (i) extend the time of payment, with interest and expenses; (ii) commence legal proceedings against the Defaulting Partner to collect the due and unpaid amount plus interest thereon at seven and one half percent (7.5%) per annum (or such lower rate as may be required by applicable law) and the expenses of collection, including reasonable attorneys' fees; (iii) prohibit the Defaulting Partner from making further Capital Contributions; (iv) terminate the voting rights of the Defaulting Partner, including the right to Consent; (v) declare the Unpaid Capital Commitment of the Defaulting Partner released; (vi) enforce by appropriate legal proceedings the Defaulting Partner's obligation to make payment on such Capital Call; (vii) terminate the Defaulting Partner's Interests in the manner provided in Section 3.3(b); (viii) offer the Defaulting Partner's Interests to the Partners other than the Defaulting Partner, including the opportunity to purchase, pro rata to their Capital Commitments, the Defaulting Partner's Interests at an amount equal to fifty percent (50%) of the balance in its Capital Account immediately prior to the default, if such purchaser agrees to cure the Default with respect to the Interest so purchased and assume the Defaulting Partner's other obligations to the Partnership with respect to the Interest so purchased (and each Limited Partner who becomes a Defaulting Partner hereby agrees to sell its Interests on such terms); (ix) reduce the Defaulting Partner's Capital Account by an amount equal to one half (1/2) of its Capital Account immediately prior to the default; (x) reduce the Defaulting Limited Partner's entitlement to subsequent distributions pursuant to Section 3.5 and Section 10.3(b) by one half (1/2) of the amount the Defaulting Partner would otherwise be entitled to under such Sections with respect to all Portfolio Investments held by the Partnership as of the date of such Default (with the excess apportioned to the remaining Partners pro rata in proportion to their relative entitlements

under <u>Section 3.5</u> to distributions attributable to such Portfolio Investments); or (xi) pursue any other remedy that the General Partner deems advisable.  Any portion of the Defaulting Partner's Interests offered pursuant to clause (viii), above, that are not subscribed for by the Limited Partners may be offered to any other Person selected by the General Partner on the same terms and conditions offered to the Limited Partners.  The General Partner shall inform the Advisory Committee promptly upon the occurrence of a Default by a Limited Partner.

(b)    The General Partner may terminate the Interest of a Defaulting Partner by giving notice to such effect to the Defaulting Partner and, thereupon, such Partner (a "<u>Terminated Partner</u>") shall cease to be a Limited Partner of the Partnership and shall have no further interest in the Partnership or rights as a Partner, including voting rights, except the right, upon dissolution of the Partnership, to receive, without interest, an amount equal to the Capital Account of such Defaulting Partner at the time of Default; <u>provided</u>, that, the Partnership shall be entitled to retain and deduct from such distribution an amount equal to the sum of: (i) fifty percent (50%) of such Defaulting Partner's cumulative Capital Contributions, or, if greater, fifty percent (50%) of such Defaulting Partner's Capital Account balance as of the date of such Default; and (ii) any expenses incurred by the Partnership in connection with such Default and such Partner's termination (including expenses incurred in enforcing the provisions of this <u>Section 3.3</u>).

3.4    <u>Distributions; General Principles</u>.

(a)    <u>Generally</u>.  Except as otherwise expressly provided in this <u>Article III</u> or in <u>Article X</u>, no Partner shall have the right to withdraw capital from the Partnership or to receive any distribution or return of its Capital Contribution.  Distributions of Partnership assets that are provided for in this <u>Article III</u> or in <u>Article X</u> shall be made only to Persons who, according to the books and records of the Partnership, were the holders of record of Interests in the Partnership on the date determined by the General Partner as of which the Partners are entitled to any such distributions.

(b)    <u>Timing of Distributions</u>.  Subject to any contrary requirements of this Agreement, including <u>Section 3.6</u> hereof, the amount and timing of distributions from the Partnership to the Partners shall be at the sole discretion of the General Partner; <u>provided</u>, that, subject to any contrary requirements of the Act or this Agreement: (i) cash received but undistributed by the Partnership from any source other than: (x) amounts held pending investment; (y) amounts reasonably reserved or set aside for Partnership Expenses; or (z) amounts described in clause (ii) below (net of taxes and expenses, if any) shall be distributed not less frequently than semi-annually; and (ii) cash attributable to the sale or other disposition of a Portfolio Investment (net of taxes and expenses, if any, and repayment of obligations of the Partnership then due), shall be distributed as soon as practical after receipt thereof.

(c)    <u>Reserves</u>.  Notwithstanding <u>Section 3.4(b)</u>, the General Partner may reserve from distributions any amount it reasonably determines to be necessary to pay for the reasonably anticipated costs, expenses, liabilities and obligations of the Partnership, properly incurred under this Agreement, which are not otherwise provided for; <u>provided</u>, that the General Partner may not reserve amounts hereby to fund any investment or pay any costs, expenses, liabilities or obligations except as expressly provided for in <u>Section 3.4(g)</u>, which shall, for the avoidance of doubt, reduce the amount of a Limited Partner's Unpaid Capital Commitment by the amounts specified in <u>Section 3.4(g)</u>.  Any amounts so reserved which are not used shall be invested in Temporary Investments.  The General Partner may at any time release any funds so reserved and any amounts

earned thereon or increment thereto and distribute such amounts to the Partners.

(d)    Subsequent Investments.  For purposes of this Agreement, whenever a subsequent investment is made in an existing Portfolio Investment, such subsequent investment shall be treated as a separate Portfolio Investment from the Portfolio Investment previously made.

(e)    Form of Distributions.  The Partnership may make distributions in cash or in kind. All cash distributions hereunder shall be payable in United States dollars.

(f)    Withholding Taxes.

(i)    The amount of any taxes paid by or withheld from receipts of the Partnership allocable to a Partner shall be deemed for purposes of this Agreement to have been distributed to such Partner to the extent that the payment or withholding of such taxes reduced the amount of the distribution otherwise payable to such Partner as provided herein.

(ii)    Any withholding taxes withheld pursuant to this Section 3.4(f) shall be withheld at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence, reasonably satisfactory to the General Partner, to the effect that a lower rate is applicable or that no withholding is applicable.

(iii)    If previously requested by a Limited Partner in writing, the General Partner will, to the extent practicable, notify such Limited Partner promptly if it determines that the Partnership is required to withhold any amount purportedly representing a tax liability of the Limited Partner and will: (A) consider in good faith any positions such Limited Partner may raise as to reasons withholding may not be required or alternative arrangements proposed by such Limited Partner which may avoid the need for withholding; (B) provide such Limited Partner with the opportunity to contest the requirement to withhold with the appropriate taxing authority (to the extent permitted by applicable law) during any period such contest does not subject the Partnership or the General Partner to any potential liability to such taxing authority for such claimed withholding or payment; and (C) prior to paying any amount purportedly representing a tax liability of the Limited Partner, give such Limited Partner at least ten (10) Business Days' prior notice of the amount and due date of the proposed payment and the opportunity to provide the necessary funds to the General Partner to make such payment.

(iv)    Without limiting the generality of the General Partner's powers otherwise specified herein, the General Partner is expressly authorized, for itself and on behalf of the Partnership, to enter into an agreement of the type contemplated by Section 1471 or 1472 of the Code ("FATCA") if it determines that such agreement is in the collective best interest of the Partners.  In such event, each Partner will provide such information (including with respect to its indirect interest owners) as the General Partner may reasonably request, in a timely manner, in order to comply with the terms and conditions of such agreement.  Each Limited Partner hereby acknowledges that the failure to promptly comply with such obligations may result in a material adverse effect on the Partners or the Partnership and acknowledges that the consequences thereof, with respect to a Limited Partner who fails to comply with such obligation, may include a required withdrawal in accordance with

9

Section 3.2(a).

(v)     Each Partner shall, to the fullest extent permitted by applicable law, indemnify and hold harmless each Indemnified Party against all claims, liabilities and expenses of whatever nature relating to such Indemnified Party's obligation to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership or any of its Affiliates with respect to such Partner or as a result of such Partner's participation in the Partnership; provided, that such liability shall not exceed the aggregate amount of all prior distributions made to such Partner and the Fair Value of such Partner's interest in the Partnership; provided further, however, that the foregoing obligation to indemnify and hold harmless shall not apply to penalties attributable to the fraud, willful misconduct or gross negligence of such Indemnified Party.

(vi)    The General Partner shall provide available information and such assistance as is reasonably requested by a Limited Partner to enable such Limited Partner to procure any available tax refunds, credits, exemptions from withholding, benefits of applicable tax treaties or similar relief in connection with withholding taxes imposed.  The General Partner will make or cause the Partnership to make any filings, applications or elections available to it or the Partnership to obtain any available exemptions from, reductions in, or refunds of any withholding or similar taxes, imposed by any taxing authority with respect to amounts received by the Partnership which are attributable to, or amounts held by the Partnership which are distributable to, or items of income allocable to, a Limited Partner under the Partnership Agreement.  If a Limited Partner is required to make any such filing, application or election directly, the General Partner, at such Limited Partner's request, will provide or cause the Partnership to provide such information and take such other action as may be reasonably necessary to complete or make such filings, applications or elections.  The General Partner's obligations under this Section 3.4(f)(vi) with respect to a specified Limited Partner shall be contingent upon such Limited Partner's provision of all reasonably requested information, timely execution and delivery of necessary documentation and reasonable cooperation with the General Partner with respect thereto; and the General Partner, in its reasonable discretion, may require a specified Limited Partner to reimburse the General Partner or the Partnership, as appropriate, for the reasonable fees, costs and expenses incurred by them pursuant to this paragraph (vi) with respect to such Limited Partner.

(g)     Retention of Amounts.  Any amounts otherwise distributable to a Limited Partner under this Article III may be retained by the Partnership and used for any purpose permissible under this Agreement, to the extent that, if such amounts had been distributed to such Limited Partner the General Partner could issue a Capital Call notice in accordance with the provisions of this Agreement to require that such amounts be recontributed thereby as a Capital Contribution. Any amount so retained shall be treated for all purposes of this Agreement as though such amount had been distributed to the Limited Partner pursuant to the applicable terms of this Agreement and immediately recontributed thereby as a Capital Contribution on the date of such distribution and shall, accordingly, reduce the amount of such Limited Partner's Unpaid Capital Commitment by such amount.  Any amounts so retained shall be retained proportionately from all Limited Partners (adjusted as reasonably necessary to reflect the withdrawal or default of one or more Limited Partners as provided for in Section 3.2(a), Section 3.2(b) and Section 3.3 hereof).

(h)     Distribution Notices.  From time to time, but at least annually, the General Partner

shall prepare and send to each Limited Partner a notice describing the portion of the total distribution proceeds attributable to a return of capital and the portion attributable to profits or other income thereon. If the General Partner intends to recall any portion of a distribution, it will send a notice to each Limited Partner that received such distribution specifying the amount of such distribution which may be subject to recall by the Partnership pursuant to the terms of this Agreement.

      3.5   <u>Amounts and Priority of Distributions</u>. Subject to <u>Section 3.6</u> and <u>Section 3.7</u>, distributions shall be preliminarily allocated between the Partners pro-rata in proportion to their respective Capital Contributions made to acquire the Portfolio Investment giving rise to the distribution proceeds (or, to the extent not attributable to a particular Portfolio Investment, in proportion to relative cumulative Capital Contributions), and then shall be distributed in the following order of priority (after payment of the expenses and liabilities of the Partnership):

      (a)   Amounts preliminarily allocated to the General Partner shall be distributed to the General Partner; and

      (b)   Amounts preliminarily allocated to a Limited Partner shall be distributed as follows:

         (i)   First, to such Limited Partner, a cumulative amount under this <u>Section 3.5(b)(i)</u> equal to such Limited Partner's cumulative Capital Contributions;

         (ii)   Second, to such Limited Partner, a cumulative amount under this <u>Section 3.5(b)(ii)</u> equal to such Limited Partner's Preferred Return;

         (iii)   Third, to the General Partner, an amount equal to the cumulative amount distributed to such Limited Partner pursuant to Section 3.5(b)(ii) (so as to result in the General Partner receiving twenty percent (20%) of the cumulative distributions made pursuant to this clause (iii) and clause (ii), above); and

         (iv)   Fourth, (A) twenty percent (20%) to the General Partner and (B) eighty percent (80%) to such Limited Partner.

      3.6   <u>Tax Distributions</u>. Notwithstanding any contrary provision of this <u>Article III</u>, the General Partner shall be entitled to cause the Partnership to distribute to the General Partner a cumulative amount under this <u>Section 3.6</u> sufficient for the General Partner (or its direct or indirect partners, members or shareholders) to pay any taxes attributable to any items of income allocated to them under this Agreement or otherwise attributable to their interest in the Partnership (excluding, however: (a) any tax liability attributable to the receipt of Management Fees or the reimbursement of any other Partnership Expenses; and (b) any tax liability attributable to the General Partner's pro rata share of the Partnership's income and profits attributable to its own Capital Contributions. Absent Advisory Committee consent to the use of a different methodology, the General Partner shall compute the amount distributable under this <u>Section 3.6</u> by: (a) treating the General Partner as a natural person resident in Los Angeles, California; (b) taking into account any allowable deductions for state taxes to the extent permitted under Section 68 of the Code; and (c) treating all allocations to the General Partner of Partnership capital losses for prior years (to the extent not offset against allocations of Partnership capital gains for such prior years) as having been carried forward and applied to reduce, to the maximum extent permitted under applicable

law, the General Partner's tax liability with respect to Partnership capital gains allocated to the General Partner for the year with respect to which the tax distribution relates. The amount of any such distribution (for the avoidance of doubt, determined on a cumulative basis through the date of such distribution) shall be reduced by the cumulative amount previously distributed to the General Partner pursuant to Section 3.5 and this Section 3.6. Any funds distributed pursuant to this Section 3.6 shall be treated as an advance against, and shall reduce, the amount of future distributions that the General Partner would otherwise receive pursuant to Section 3.5.

3.7   Limitation on Distributions. Anything to the contrary herein notwithstanding, no distribution shall be made to the extent such distribution would render the Partnership insolvent or would otherwise be prohibited by the Act.

3.8   Clawback.

(a)   With respect to each Limited Partner, upon liquidation of the Partnership, the General Partner shall be obligated to return to the Partnership for distribution to such Limited Partner the greater of: (x) the amount required for such Limited Partner to have received aggregate distributions pursuant to this Agreement equal to its aggregate Capital Contributions and the Preferred Return thereon; and (y) the excess, if any, of: (a) aggregate distributions received by the General Partner pursuant to Section 3.5(b)(iii) and Section 3.5(b)(iv)(A), including such portion of the tax distributions made pursuant to Section 3.6 and the liquidating distributions pursuant to Section 10.3 as the General Partner reasonably determines to be attributable to distributions that the General Partner would otherwise have received pursuant to Section 3.5(b)(iii) and Section 3.5(b)(iv)(A) with respect to such Limited Partner; over (b) twenty percent (20%) of aggregate distributions made pursuant to Section 3.5(b) to such Limited Partner and the General Partner with respect to such Limited Partner in excess of the Limited Partner's aggregate Capital Contributions; provided, that the amount required to be so contributed to the Partnership by the General Partner with respect to such Limited Partner shall not exceed the aggregate distributions received by the General Partner pursuant to Section 3.5(b)(iii) and Section 3.5(b)(iv)(A) with respect to such Limited Partner, including such portion of the tax distributions made pursuant to Section 3.6 and the liquidating distributions pursuant to Section 10.3 as the General Partner reasonably determines to be attributable to distributions that the General Partner would otherwise have received pursuant to Section 3.5(b)(iii) and Section 3.5(b)(iv)(A) with respect to such Limited Partner, less any taxes paid by the General Partner (or its direct or indirect partners, members or shareholders) with respect to or otherwise attributable to the receipt of such distributions or any associated allocation of income (calculated using the same assumptions provided for in Section 3.6 hereof); provided, that to the extent the voting members of the General Partner, during the five (5) year period following the liquidation of the Partnership, are able to reduce the amount of taxes they are otherwise required to bear by the use of any losses directly attributable to the recontribution of amounts provided for under this Section 3.8 (as determined by a nationally recognized independent public accounting firm mutually agreed upon by such members of the General Partner or, in the absence of such agreement, by a Majority in Interest of the Limited Partners, which accounting firm shall be provided copies of the income tax returns of all such individuals for such five (5)-year period and which has been instructed to provide the determination of the amount of such benefit to such Person as a Majority in Interest of the Limited Partners may agree upon, but which firm shall not otherwise be permitted to release such returns, or any information contained therein, to any other Person), then the reduction in the amount of the clawback for the amount of taxes borne shall be reduced (as of the date such losses are actually used by such individual members of the General Partner for such purpose) by an equivalent amount and, accordingly, the amount

required to be so contributed shall be increased as of such date.

(b)      If the Partnership shall not have been liquidated and the clawback shall not have been determined pursuant to Section 3.8(a) as of the sixth (6th) anniversary of the Final Closing, then the General Partner shall cause the clawback to be determined pursuant to Section 3.8(a) and within six months of such sixth (6th) anniversary of the Final Closing, the General Partner shall cause any Clawback Amount to be paid; provided, that for purposes of such determination, it shall be assumed that any remaining Portfolio Investments shall have been sold for their Fair Value and the net proceeds from any such sale distributed in accordance with the distribution priorities of Section 3.5. Upon the sale of any remaining Portfolio Investments, any discrepancy between such assumptions and such sale amount (on a cumulative basis at the time of any such distribution) shall be taken into account at the time of any distribution made pursuant to Section 3.5.

ARTICLE IV

Fees and Expenses

4.1      The Management Fee.

(a)      Subject to the provisions of this Section 4.1, the Partnership will pay to the General Partner or an Affiliate of the General Partner designated by the General Partner a management fee (the "Management Fee") for the services to be provided hereunder. The Management Fee shall be calculated separately for each Limited Partner and shall be paid or charged against such Limited Partner's Capital Account as set forth herein.

(b)      The Management Fee shall be calculated with respect to each Limited Partner as follows:

(i)      During the period commencing on the Initial Closing Date and ending on the earlier to occur of: (A) initial closing of a Successor Fund, or (B) the expiration of the Subscription Period, such Limited Partner's pro rata share of the Management Fee shall equal two percent (2.0%) per annum of the Capital Contributions of such Limited Partner.

(ii)      After the earlier of to occur of: (A) the expiration of the Subscription Period or (B) the date on which such Limited Partner's Capital Contributions during the Subscription Period have initially been called up to the amount of Limited Partner's Capital Commitment, each Limited Partner's pro rata share of the Management Fee shall be an amount up to two percent (2.0%) per annum of such Limited Partner's share of the Invested Amount. The "Invested Amount" shall equal the aggregate cost to the Partnership of its Portfolio Investments; provided, that the cost of any portion of a Portfolio Investment which has been disposed of or which has been completely written-off shall be excluded; provided further, that if the aggregate fair market value of the Partnership's Portfolio Investments is less than the aggregate cost of such Portfolio Investments (excluding the cost of all Portfolio Investments described in the foregoing proviso), then the Invested Amount shall instead be the aggregate fair market value of the Partnership's Portfolio Investments. A Limited Partner's share of the Invested Amount shall be determined by reference to the cumulative Capital Contributions made by such Limited Partner invested in the Portfolio Investments which are taken into account for purposes of computing the

Invested Amount, expressed as a fraction of the cumulative Capital Contributions of all Limited Partners so invested.

(c)     Payments of the Management Fee will be due on the date of this Agreement with respect to each Limited Partner admitted as a Limited Partner on such date.  Thereafter, payments of the Management Fee with respect to each Limited Partner will be made quarterly in advance on: (i) the fifth (5th) Business Day of each calendar quarter; or (ii) such later date as may be specified by the General Partner in a notice to the Limited Partners.  The Management Fee for any partial period shall be prorated on the basis of the ratio that the total number of days in such partial period for which the Management Fee is payable bears to the total number of days in the calendar quarter or other period with respect to which the Management Fee is being calculated.  The calculation of the Management Fee which is determined by reference to the Invested Amount of a Limited Partner shall be determined by reference to the Invested Amount on the last day of the quarterly period immediately prior to the quarterly period with respect to which the Management Fee is to be paid.

(d)     For purposes of this Section 4.1, the Management Fee shall not include (or be reduced or offset in any manner by) the amount of any reimbursement of Partnership Expenses paid in cash during such year, payable to the General Partner or to any member or manager of the General Partner (or any Affiliate of such member or manager), which reimbursement shall be the exclusive property of the person receiving the same.  Indigo, the General Partner, its members and managers and its and their respective Affiliates may earn monitoring, origination, servicing and other fee income in connection with Portfolio Investments.  None of these fees paid with respect to Portfolio Investments shall be applied to reduce the Management Fee due with respect to the Limited Partners hereunder.

4.2     General Partner Expenses.  The Partnership shall not have any salaried personnel. The General Partner and its Affiliates, but not the Partnership or any Limited Partner, shall bear and be charged with the following costs and expenses of the Partnership's activities: (a) the compensation of the investment personnel and other employees of the General Partner and its Affiliates; (b) the costs and expenses of such personnel and their related overhead, including benefits, rent, furniture, fixtures and equipment other, similar, back office expenses; and (c) expenses not indemnifiable pursuant to the provisions of Section 6.5 hereof.  Amounts spent or advanced by the General Partner for which express provision for payment by the Partnership or reimbursement of the General Partner is provided for in Section 4.3(a) through Section 4.3(m) hereof shall not, however, be treated as a General Partner Expense by reason of such payment or advance.  The expenses that the General Partner is obligated to pay under this Section 4.2 shall be collectively referred to as the "General Partner Expenses."

4.3     Partnership Expenses.  The Partnership shall bear and be charged with all costs, fees and expenses of the Partnership's operations other than the General Partner Expenses (and shall promptly reimburse the General Partner and its Affiliates, as the case may be, to the extent that any of such costs, fees and expenses are paid or incurred by such entities) (the "Partnership Expenses"), including:

(a)     the Management Fee,

(b)     the Portfolio Loan Costs,

14

(c)     the Servicing Cost,

(d)     the Origination Fee,

(e)     the Partnership-Level Expenses,

(f)     the Organizational Expenses and

(g)     the Offering Expenses.

## ARTICLE V

### Capital Accounts and Allocations

5.1    Capital Accounts.

(a)    A separate capital account ("Capital Account") shall be established and maintained for each Partner. The Capital Account of each Partner shall be credited with such Partner's Capital Contributions, all Profits allocated to such Partner and any items of income or gain which are specially allocated hereunder; and shall be debited with all Losses allocated to such Partner, any items of loss or deduction of the Partnership specially allocated to such Partner hereunder, and all cash and the Carrying Value of any property (net of liabilities assumed by such Partner and the liabilities to which such property is subject) distributed by the Partnership to such Partner. To the extent not provided for in the preceding sentence, the Capital Accounts of the Partners shall be adjusted and maintained in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), as the same may be amended or revised; provided, that such adjustment and maintenance does not have a material adverse effect on the economic interests of the Partners. Any references in any section of this Agreement to the Capital Account of a Partner shall be deemed to refer to such Capital Account as the same may be credited or debited from time to time as set forth above. In the event of any transfer of any interest in the Partnership in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(b)    Except as expressly provided in Section 3.8 and Section 7.2 no Partner shall be required to pay to the Partnership or to any other Partner the amount of any negative balance which may exist from time to time in such Partner's Capital Account.

5.2    Allocations of Profits and Losses. Except as otherwise expressly required by this Agreement, Profits and Losses and, to the extent necessary, individual items of income, gain, loss or deduction of the Partnership shall be allocated among the Partners in a manner such that the Capital Account of each Partner, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to: (i) the distributions that would be made to such Partner pursuant to Section 3.5 if the Partnership were dissolved, its affairs wound up and its assets sold for cash equal to their Carrying Value, all Partnership liabilities were satisfied (limited with respect to each nonrecourse liability to the Carrying Value of the assets securing such liability), and the net assets of the Partnership were distributed in accordance with Section 3.5 to the Partners immediately after making such allocation; minus (ii) such Partner's share of Partnership Minimum Gain and Partner Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets; minus (iii) in the case of the General Partner, any obligation of the

General Partner to make any capital contribution to the Partnership if the Partnership were liquidated at such time; plus (iv) in the case of each Limited Partner, such Limited Partner's share of the hypothetical capital contribution of the General Partner pursuant to clause (iii) hereof.

5.3    Special Allocation Provisions.  Notwithstanding Section 5.2:

(a)    Minimum Gain Chargeback.  If there is a net decrease in Partnership Minimum Gain or Partner Nonrecourse Debt Minimum Gain (determined in accordance with the principles of Treasury Regulations Sections 1.704-2(d) and 1.704-2(i)) during any Partnership taxable year, the Partners shall be specially allocated items of Partnership income and gain for such year (and, if necessary, subsequent years) in an amount equal to their respective shares of such net decrease during such year, determined pursuant to Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5). The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f). This provision is intended to comply with the minimum gain chargeback requirements in such Treasury Regulations Sections and shall be interpreted consistently therewith; including that no chargeback shall be required to the extent of the exceptions provided in Treasury Regulations Sections 1.704-2(f) and 1.704-2(i)(4).

(b)    Qualified Income Offset.  In the event any Partner unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Partnership income and gain shall be specially allocated to such Partner in an amount and manner sufficient to eliminate the deficit balance in its Capital Account created by such adjustments, allocations or distributions as promptly as possible.

(c)    Gross Income Allocation.  In the event any Partner has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of: (i) the amount such Partner is obligated to restore, if any, pursuant to any provision of this Agreement; and (ii) the amount such Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Partner shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible; provided, that such allocation shall be made only if and to the extent such Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 5.3 and in Section 5.2 have been tentatively made as if this Section 5.3(c) were not in this Agreement.

(d)    General Partner Expenses.  To the extent, if any, that General Partner Expenses and any items of loss, expense or deduction resulting therefrom are deemed to constitute items of Partnership loss or deduction rather than items of loss or deduction of the General Partner, such General Partner Expenses and other items of loss, expense or deduction shall be allocated 100% to the General Partner.

(e)    Payee Allocation.  In the event any payment to any Person that is treated by the Partnership as the payment of an expense is recharacterized by a taxing authority as a Partnership distribution to the payee as a partner, such payee shall be specially allocated an amount of Partnership gross income and gain as quickly as possible equal to the amount of the distribution.

(f)    Nonrecourse Deductions.  Nonrecourse Deductions shall be allocated among the Partners in accordance with their relative Capital Contributions.

16

    (g)    <u>Partner Nonrecourse Deductions</u>. Partner Nonrecourse Deductions for any taxable period shall be allocated to the Partner who bears the economic risk of loss with respect to the liability to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Sections 1.704-2(i) and 1.704-2(j).

    (h)    <u>Management Fee Expense</u>. Items of loss, deduction and expense attributable to the Management Fee shall be allocated among the Partners in such a manner as to cause the cumulative amount thereof allocated to each Partner to equal, as nearly as practicable, the cumulative Capital Contributions made by such Partner pursuant to <u>Section 3.1(b)(ii)</u> and <u>Section 2.2(iii)</u>.

    5.4    <u>Tax Allocations</u>. For income tax purposes only, each item of income, gain, loss and deduction of the Partnership shall be allocated among the Partners in the same manner as the corresponding items of Profits and Losses and specially allocated items are allocated for Capital Account purposes; provided, that in the case of any Partnership asset the Carrying Value of which differs from its adjusted tax basis for U.S. federal income tax purposes, income, gain, loss and deduction with respect to such asset shall be allocated solely for income tax purposes in accordance with the principles of Section 704(b) and Section 704(c) of the Code and the regulations thereunder (in any manner determined by the General Partner in its reasonable discretion) so as to take account of the difference between Carrying Value and adjusted basis of such asset.

    5.5    <u>Other Allocation Provisions</u>. The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) (subject to the limitation on deficit capital account restoration obligations specified in <u>Section 5.1(b)</u>)) and shall be interpreted and applied in a manner consistent with such regulations. <u>Section 5.1</u> through this <u>Section 5.5</u> may be amended at any time by the General Partner if necessary, in the opinion of tax counsel to the Partnership, to comply with such regulations, so long as any such amendment does not materially change the relative economic interests of the Partners.

ARTICLE VI

<u>General Partner</u>

    6.1    <u>Powers of the General Partner</u>.

    (a)    The control, management and operation of, and policy making for, the Partnership shall be vested exclusively in the General Partner (and its duly authorized agents and delegates), which shall have the power by itself and shall be authorized and empowered on behalf and in the name of the Partnership to carry out any and all of the objects and purposes of the Partnership and to perform all acts and enter into and perform all contracts and other undertakings that it may in its sole discretion deem necessary or advisable or incidental thereto, all in accordance with and subject to the other terms of this Agreement.

    (b)    Without limiting the foregoing general powers and duties, the General Partner is hereby authorized and empowered acting on behalf and in the name of the Partnership, or on its own behalf and in its own name, or through agents, as may be appropriate, subject to the limitations contained elsewhere in this Agreement, to:

    (i)    make all decisions concerning the investigation, selection, negotiation,

17

structuring, commitment to, making, monitoring and disposition of Portfolio Investments;

(ii)    direct the formulation of investment policies and strategies for the Partnership and select and approve the investment of Partnership funds, all in accordance with the limitations of this Agreement;

(iii)    acquire, hold, sell, transfer, exchange, pledge and dispose of Portfolio Investments and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Portfolio Investments, including participation in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other similar matters; provided, however, that the General Partner shall not enter into any settlement or compromise of any suit or administrative proceeding that, in the reasonable judgment of the General Partner, would have a material adverse effect on the business of the Partnership without the approval of either the Advisory Committee or a Majority in Interest of the Limited Partners; provided, further, that if the settlement or compromise of any suit or administrative proceeding would create or result in a conflict of interest between the General Partner, the Investment Manager, an individual member of the General Partner or any of their Affiliates and the Partnership or any Limited Partner, then the General Partner shall obtain Advisory Committee approval prior to entering into such settlement or compromise;

(iv)    make Temporary Investments pending the investment of Partnership funds in any Portfolio Investment, apply such funds to Management Fees and other Partnership Expenses or make cash distributions to the Partners;

(v)    open, maintain and close bank accounts and draw checks or other orders for the payment of money and open, maintain and close brokerage, custody, money market fund and similar accounts;

(vi)    subject to any restrictions expressly provided for herein, lend, with or without security, any funds or properties of the Partnership;

(vii)    hire for usual and customary payments and expenses consultants, brokers, custodian, attorneys, accountants and such other advisors or agents for the Partnership as it may deem necessary or advisable and authorize any such advisor or agent to act for and on behalf of the Partnership;

(viii)    enter into, execute, maintain or terminate contracts, indemnities, undertakings, agreements and any and all other documents and instruments in the name of the Partnership and to do or perform all such things as may be necessary or advisable in furtherance of the Partnership's powers, objects or purposes or to the conduct of the Partnership's activities, including entering into agreements to make or dispose of Portfolio Investments which may include such representations, warranties, covenants, indemnities and guarantees as the General Partner deems necessary or advisable;

(ix)    to purchase and pay for such insurance, if any, as the General Partner shall deem necessary or appropriate for the conduct of the business of the Partnership;

(x)    make in good faith any and all elections for U.S. federal, state, local and

foreign tax matters, including any election to adjust the basis of Partnership property pursuant to Sections 734(b), 743(b) and 754 of the Code or comparable provisions of state, local or foreign law; and

(xi)    act as the "tax matters partner" under the Code and in any similar capacity under state, local or foreign law.

(c)    Borrowing and Guarantees.  The General Partner shall have the right, at its option, to cause the Partnership to: (x) guarantee loans or other extensions of credit to support an obligation made to any current or prospective Portfolio Investment or any vehicle formed to effect the investment therein; and (y) borrow money from any Person (including from Indigo, the General Partner and their respective Affiliates) for purposes of: (i) covering Partnership Expenses; (ii) providing interim financing to consummate the investment in Portfolio Investments prior to the receipt of Capital Contributions; or (iii) providing interim financing to fund Portfolio Investments prior to the receipt of Capital Contributions; provided, that any such borrowings shall be made on such terms, taken as a whole, as the General Partner determines to be fair and reasonable to the Partnership.  The General Partner shall have the right to cause the Partners to make Capital Contributions in order to repay any borrowing, or fund any guarantee, incurred or entered into pursuant to this Section 6.1(c), and may secure the repayment of any such borrowing or the performance of any such guarantee by mortgage, pledge or assignment of or grant of a security interest in all or any part of the Securities or other assets then owned or thereafter acquired by the Partnership and may pledge, assign or grant a security interest in the right to issue Capital Calls to Limited Partners or to receive Capital Contributions (in each case, subject to the terms, conditions and limitations set forth herein).  In connection with any borrowing, guarantee or other matter contemplated by this Section 6.1(c), each Limited Partner agrees to cooperate with the General Partner and provide such information and documentation as is reasonably and customarily required in connection therewith, including without limitation, confirmation of the amount of such Limited Partner's Uncalled Capital Commitment.

6.2    Restrictions and Limitations.

(a)    At such time as any funds of the Partnership are not invested in Portfolio Investments, distributed to the Partners or applied towards the expenses of the Partnership, the General Partner shall maintain such funds either in Temporary Investments or, to the extent the General Partner determines in good faith it is not reasonably practical to do so, in cash.  Any other proposed investments for such funds of the Partnership must be approved by the Advisory Committee.

(b)    Except with respect to an interest (direct or indirect) in a Holding Entity, for the period commencing 180 days after the end of the Subscription Period, the amount committed (directly or indirectly) by the Partnership to any single Portfolio Investment, as of the date on which such commitment was made, shall not exceed twenty percent (20%) of the Invested Amount.

6.3    Holding Entities.  The Partnership may, as determined by the General Partner in its sole discretion, acquire and hold its interests in Portfolio Investments through holding entities (each a "Holding Entity") established for tax, regulatory, legal or similar reasons, as determined by the General Partner in its sole discretion.  The General Partner will be a general partner or manager of any such Holding Entity.  A single Holding Entity may be used for multiple

investments.

6.4     Limitation on Liability.

(a)     The General Partner shall be subject to all of the liabilities of a general partner of a limited partnership under the Act; provided, that none of the General Partner, the Investment Manager, the Originator, the Servicer and their respective Affiliates, nor each of their respective direct and indirect officers, directors, agents, stockholders, members, employees and partners, and any other Person who serves at the request of the General Partner on behalf of the Partnership as an officer, director, member, partner or employee of any other entities, (each, an "Indemnified Party") shall be liable to the Partnership or to any Limited Partner for: (i) any act or omission taken or suffered by any Indemnified Party in connection with the conduct of the affairs of the Partnership, its current or former Portfolio Investments or any Holding Entity or otherwise in connection with this Agreement or the matters contemplated herein, unless such act or omission resulted from fraud, bad faith, willful misconduct, gross negligence, a breach of fiduciary duty to the Partnership under applicable law (as modified by the provisions of this Agreement), a material violation of applicable U.S. federal or state securities laws, a conviction of a felony involving moral turpitude by a court in the United States or a material breach of this Agreement (or the Investment Management Agreement to the extent that the Investment Manager is the Indemnified Party) by such Indemnified Party, and except that nothing herein shall constitute a waiver or limitation of any rights which a Partner or the Partnership may have under applicable securities laws or other laws and which may not be waived; or (ii) any mistake, negligence, dishonesty or bad faith of any broker, adviser or other agent of the Partnership selected and monitored by the General Partner with reasonable care.

(b)     The General Partner acknowledges that it has a fiduciary duty to the Partnership and the Limited Partners.  To the extent that, at law or in equity or otherwise, the General Partner has duties (including fiduciary duties) and liabilities relating thereto to the Partnership or to another Partner, the General Partner acting under this Agreement shall not be liable to the Partnership or to any such other Partner for its good faith reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent that they expand or restrict the duties and liabilities of the General Partner otherwise existing at law or in equity or otherwise, are agreed by the Partners, to the maximum extent permitted by applicable law, to modify to that extent such other duties and liabilities of the General Partner.

(c)     The General Partner may consult with legal counsel and accountants selected by it and any act or omission suffered or taken by it on behalf of the Partnership or in furtherance of the interests of the Partnership in good faith in reasonable reliance upon and in accordance with the advice of such counsel or accountants shall be full justification for any such act or omission, and the General Partner shall be fully protected in so acting or omitting to act, provided such counsel or accountants were selected with reasonable care.

6.5     Indemnification.

(a)     To the fullest extent permitted by law, the Partnership shall indemnify and save harmless each of the Indemnified Parties from and against any and all claims, liabilities, damages, losses, costs and expenses (including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and reasonable expenses of investigating or defending against any claim or alleged claim) of any nature whatsoever, known

or unknown, liquidated or unliquidated, that may accrue or are incurred by any Indemnified Party or to which such Indemnified Party may be subject by reason of its activities on behalf of the Partnership or in furtherance of the interest of the Partnership or otherwise arising out of or in connection with the affairs of the Partnership, its Portfolio Investments or any Holding Entity, including the performance by such Indemnified Party of any of the General Partner's responsibilities hereunder or the Investment Manager's responsibilities under the Investment Management Agreement or otherwise in connection with the matters contemplated herein or therein; provided, that: (i) an Indemnified Party shall be entitled to indemnification hereunder only to the extent that such Indemnified Party's conduct did not constitute fraud, bad faith, willful misconduct, gross negligence, a breach of fiduciary duty to the Partnership under applicable law (as modified by the provisions of this Agreement), result in a conviction of a felony involving moral turpitude by a court in the United States, constitute a violation of applicable securities laws or a material breach of this Agreement; (ii) an Indemnified Party shall not be entitled to indemnification with respect to any mistake, negligence, dishonesty or bad faith of any broker or other agent of the Partnership to the extent that such Indemnified Party was responsible for the selection and monitoring of such broker or agent and acted in such capacity with gross negligence; (iii) nothing herein shall constitute a waiver or limitation of any rights which a Partner or the Partnership may have under applicable securities laws or other laws and which may not be waived; and (iv) the Partnership's obligations hereunder shall not apply with respect to: (x) economic losses or tax obligations incurred by any Indemnified Party as a result of such Indemnified Party's ownership of an interest in the Partnership or in Portfolio Investments; (y) expenses of the Partnership that an Indemnified Party has agreed to bear; or (z) claims or disputes that are solely between and among the members of the General Partner or other Affiliates of the General Partner. The satisfaction of any indemnification and any saving harmless pursuant to this Section 6.5(a) shall be from and limited to Partnership assets, no Limited Partner shall have any obligation to make Capital Contributions to fund its share of any indemnification obligations under this Section 6.5 in excess of such Limited Partner's Unpaid Capital Commitments, and no Partner shall have any personal liability on account thereof; provided, that each Limited Partner will be obligated to return any amounts distributed to it in order to fund any deficiency in the Partnership's indemnity obligations hereunder to the extent provided in Section 7.2.

(b)     Expenses reasonably incurred by an Indemnified Party in defense or settlement of any claim that may be subject to a right of indemnification hereunder shall be advanced by the Partnership prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnified Party to repay such amount to the extent that it shall be determined ultimately that such Indemnified Party is not entitled to be indemnified hereunder.  No advances shall be made by the Partnership under this Section 6.5(b) without the prior written approval of the General Partner and no advances shall be made by the Partnership under this Section 6.5(b) in connection with an action, suit or proceeding commenced by or joined by a Majority in Interest of the Limited Partners against an Indemnified Party.  Notwithstanding the foregoing, an Indemnified Party shall not be entitled to receive any further advances under this Section 6.5(b) after such time, if any, as such Indemnified Party's conduct is determined by any court or governmental body of competent jurisdiction in a final judgment (determined without regard to the availability of appeals) to constitute fraud, bad faith, willful misconduct or gross negligence, a breach of fiduciary duty to the Partnership under applicable law (as modified by the provisions of this Agreement), a violation of applicable securities laws, result in a conviction of a felony involving moral turpitude by a court in the United States or constitute a material breach of this Agreement.  The General Partner shall notify the Advisory Committee at such time as the Partnership advances two hundred and fifty

thousand dollars ($250,000) or more to any Indemnified Party pursuant to this Section 6.5(b) to cover such Indemnified Party's expenses incurred in the defense or settlement of any claim.

(c)     The right of any Indemnified Party to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which such Indemnified Party may otherwise be entitled by contract or as a matter of law or equity and shall extend to such Indemnified Party's successors, assigns and legal representatives.

(d)     Any Indemnified Party shall first seek recovery under any other indemnity or any insurance policies (for the avoidance of any doubt, other than indemnities provided by Indigo and its Affiliates to their own respective officers, directors, employees or persons acting in a similar capacity and other than insurance maintained and paid for by Indigo or such Affiliates for their own benefit or the benefit of their officers, directors and employees) by which such Indemnified Party is indemnified or covered, as the case may be, but only to the extent that the indemnitor with respect to such indemnity or the insurer with respect to such insurance policy provides (or acknowledges its obligation to provide) such indemnity or coverage, as the case may be, on a timely basis.  To the extent that an Indemnified Party receives an indemnification payment from the Partnership under this Section 6.5 in respect of the conduct of such Indemnified Party and then recovers amounts in respect of such conduct under any insurance policies or other indemnity referred to in the preceding sentence, such Indemnified Party shall return such recovered amounts (net of expenses incurred in connection with such recovery) to the Partnership up to the amount of such indemnification previously paid by the Partnership.  If such Indemnified Party is other than the General Partner, such Indemnified Party shall obtain the written consent of the General Partner prior to entering into any compromise or settlement which would result in an obligation of the Partnership to indemnify such Indemnified Party.  If liabilities arise out of the conduct of the affairs of the Partnership and any other Person for which the Indemnified Party was then acting in a similar capacity, the amount of the indemnification provided by the Partnership shall be limited to the Partnership's proportionate share thereof as determined in good faith by the General Partner.

(e)     Any Indemnified Party shall be deemed to be a creditor of the Partnership and shall be entitled to enforce the obligations of Partners to return distributions pursuant to Section 7.2 following the termination of the Partnership.

(f)     The General Partner may in its sole discretion cause the Partnership to purchase, at the Partnership's expense, insurance to insure the General Partner or any other indemnified party against liability for any breach or alleged breach of their responsibilities under this Agreement or otherwise in connection with the Partnership or the General Partner; provided, that the Partnership shall be a beneficiary of any such insurance policy; and provided that to the extent practicable the Partnership shall not bear the cost of any incremental premium associated with the purchase of insurance designed to insure the General Partner or any other Indemnified Party against any act or omission which is not indemnifiable under this section.

(g)     The General Partner shall, acting in its sole discretion, be entitled to enter into one or more agreements and/or deeds on behalf of the Partnership to give effect to the exculpation and indemnification provisions set out in this Agreement.

6.6     General Partner as Limited Partner.  The General Partner also shall be a Limited Partner to the extent that it purchases or becomes a transferee of all or any part of the Interest of a Limited Partner and to such extent shall be treated as a Limited Partner in all respects (except as

provided in the next sentence). Any Interest of a Limited Partner that is held by the General Partner or any of its Affiliates shall: (a) be voted or abstained in the same manner and proportions as the aggregate Interests of the other Limited Partners are voted or abstained; and (b) participate in Portfolio Investments on the same terms and conditions as the other Limited Partners (but will not bear any Management Fees or Carried Interest, except as the General Partner may otherwise expressly determine).

6.7     Other Activities.

(a)     Restriction on Successor Fund. Except as otherwise provided in this Section 6.7 and Section 6.9 until the earlier of: (i) the end of the Investment Period; and (ii) the date on which Full Investment has occurred: (A) none of the General Partner or its Affiliates may make any investments that are substantially similar to the types of investments that are within the specific investment guidelines of the Partnership, outside of the Partnership or a Parallel Fund for their own account without the consent of the Advisory Committee; and (B) none of the General Partner or its Affiliates shall close (or be the primary source of investments for) any other pooled equity investment vehicle (other than a Parallel Fund, a Separate Account or an Existing Client) that has as its primary investment focus substantially similar to the types of investments that are within the primary investment focus of the Partnership (a "Successor Fund"). Any of the foregoing restrictions in this Section 6.7(a) may be waived or modified by the General Partner with the consent of the Advisory Committee. Notwithstanding the foregoing, the General Partner and its Affiliates are permitted to make, directly or indirectly, investments that the Partnership is restricted from making or that are not within the investment focus of the Partnership.

(b)     Transactions with Affiliates. The General Partner and its Affiliates may engage in transactions with the Partnership or any Holding Entity only to the extent that the terms of such transactions, taken as a whole, are fair and reasonable to the Partnership (as determined by the Advisory Committee); provided, for the avoidance of doubt, nothing in this Section 6.7(b) shall be construed to modify (or require Advisory Committee approval of) any of the expressly provided for rights, duties and obligations of the General Partner under this Agreement, including Section 3.5 and Section 4.1 hereof.

(c)     No General Prohibition on Activities. The Limited Partners acknowledge that Indigo and its Affiliates may have certain obligations to Existing Clients, and may also sponsor or otherwise form other investment vehicles or investment accounts ("Separate Accounts") whose investment focus or investment criteria may vary from, or be substantially similar to, that of the Partnership. Moreover, Indigo and such Affiliates expect to devote a portion of their business time and efforts to such Existing Clients and Separate Accounts. Except as otherwise expressly provided in this Section 6.7 and in Section 6.9 and Section 6.9(c), below, this Agreement shall not be construed to preclude Indigo from engaging in any business or other activity whatsoever. For the avoidance of doubt, all obligations of Indigo, the General Partner and their Affiliates under this Section 6.7 shall cease upon the removal of the General Partner hereunder. The General Partner shall cause all investment opportunities to be allocated between the Partnership (including any Holding Entity), any Existing Clients and any Separate Accounts on a fair and equitable basis.

6.8     Valuation.

(a)     The fair value of any Portfolio Investments or of property received in exchange for any Portfolio Investments shall be determined in accordance with the "Asset Valuation" section

of the Memorandum ("Fair Value"). For all purposes of this Agreement, all determinations of Fair Value shall be final and conclusive on the Partnership and all Partners, their successors and assigns, unless written objection of the Advisory Committee is received within thirty (30) days after the General Partner has notified the Advisory Committee of its determination (which notice shall provide reasonable details as to the manner in which such Fair Value was determined and shall be promptly provided to the Advisory Committee by the General Partner); provided, that after receipt of any objection by the Advisory Committee, if the General Partner and the Advisory Committee are unable to agree on the Fair Value of any Portfolio Investments or of property received in exchange for any Portfolio Investments, the General Partner shall obtain a Valuation Opinion, and such Valuation Opinion shall be final and binding on the Partnership and all Partners.

(b)     For purposes of determining Fair Value, the General Partner may obtain the opinion (a "Valuation Opinion") of a recognized investment banking, asset management or appraisal firm (an "Appraisal Firm") and shall be entitled to rely on any such Valuation Opinion in determining Fair Value. The selection by the General Partner of an Appraisal Firm used in connection with making Partnership allocations and distributions decisions shall be approved by the Advisory Committee, which approval shall not be unreasonably withheld.

(c)     If the Fair Value of the Partnership property as determined by a Valuation Opinion received by the Partnership as aforesaid differs from that determined by the General Partner, appropriate adjustments to reflect the Fair Value determined by such Valuation Opinion shall be made to any distributions made on the basis of a determination of Fair Value made by the General Partner.

(d)     All assets classified as real estate owned assets are valued using an as-is sale opinion from a third party valuation provider, primarily the valuation opinion of the listing agent that is marketing the property or a reliable real estate broker. The General Partner may assign a premium or discount to this third-party valuation if deemed appropriate based on certain shortcomings in the valuation opinion with any valuation differences being supported by more suitable sales comparables.

(e)     Notwithstanding anything to the contrary otherwise provided for in this Section 6.8, to the extent the value of any Portfolio Investment or other asset of the Partnership is required, in order to comply with requirements of U.S. generally accepted accounting principles in connection with the preparation of the Partnership's financial statements, to be determined in a manner different than as provided for above in this Section 6.8 (including, without limitation, in a manner which varies from that set forth in Section 6.8(b) or Section 6.8(d) hereof) then, solely for such financial reporting purposes, such valuation shall be made in accordance with the relevant requirements of U.S. generally accepted accounting principles.

6.9     Investment Opportunities.

(a)     Subject to Section 6.7, each of the Limited Partners hereby agrees that the General Partner may offer the right to participate in investment opportunities of the Partnership to other private investors, groups, partnerships or corporations whenever the General Partner, in its sole discretion, so determines, including Separate Accounts and Existing Clients.

(b)     Subject to Section 6.7, until the earlier of: (i) the end of the Investment Period; and (ii) the date on which Full Investment has occurred, the General Partner and the Investment

Manager, pursuant to the Investment Management Agreement, will devote a significant portion of its respective business time and activities in order to perform its respective obligations to the Partnership and the Holding Entities and will, in accordance with the Investment Manager's investment allocation policy, present all appropriate investment opportunities to the Partnership.

(c)     Subject to Section 6.7 and Section 6.9(b), any Partner and any Affiliate of any Partner, and any partner, manager, director, officer, shareholder, member or employee of the foregoing, may engage in or possess an interest in other profit-seeking or business ventures of any kind, nature or description, independently or with others, whether or not such ventures are competitive with the Partnership, and the doctrine of corporate opportunity, or any analogous doctrine, shall not apply to any Partner. Subject to the same preceding limitations, no such Partner who acquires knowledge of a potential transaction, agreement, arrangement or other matter that may be an opportunity for the Partnership shall have any duty to communicate or offer such opportunity to the Partnership, and such Partner shall not be liable to the Partnership or to the other Partners for breach of any fiduciary or other duty by reason of the fact that such Partner pursues or acquires for, or directs such opportunity to another Person or does not communicate such opportunity or information to the Partnership. Neither the Partnership nor any such Partner shall have any rights or obligations by virtue of this Agreement or the partnership relationship created hereby in or to such independent ventures or the income or profits or losses derived therefrom, and the pursuit of such ventures, even if competitive with the activities of the Partnership, shall not be deemed wrongful or improper.

6.10    Early Termination of Investment Period.  Limited Partners holding at least seventy-five percent (75%) in Interest of the Limited Partners that are not Affiliates of the General Partner may at any time terminate the Investment Period.

6.11    Investment Management Agreement.  The General Partner may enter into the Investment Management Agreement with the Investment Manager and may assign its right to receive the Management Fee or some portion thereof to the Investment Manager. The terms of the Investment Management Agreement shall provide for its automatic termination, without cost or penalty, upon the removal of the General Partner or in any other situation in which neither the General Partner or any Affiliate of the General Partner continues to serve as the general partner of the Partnership. The right of the Investment Manager to indemnification and exculpation pursuant to the Investment Management Agreement shall be limited to those actions and activities for which indemnification is specified in Section 6.4 and Section 6.5.

6.12    Key Person Event.  During the Investment Period, if the Key Person becomes Incapacitated or ceases to devote the time required by Section 6.9(b) to the business related to the Partnership, including the Related Entities (and any vehicle formed in connection with any of them) (a "Key Person Event"), the General Partner shall promptly give notice to the Limited Partners of the Key Person Event and shall cease making any new Portfolio Investments (other than those for which a binding letter of intent or the equivalent has been executed) until the Advisory Committee or Limited Partners holding at least seventy-five percent (75%) in Interest of the Limited Partners approve a plan provided by the General Partner for the recommencement of investing activity (a "Key Person Plan"); provided, that any such Key Person Plan shall include a proposed modification to this Section 6.12 (redefining the circumstances which shall thereafter constitute a Key Person Event) which the General Partner shall agree to propose for adoption pursuant to Section 11.3 hereof in conjunction with the approval of any such Key Person Plan. If no Key Person Plan has been approved within one hundred and eighty (180) days following the

25

notice of such Key Person Event (and the Investment Period has not previously been terminated), then the Management Fee shall thereafter be determined in accordance with the provisions of Section 4.1(b)(ii) until such time, if any, as a Key Person Plan is approved in accordance with this Section 6.12 or the Investment Period is otherwise terminated.  If no Key Person Plan has been approved on or prior to the date which is one hundred eighty (180) days following the notice of such Key Person Event (and the Investment Period has not previously been terminated), then the Investment Period shall be automatically terminated as of such date.  The Advisory Committee may extent any of the periods of time set forth in this Section 6.12, but in no event shall any such extension extend past the first (1st) anniversary of the notice of such Key Person Event.  The General Partner shall provide prompt notice to the Advisory Committee if it determines that it is reasonably likely that the Key Person will violate his time commitment specified in Section 6.9(b) or will become Incapacitated.  In the event that a Majority in Interest of the Limited Partners reasonably believe that a Key Person Event has occurred, they shall be entitled, by joint notice to the General Partner, to suspend further Capital Calls for a period of up to forty-five (45) days so that they may investigate the relevant facts, except for such installments of their Capital Commitments required by the Partnership to honor then existing contractual commitments and to pay Partnership Expenses.

## ARTICLE VII

### Limited Partners

7.1    No Participation in Management.

(a)    No Limited Partner shall have the right or power to participate in the management or affairs of the Partnership, nor shall any Limited Partner have the power to sign for or bind the Partnership or deal with third parties on behalf of the Partnership.  The exercise by any Limited Partner of any right conferred herein shall not be construed to constitute participation by such Limited Partner in the control of the business of the Partnership so as to make such Limited Partner liable as a general partner for the debts and obligations of the Partnership for purposes of the Act.

(b)    Any Limited Partner may, upon notice to the General Partner, elect to hold all or any fraction of such Limited Partner's Interest as a non-voting Interest, in which case such Limited Partner shall not be entitled to participate in any consent of the Limited Partners with respect to the portion of its Interest which is held as a non-voting Interest (and such non-voting Interest shall not be counted in either the numerator or the denominator in determining the giving or withholding of any such consent).  Except as provided in this Section 7.1, an Interest held as a non-voting Interest shall be identical in all regards to all other Interests held by Limited Partners.  Any such election shall be irrevocable and shall bind the assignees of such Limited Partner's Interest.

(c)    Any Interest or portion of an Interest held for its own account by a Limited Partner that is a bank holding company, as defined in Section 2(a) of BHC Act, or a non-bank subsidiary of such bank holding company or a foreign bank subject to the BHC Act pursuant to the International Banking Act of 1978, as amended, or an Affiliate of any such foreign bank (each, a "BHC Partner"), together with the Interests of all Affiliates that are Limited Partners, that is determined: (i) initially at the time of admission of such Limited Partner; (ii) upon the withdrawal of another Limited Partner; or (iii) any other event that causes a change in the relative ownership percentages of the Partners hereunder, to be in the aggregate in excess of 4.99% of the Interests of the Limited Partners, excluding for purposes of calculating this percentage portions of any other

interests that are non-voting Interests pursuant to this <u>Section 7.1</u> and any other Section of this Agreement (collectively the "<u>Non-Voting Interests</u>"), shall be a Non-Voting Interest (whether or not subsequently transferred in whole or in part to any other Person except as provided in the following sentence) and shall not be entitled to vote or consent with respect to such Interests, shall be deemed to have waived any rights to vote or consent with respect to such Interests under the Act and shall not be included in determining whether the requisite percentage in Interest of the Limited Partners  have consented to, approved, adopted or taken any action hereunder. Notwithstanding the foregoing, at the time of admission to the Partnership, any BHC Partner may elect not to be governed by this <u>Section 7.1(c)</u> by providing notice to the General Partner stating that such BHC Partner is not prohibited from acquiring or controlling more than 4.99% of the voting interest held by the Limited Partners pursuant to such BHC Partner's reliance on Section 4(k) of the BHC Act.  Any such election by a BHC Partner may be rescinded at any time by notice to the General Partner, <u>provided</u>, that any such rescission shall be irrevocable.

7.2     <u>Liabilities of the Limited Partners</u>.

(a)     Except as provided by the Act or other applicable law and subject to the obligations to make Capital Contributions pursuant to <u>Article III</u> and to return distributions as provided in <u>Section 7.2(b)</u>, no Limited Partner shall have any personal liability whatsoever in its capacity as a Limited Partner, whether to the Partnership, to any of the Partners, to the creditors of the Partnership, for the debts, liabilities, contracts, or other obligations of the Partnership or for any losses of the Partnership; <u>provided</u>, that a Limited Partner shall be required to return any distribution that was made to such Limited Partner in violation of this Agreement.

(b)     <u>LP Clawback</u>.  Except as required by the Act, or other applicable law, no Limited Partner shall be required to repay to the Partnership, any Partner or any creditor of the Partnership all or any part of the distributions made to such Limited Partner pursuant to <u>Article III</u> and <u>Section 10.3</u> hereof; <u>provided</u>, that to the maximum extent permitted by applicable law and subject to the limitations set forth in <u>Section 7.2(c)</u> below, the General Partner may require a Limited Partner (including any former Limited Partner) to return distributions made to such Limited Partner or former Limited Partner (or any of its predecessors in interest) for the purpose of meeting such Limited Partner's share of the Partnership's indemnity obligations under <u>Section 6.5</u> and <u>Section 7.4(h)</u> in an amount up to, but in no event in excess of, the aggregate amount of distributions actually received by such Limited Partner from the Partnership.  For the avoidance of doubt, in connection with any such clawback from the Limited Partners, the General Partner shall similarly be required to return distributions made to it and the determination of the General Partner's share thereof shall be as provided for in <u>Section 7.2(d)</u>, below.  If, notwithstanding the terms of this Agreement, it is determined under applicable law that any Limited Partner has received a distribution which is required to be returned to or for the account of the Partnership or Partnership creditors, then the obligation under applicable law of any Limited Partner to return all or any part of a distribution made to such Limited Partner shall be the obligation of such Limited Partner and not of any other Partner.  Any amount returned by a Limited Partner pursuant to this <u>Section 7.2(b)</u> shall be treated as a contribution of capital to the Partnership.

(c)     <u>Restrictions on LP Clawback</u>.  The obligation of a Limited Partner to return distributions made to such Limited Partner for the purpose of meeting the Partnership's indemnity obligations under <u>Section 6.5</u> and <u>Section 7.4(h)</u> shall be subject to the following limitations: (A) no Limited Partner shall be required to return a distribution (including the Final Distribution) after the second (2nd) anniversary of the date of such distribution; <u>provided</u>, that if at the end of such

period, there are any Proceedings then pending or any other liability (whether contingent or otherwise) or claim then outstanding, the General Partner shall so notify the Limited Partners at such time (which notice shall include a brief description of each such Proceeding (and of the liabilities asserted in such Proceeding) or of such liabilities and claims) and the obligation of the Limited Partners to return any distribution for the purpose of meeting the Partnership's indemnity obligations under Section 6.5 and Section 7.4(h) shall survive with respect to each such Proceeding, liability and claim set forth in such notice (or any related Proceeding, liability or claim based upon the same or a similar claim) until the date that such Proceeding, liability or claim is ultimately resolved and satisfied; and provided, further, that the provisions of this clause (A) shall not affect the obligations of the Limited Partners under Section 17-607 of the Act or other applicable law; and (B) the aggregate amount of distributions which a Limited Partner shall be required to return hereunder shall not exceed 20% of the amount of its Capital Commitment.

(d)     Determination of Each Partner's Share of Clawback.  Subject to the restrictions contained in Section 7.2(c) above, each Partner shall be obligated to contribute an amount equal to the product of : (A) the percentage that such Partner's Capital Commitment represents of the total Capital Commitments of the Partners and (B) the amount of the Partnership's indemnity obligation under Section 6.5 and Section 7.4(h) (the "Other Clawback Amount").  Notwithstanding the preceding sentence, to the extent distributions of Carried Interest in respect of any Limited Partner have been made to the General Partner and have not already been repaid pursuant to this Section 7.2 (or returned pursuant to Section 3.8), such Limited Partner's share of such Other Clawback Amount shall be reduced, and the General Partner's share of such Other Clawback Amount shall be increased, by an amount  equal to the lesser of: (x) the amount of such Carried Interest distributions not previously repaid or returned; and (y) twenty percent (20%) of such Limited Partner's share of such Other Clawback Amount.

7.3     Limited Partners' Outside Activities.  Subject to Section 6.6 and Section 6.7 with respect to Limited Partners that are affiliated with the General Partner, a Limited Partner shall be entitled to and may have business interests and engage in activities in addition to those relating to the Partnership, including business interests and activities in direct competition with the Partnership.  Neither the Partnership, any other Partner nor any other Person shall have any rights by virtue of this Agreement in any other business, venture or interest of any Limited Partner.

7.4     Advisory Committee.

(a)     The General Partner shall select a committee (the "Advisory Committee") consisting of one or more representatives of the Limited Partners, all of whom shall be selected by the General Partner in its sole discretion by the Final Closing.  An Advisory Committee member may be a member of the General Partner, but shall not be employed in an operating capacity in the Manager, Servicer or Originator.  The General Partner shall seek the approval or advice, as applicable, of the Advisory Committee in connection with: (i) any potential conflicts of interest in any transaction or relationship between the Partnership and the General Partner, the Investment Manager or any employee or Affiliate thereof; (ii) any other matter for which Advisory Committee approval is expressly provided for herein; and (iii) any other matter deemed appropriate by the General Partner.  Each Limited Partner agrees that with respect to any approval sought under this Section 7.4, the approval of the Advisory Committee shall be binding upon the Partnership and each Partner.

28

(b)     Without limiting the duties and obligations of the Advisory Committee set forth in Section 7.4(a) above, the Advisory Committee shall have the following responsibility:

(i)     to review the General Partner's calculation of the Management Fee;

(ii)     to approve or disapprove of any proposal by the General Partner to modify any of the investment policies or investment restrictions set forth in this Agreement; provided, that this Section 7.4(b)(ii) shall not be deemed to permit any modifications not expressly provided for elsewhere in this Agreement;

(iii)     to approve or disapprove of any payment to be made by the Partnership to the General Partner, the Investment Manager or any Affiliate thereof if such payment is not expressly provided for in this Agreement; provided, that this Section 7.4(b)(iii) shall not be deemed to permit any payment not expressly provided for elsewhere in this Agreement;

(iv)     to approve or disapprove the General Partner's valuation of Portfolio Investments, to the extent expressly provided for in Section 6.08;

(v)     to provide advice and counsel to the General Partner on investment strategies and investment policies; provided, that such advice shall be non-binding;

(vi)     to provide advice to the General Partner with respect to such other matters relating to the affairs of the Partnership as the General Partner may determine; provided, that such advice shall be non-binding; and

(vii)     to approve or disapprove of a Key Person Plan, to the extent expressly provided for in Section 6.12.

For the avoidance of doubt, to the extent this Agreement requires the approval or consent of the Advisory Committee for the General Partner (or the Investment Manager or its or their Affiliates) to proceed with a particular matter, then the General Partner (and the Investment Manager and such Affiliates) shall be without authority to proceed with such matter absent such consent or approval.

(c)     The Advisory Committee shall act by a majority of its members (voting by head-count), which action may be taken by written consent of a majority of such members (by head-count) in lieu of a meeting. The General Partner shall take or cause to be taken the minutes of each Advisory Committee meeting and shall circulate such minutes within thirty (30) days following each such meeting. The General Partner shall record all votes and approvals of the Advisory Committee and shall promptly provide such information to the Limited Partners. The General Partner shall provide the Limited Partners with a roster, including contact information, of the members of the Advisory Committee promptly following the formation of the Advisory Committee and shall provide the Limited Partners with an updated roster promptly following any changes in the composition of the Advisory Committee.

(d)     During the Investment Period, the members of the Advisory Committee shall meet at least once; provided, that the General Partner, in its sole discretion, may require that the members of the Advisory Committee meet more frequently. A majority by number of the members

of the Advisory Committee may call a meeting of the Advisory Committee with or without the consent of the General Partner.  If requested by a majority of the members of the Advisory Committee, the General Partner shall permit the Advisory Committee to meet from time to time (or for a period of time in connection with any one or more meetings of the Advisory Committee) without the General Partner's participation in such meeting.  The quorum for a meeting of the Advisory Committee shall be a majority of its members.  Members of the Advisory Committee may participate in a meeting of the Advisory Committee by means of conference telephone or similar communications by means of which all persons participating in the meeting can hear and be heard.  Any member of the Advisory Committee who is unable to attend a meeting of the Advisory Committee may: (i) grant in writing to another member of the Advisory Committee or any director or employee of the Limited Partner that designated such member, if applicable, such member's proxy to vote on any matter upon which action is taken at such meeting; and (ii) designate in writing to the General Partner an alternate reasonably acceptable to the General Partner to observe, but not vote on any matter acted upon at such meeting (unless such alternate is also granted a proxy pursuant to the preceding clause (i)).  Meetings of the Advisory Committee may be called, or written consents solicited, only by the General Partner and, to the extent reasonably practicable, the General Partner shall include in the notice of a meeting of the Advisory Committee, or shall otherwise furnish to the members of the Advisory Committee in advance of such meeting, an agenda and any other material which the General Partner considers necessary or desirable to facilitate discussion of the topics on such agenda.  The Advisory Committee shall conduct its business by such other procedures as the General Partner and a majority of its members consider appropriate.

(e)  Meetings of the Advisory Committee of the Partnership may be held jointly with meetings of the advisory boards, if any, of the Existing Clients, Successor Funds or Separate Accounts where the agendas substantially overlap.  Where only a portion of the agendas overlap, such meetings may initially be held jointly but shall be separated at the point where the agendas cease to overlap.  Only the members of the Advisory Committee may be present when an Advisory Committee vote or consent is taken with respect to a Partnership matter.

(f)  No fees shall be paid by the Partnership to members of the Advisory Committee, but the reasonable costs and expenses of the members of the Advisory Committee incurred in carrying out their duties and responsibilities under the Agreement shall be paid by the Partnership as they are incurred.  In connection with the foregoing, the members of the Advisory Committee shall be reimbursed by the Partnership for all reasonable out-of-pocket expenses in connection with the performance of their responsibilities as members of the Advisory Committee and may be directly reimbursed by the Partnership for their reasonable out-of-pocket costs of attending meetings of the Advisory Committee.  Upon the request of the Limited Partner whose representative is a member of the Advisory Committee, the Partnership shall instead reimburse such Limited Partner for its representative's otherwise reimbursable costs hereunder, promptly following receipt of an invoice from such Limited Partner detailing such reasonable out-of-pocket costs and expenses.

(g)  Any member of the Advisory Committee may resign upon delivery of notice from such member to the General Partner, and, if applicable, shall be deemed removed if the Limited Partner that designated such member requests such removal in writing to the General Partner or becomes a Defaulting Partner.  If any representative of a Limited Partner who is not a Defaulting Partner cannot serve, another representative of such Limited Partner may serve on the Advisory Committee as long as such representative is reasonably acceptable to the General Partner and

30

otherwise meets the requirements for Advisory Committee membership set forth in <u>Section 7.4(a)</u>. The Advisory Committee may, by taking action in accordance with <u>Section 7.4(c)</u>, remove any member of the Advisory Committee. Any vacancy in the Advisory Committee, whether created by such a resignation or removal or by the death of any member, shall promptly be filled by the General Partner after the General Partner becomes aware of it, subject to the limitations provided for in <u>Section 7.4(a)</u>; <u>provided</u>, that, to the extent applicable, the General Partner shall provide a Limited Partner whose representative was originally appointed to the Advisory Committee a reasonable period of time to designate a replacement member of the Advisory Committee and, during such period, such member's seat shall be considered vacant and shall not be counted (in either the numerator or the denominator) for purposes of determining any consent, approval or other action of the Advisory Committee.

(h)      No member of the Advisory Committee (including the Limited Partner represented by such member) shall be liable to any other Partner or the Partnership for any reason related to such member's participation on the Advisory Committee (other than fraud or willful misconduct on the part of such member) including for any mistake in judgment, any action or inaction taken or omitted to be taken, or for any loss due to any mistake, action or inaction. The participation by any Limited Partner who is, or whose representative is, a member of the Advisory Committee in the activities of the Advisory Committee shall not be construed to constitute participation by such Limited Partner in the management or control of the business of the Partnership so as to make such Limited Partner liable as a general partner for the debts and obligations of the Partnership for purposes of the Act. No Limited Partner who is a member of the Advisory Committee shall be deemed to be an Affiliate of the Partnership or the General Partner solely by reason of such membership. In the absence of fraud or willful misconduct on the part of members of the Advisory Committee the Partnership shall, to the fullest extent permitted by law, indemnify and hold harmless each such member of the Advisory Committee with respect to the Partnership (and their respective heirs and legal and personal representatives) (including the Limited Partner represented by such member and any of its officers, directors, trustees, partners, members, shareholders, employees or agents) who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including any action by or in the right of the Partnership or any of the Partners), by reason of any actions or omissions or alleged acts or omissions arising out of such Person's activities in connection with serving on the Advisory Committee against any losses, damages or expenses (including attorney's fees, judgments, fines and amounts paid in settlement) actually incurred by such Person in connection with such actions, suit or proceedings; <u>provided</u>, that any Person entitled to indemnification from the Partnership hereunder shall obtain the written consent of the General Partner (which consent shall not be unreasonably withheld) prior to entering into any compromise or settlement which would result in an obligation of the Partnership to indemnify such Person. The satisfaction of any indemnification and any saving harmless pursuant to this <u>Section 7.4(h)</u> shall be from and limited to Partnership assets, and no Partner shall have any personal liability on account thereof; <u>provided</u>, that each Limited Partner will be obligated to return any amounts distributed to it in order to fund any deficiency in the Partnership's indemnity obligations hereunder to the extent provided in <u>Section 7.2</u>. To the fullest extent permitted by law, neither the members of the Advisory Committee nor the Limited Partners on behalf of whom such members act as representatives, shall owe any duties (fiduciary or otherwise) to the General Partner, the Partnership or any Limited Partner in respect of the activities of the Advisory Committee, other than the duty to act in good faith. For purposes of this <u>Section 7.4(h)</u>, the Partners acknowledge that, in taking or omitting to take any action hereunder, each member of the

31

Advisory Committee shall be permitted to take into consideration solely the interests of the Limited Partner represented by such member and, in so doing, such member shall not be treated as failing to act in good faith.

7.5     Investment Representations of the Limited Partners.  This Agreement is made with each of the Limited Partners in reliance upon each Limited Partner's representation to the Partnership, which by executing or adhering to this Agreement (either directly or through a power of attorney) each Limited Partner hereby confirms, that its interest in the Partnership is to be acquired for investment, and not with a view to the sale or distribution of any part thereof, and that it has no present intention of selling, granting participation in, or otherwise distributing the same, and each Limited Partner understands that its interest in the Partnership has not been registered under the Securities Act and that any transfer or other disposition of the interest may not be made without registration under the Securities Act or pursuant to an applicable exemption therefrom. Each Limited Partner further represents that it does not have any contract, undertaking, agreement, or arrangement with any Person to sell, transfer, or grant participations to such Person, or to any third Person, with respect to its interest in the Partnership.

7.6     Qualifications of the Limited Partners.  Each Limited Partner represents that it is (i) an "accredited investor" within the meaning of that term as defined in Regulation D promulgated under the Securities Act and (ii) a "qualified client" as defined in the rules promulgated under the Advisers Act.

7.7     Provision of Withholding Documentation.  Each Limited Partner represents that it: (i) will provide the Partnership with a valid and duly executed Internal Revenue Service Form W-9 or Form W-8BEN (or other Form W-8), as appropriate, upon the Limited Partner's admission to the Partnership (as set forth in Article II of this Agreement) and promptly upon a subsequent reasonable request by the Partnership or the General Partner; (ii) will provide the Partnership with a valid and duly executed Internal Revenue Service Form W-9 or Form W-8BEN (or other Form W-8), as appropriate, thirty (30) days prior to the end of each third taxable year thereafter that the Limited Partner owns an interest in the Partnership; and (iii) will promptly notify the Partnership upon any change in the information provided on such form.

ARTICLE VIII

Books and Records;

Reports to Partners; Meetings and Consents

8.1     Books and Records.  The General Partner shall keep or cause to be kept complete and appropriate records and books of account.  Except as otherwise expressly provided herein, such books and records shall be maintained on a basis which allows the proper preparation of the Partnership's financial statements and tax returns.  Upon furnishing reasonable advance notice to the General Partner, any Limited Partner or its duly authorized representatives shall be permitted to inspect the books and records of the Partnership for any proper purpose and make copies thereof consistent with reasonable confidentiality restrictions established by the General Partner at any reasonable time during normal business hours.  The General Partner shall cause the books and records of the Partnership to reflect the names of Partners and changes thereto and the Transfer of Interests and changes in Capital Commitments which are accomplished in accordance with the provisions hereof.  The General Partner shall maintain or cause to be maintained the books and

records of the Partnership for a period of at least six (6) years following the complete liquidation of the Partnership.

8.2     Income Tax Information.  The General Partner shall use commercially reasonable efforts to provide each Person who was a Partner at any time during the immediately preceding Fiscal Year, copies of such information as may be required to estimate such Limited Partner's U.S. federal income tax liability.  Within forty-five (45) days following receipt of the information provided for in Section 8.3(b), (subject to the reasonable delays in the event of the late receipt of necessary tax information with respect to any Portfolio Investment), the General Partner shall prepare and send, or cause to be prepared and sent, to each Person who was a Partner at any time during the immediately preceding Fiscal Year, copies of such information as may be required for applicable income tax reporting purposes, including copies of Schedule K-1 ("Partner's Share of Income Credits, Deductions, etc.") or any successor schedule or form, for such Person and such other information as a Partner may reasonably request for the purpose of applying for refunds of withholding taxes.

8.3     Reports.

(a)     The General Partner shall provide each Partner with quarterly investor account statements and performance updates within forty-five (45) days (subject to the reasonable delays in the event of the late receipt of necessary tax information with respect to any Portfolio Investment) after the end of each Fiscal Quarter, which shall include a status report on the activities of the Partnership, including new Portfolio Investments.

(b)     To the extent practicable, within one hundred twenty (120) days after the end of each Fiscal Year of the Partnership (subject to the reasonable delays in the event of the late receipt of necessary financial statements with respect to any Portfolio Investment), the General Partner shall send to each Person who was a Partner during such period the following financial statements for the Partnership prepared in accordance with U.S. generally accepted accounting principles consistently applied, together with an opinion of a nationally recognized accounting firm based upon its review of the financial statements referred to in clauses (i) through (vi) below:

(i)     a balance sheet as of the end of such period;

(ii)    a statement of income or loss for such period;

(iii)   a statement of changes in Partners' equity;

(iv)    a statement of cash flows;

(v)     a schedule of Portfolio Investments; and

(vi)    a schedule of changes in Capital Account balances by Partner.

(c)     With reasonable promptness, to the extent the General Partner is permitted to do so under applicable law and any applicable agreements, the General Partner will deliver such other information available to the General Partner, including financial statements and reasonable computations, as any Limited Partner may from time to time reasonably request in order to comply with regulatory requirements, including reporting requirements, to which such Limited Partner is

subject.

(d)     The General Partner agrees that the review to be performed at the end of each fiscal year pursuant to this Section 8.3 shall be performed in accordance with United States generally accepted accounting standards.

(e)     To the extent not previously disclosed in a Capital Call Notice or distribution notice or other, similar, written communication with the Limited Partners, each annual report shall also include:

(i)     a summary of each Limited Partner's Capital Account activity for such Fiscal Year, including: (A) a beginning Capital Account balance; (B) cash contributions; (C) distributions; (D) gain or loss from operations; (E) net change in the unrealized gain or loss on Portfolio Investments; (F) the amount of Management Fees and details supporting the calculation of such amount including any fees or expenses of any placement agent; and (G) a closing Capital Account balance;

(ii)     a description (to the extent applicable and reasonably available to the Partnership) of: (A) valuation changes in Portfolio Investments; (B) new Portfolio Investments; (C) dispositions or write-offs; and (D) cash distributions, in each case, with respect to such Fiscal Year;

(iii)     a description of Partnership leverage;

(iv)     a summary of: (A) any litigation pending against the General Partner or the Partnership; (B) any litigation pending against any member of the General Partner that alleges fraud, misrepresentation or a violation of any federal, state or other applicable securities law, rule or regulation, on the part of such individual, in connection with the investment activities of such individual; and (C) any litigation that, to the actual knowledge of the General Partner, is pending against the Partnership or with respect to any Portfolio Investment, in each case, to the extent that any such litigation described in the foregoing clauses (A) through (C) would be reasonably expected to have a material adverse effect on the Partnership; provided that nothing in the foregoing shall require disclosure of any litigation pending against any Portfolio Investment in which the Partnership holds an interest to the extent that: (x) the General Partner in good faith believes that such disclosure is not in the best interest of the Partnership or could damage the Partnership or its business; or (y) the Partnership is required by law or by agreement with a third Person to keep confidential;

(v)     a statement setting forth the identity of each Limited Partner that has withdrawn from the Partnership pursuant to Section 3.2(b) during such Fiscal Year; and

(vi)     a summary of each Portfolio Investment held by the Partnership as of the end of such Fiscal Year.

(f)     In connection with the annual financial statements contemplated by Section 8.3(b), the General Partner shall also provide: (i) a statement showing the amount of Carried Interest distributions to the General Partner during such Fiscal Year; and (ii) a determination and supporting calculations of whether, based on the net asset value of the Partnership as provided for

34

in the Partnership's financial statements and the cumulative amount of Carried Interest distributions received by the General Partner through the end of the Fiscal Year, the General Partner would be subject to a clawback obligation pursuant to the provisions of <u>Section 3.8</u> hereof assuming the Partnership had been liquidated at its reported net asset value as of the end of such Fiscal Year.

(g)     If the Partnership's accounting firm resigns or is removed, the General Partner shall promptly notify the Limited Partners of such event and provide the Limited Partners with an explanation of the cause of such resignation or removal.

(h)     The General Partner shall use reasonable efforts to cause a representative of the Partnership's accounting firm to be available to discuss valuation and financial statement matters with the members of the Advisory Committee at the Partnership's annual meeting.

8.4     <u>Partnership Meetings</u>.

(a)     The Partnership does not intend to hold regular annual meetings of the Partners.

(b)     The General Partner may in its sole discretion call a special meeting of the Partnership by giving at least twenty-one (21) days' notice of the time and place of such meeting to each Limited Partner, which notice shall set out the agenda for such meeting. In addition, the General Partner shall call a special meeting of the Partnership if a Majority in Interest of the Limited Partners request that a special meeting of the Partnership be so called. The General Partner shall give at least twenty-one (21) days notice of the time and place of such meeting to each Limited Partner, which notice shall set out the agenda for such meeting. Any annual or special meeting of the Partnership may be held in person or by means of telephone or similar communications equipment by means of which all persons participating in such meeting can hear each other.

(c)     Any action required to be, or which may be, taken at any special meeting by the Partners may be taken in writing without a meeting if consents thereto are given by the General Partner and Limited Partners holding Interests in an amount not less than the amount that would be necessary to take such action at a meeting; provided that all Limited Partners shall be provided with notice of such actions including a copy of such written consent.

(d)     To the extent Limited Partners are entitled to vote hereunder, a Limited Partner may vote at any meeting either in person or by a proxy which such Limited Partner has duly executed in writing. The General Partner may in its sole discretion permit Persons other than Partners to participate in a meeting; <u>provided</u>, that no such Person shall be entitled to vote.

(e)     The chairman of any meeting shall be a Person affiliated with and designated by the General Partner. A Person designated by the General Partner shall keep written minutes of all of the proceedings and votes of any such meeting.

8.5     <u>Written Consents</u>. Whenever Partners are required or permitted to take any action by vote or at a meeting, such action may be taken without a meeting or without a vote, if a written Consent setting forth the action so taken is signed by the Limited Partners owning not less than the minimum number of Interests that would be necessary to authorize or take such action by vote or at a meeting and provided that ten (10) days' prior notice of the solicitation of such Consents is

given to all of the Limited Partners.  Notice of any action so taken by written Consent shall be given by the General Partner to all Partners, in the manner prescribed in <u>Section 11.5</u>, promptly after the taking of such action.

ARTICLE IX

<u>Transfers and Withdrawals</u>

9.1     <u>Transfer and Withdrawal of the General Partner</u>.

(a)     <u>Voluntary Transfer</u>.  Without the consent of seventy-five percent (75%) in Interest of the Limited Partners the General Partner shall not have the right to transfer its interest as a general partner of the Partnership, and the General Partner shall not have the right to withdraw from the Partnership; <u>provided</u>, that without the consent of any of the Limited Partners the General Partner may, at the General Partner's sole discretion and its expense, be reconstituted as or converted into a corporation, limited partnership or other form of entity (any such reconstituted or converted entity being deemed to be a General Partner for all purposes hereof) by merger, consolidation or otherwise, or transfer its interest as a general partner of the Partnership to one of its Affiliates, so long as: (i) Indigo continues to hold (directly or indirectly) at least sixty-seven percent (67%) of the ownership in such partnership, other entity or Affiliate; (ii) such reconstitution, conversion or transfer does not have adverse tax or legal consequences for the Limited Partners; (iii) the Key Person continues to control all material decisions of the General Partner and the Investment Manager (including all investment-related decisions); (iv) the Key Person and the other employees of the General Partner and/or Indigo continue to retain, directly or indirectly, entitlement to at least sixty-seven percent (67%) of the Carried Interest distributions reasonably anticipated to be made to the General Partner over the life of the Partnership; and (v) such corporation, other entity or Affiliate shall have assumed in writing, or shall have succeeded to by operation of law, the obligations of the General Partner under this Agreement and any other agreements of the General Partner.  In the event of an assignment or other transfer of all of the General Partner's interest as a general partner of the Partnership in accordance with this <u>Section 9.1(a)</u>, its assignee or transferee shall be substituted in its place as general partner of the Partnership and immediately thereafter the General Partner shall withdraw as a general partner of the Partnership.  During the term of the Partnership, the Key Person will continue to control all material decisions of the General Partner and the Investment Manager (including all investment-related decisions) and the Key Person and the other employees of the General Partner and/or Indigo will continue to retain, directly or indirectly, entitlement to at least sixty-seven percent (67%) of the Carried Interest distributions reasonably anticipated to be made to the General Partner over the life of the Partnership.

(b)     <u>Removal or Dissolution for Cause</u>.

(i)     Limited Partners holding at least fifty-five percent (55%) in Interest of the Limited Partners that are not Affiliates of the General Partner, may, at their option at any time following a determination of Cause and a failure of the General Partner or the Investment Manager to cure such Cause within the period of time specified in clause (iii) below, either (x) require the removal, effective as of a date not less than forty-five (45) days from the date of notice to the General Partner of such removal, of the General Partner from the Partnership and the substitution of another Person or Persons as general partner of the Partnership in lieu thereof (which successor general partner shall be approved by

36

Limited Partners representing a Majority in Interest of the Limited Partners) (which removal shall be effected in accordance with the procedures set forth in Section 9.1(d) and Section 9.1(e) and shall result in the termination of the Investment Period and cancellation of the obligation of the Partners to make Capital Contributions for Portfolio Investments (except as otherwise approved by the Advisory Committee with respect to Follow-Up Investments and/or Follow-On Investments), or (y) dissolve and liquidate the Partnership effective as of a date not less than ninety (90) days from the date of notice to the General Partner of such dissolution; provided, that the General Partner (or the Investment Manager if such finding of Cause relates to the Investment Manager) shall be deemed to have cured any finding of Cause if it terminates or causes the termination of employment (or other relationship) with the General Partner, the Investment Manager and their Affiliates of all individuals who engaged in the conduct constituting such Cause (and does not thereafter enter into any new contractual arrangement with any such terminated individuals) and makes the Partnership whole for any actual financial loss which such conduct had caused the Partnership.

(ii)    For purposes of this clause (b), "Cause" means any of the following: (A) a breach of the General Partner's obligation to make Capital Contributions in accordance with this Agreement, (B) a finding by any court or governmental body of competent jurisdiction in a final judgment (without regard to the availability of appeals), or an admission by the General Partner or the Investment Manager in a settlement of any lawsuit, that the General Partner or the Investment Manager has otherwise committed a material breach of its duties under this Agreement, (C) the General Partner, the Investment Manager or the Key Person has engaged in fraud, gross negligence, bad faith or willful misconduct in connection with the performance of their duties under the terms of this Agreement, (D) the conviction of any felony by the General Partner or the Investment Manager, (E) any material violation of federal or state securities laws by the General Partner or the Investment Manager, or (F) the filing of a voluntary petition in bankruptcy, the entry of an order of relief in any bankruptcy or insolvency proceeding or the entry of an order that the General Partner is a bankrupt or insolvent. The General Partner shall promptly give notice to the Limited Partners of (x) the occurrence of any event constituting Cause of which it has actual knowledge, which notice shall include a description of the alternatives available to the Limited Partners pursuant to this Section 9.1(b) and shall, to the extent the Investment Period has not terminated prior to such date, cease making any new commitments to any potential Portfolio Investments until such time, if any, as the Advisory Committee or Limited Partners representing at least seventy-five percent (75%) in Interest of the Limited Partners consent to the recommencement of such investing activity; and (y) the commencement of any litigation of which it has actual knowledge which could reasonably be expected to give rise to an event of Cause and material updates with respect to developments of record in such litigation.

(iii)   A cure of any event constituting Cause under this Section 9.1(b) must occur:

(A)    if such event relates to Section 9.1(b)(ii)(A), within five (5) Business Days after such event;

(B)    if such event relates to Section 9.1(b)(ii)(B), and provided that such breach is reasonably capable of being cured, within thirty (30) calendar days after such event; and

(C)   if such event relates to Section 9.1(b)(ii)(C), within thirty (30) calendar days after the date that a determination that such event constitutes Cause is communicated in writing to the General Partner by fifty-five percent (55%) in Interest of the Limited Partners; provided, that notwithstanding Section 9.1(b)(i), "cure" shall not be permitted with respect to any event described in Section 9.1(b)(ii)(C) if the Key Person is engaged in the activities constituting "Cause" thereunder.

(c)   Disabling Event. The General Partner shall cease to be the general partner of the Partnership upon the occurrence of a Disabling Event, and thereafter, except as required by applicable law, neither the General Partner nor its successors in interest shall have any of the powers, obligations or liabilities (other than liabilities arising before such Disabling Event) of a general partner of the Partnership under this Agreement or under applicable law.  Subject to Section 10.1(b), upon the occurrence of any Disabling Event the Partnership shall be wound up and dissolved in accordance with the provisions of Section 10.2. If the General Partner shall cease to be the general partner of the Partnership upon the occurrence of a Disabling Event and Limited Partners representing a Majority in Interest of the Limited Partners (or such greater percentage as may be required by the Act) shall determine to resume and continue the business of the Partnership pursuant to Section 10.1(b), notice of that determination shall be given to the General Partner by a party authorized by such Limited Partners to give such notice on behalf of such Limited Partners.

(d)   A successor general partner selected pursuant to Section 9.1(b) or Section 10.1(b) shall be required to purchase for cash the General Partner's interest in the Partnership at a price equal to, and upon liquidation pursuant to Section 9.1(b) or Section 10.1(b) the General Partner shall be entitled to receive an amount equal to, the Appraised Value With Discounted Carry.

(e)   If a successor general partner selected pursuant to Section 9.1(b) or Section 10.1(b) is required to purchase for cash the General Partner's interest in the Partnership, then within thirty (30) days after the determination of the Appraised Value With Discounted Carry, such successor general partner shall purchase, and the General Partner shall sell, assign and transfer to such successor general partner, all of the General Partner's right, title and interest in and to the Partnership and the Partnership's assets upon payment in cash of the Appraised Value With Discounted Carry by such successor general partner.

(f)   No-Fault Removal. Limited Partners holding at least seventy-five percent (75%) in Interest of the Limited Partners that are not Affiliates of the General Partner may, at their option, at any time require:

(x)   the removal, effective as of a date not less than ninety (90) days from the date of notice to the General Partner of such removal, of the General Partner from the Partnership; and

(y)   the substitution, in accordance with the applicable laws of the State of Delaware, including the Act, of another Person as successor general partner of the Partnership in lieu thereof;

provided, that all votes purporting to constitute at least seventy-five percent (75%) in Interest of the Limited Partners for purposes of the foregoing must be solicited and obtained within a 60-day

period.

Upon the effective date of such removal, such successor general partner shall be admitted as the general partner of the Partnership, and upon such admission, the General Partner being removed shall assign and transfer to the successor general partner all of the General Partner's right, title and interest as general partner of the Partnership; provided, that upon such assignment and transfer:

        (i)     the removed General Partner's interest shall be converted into a special limited partnership Interest in the Partnership with an Unpaid Capital Commitment equal to $0.00 (subject to clauses (ii), (iii) and (iv) below), will not be required to pay or bear any Management Fees, Carried Interest or other Partnership Expenses and such removed General Partner may not be removed as a Limited Partner without its written consent;

        (ii)    the removed General Partner, as a special Limited Partner, shall retain a Percentage Interest in each Portfolio Investment made by the Partnership during the period such General Partner served as general partner of the Partnership and prior to the effective date of such General Partner's removal under this Section 9.1(f) (the "Pre-Removal Investments") and shall be entitled to receive all distributions in respect of its Capital Contributions for, and corresponding Percentage Interest in, such Pre-Removal Investments in accordance with the distribution priorities set forth in Section 3.5 of this Agreement (but, except as provided in Section 9.1(f)(iii), exclusive of any right to receive Carried Interest distributions thereunder), as in effect immediately prior to the delivery of notice of removal hereunder; provided, that the successor general partner shall not have any right to receive any Carried Interest, directly or indirectly, with respect to amounts distributable to the removed General Partner in accordance with this Section 9.1(f)(ii);

        (iii)   all distributions (including the Partnership's liquidating distributions) with respect to any Portfolio Investment otherwise payable to the successor general partner shall instead be made as a special distribution to the removed General Partner, in its capacity as a special Limited Partner, until the removed General Partner (and Indigo, if applicable) has received cumulative distributions equal to the amount that the removed General Partner would have been entitled to receive as a Carried Interest distribution pursuant to Section 3.5(b)(iii) and Section 3.5(b)(iv) hereof pursuant to the terms of this Agreement in effect immediately prior to the delivery of notice of removal hereunder calculated as if: (x) the removed General Partner had not been removed pursuant to this Section 9.1(f); and (y) no Portfolio Investments had been made by the Partnership other than the Pre-Removal Investments.

        (iv)   all obligations under this Agreement to fund any further amount of the Capital Commitment by Indigo or for the removed General Partner (either as Limited Partner, general partner or otherwise, but subject to the obligations of former Partners under Section 7.2(c) and Section 7.2(d)) to make any contributions of capital or other payments, whether by debit to its Capital Account or otherwise (including, for the avoidance of any doubt, payment of Management Fees or any similar fees, or other Partnership Expenses or amounts to fund the acquisition of Portfolio Investments) shall cease, and Indigo and its personnel, if applicable, shall no longer be bound by its covenants under Section 6.7 or any other provision of this Agreement upon the effective date of removal (except the removed General Partner in its capacity as a special Limited Partner unless otherwise contemplated by this Section 9.1); provided, however, that the removed General Partner, in its capacity

as a special Limited Partner, shall otherwise have all of the rights and protections of a Limited Partner; and provided, further, that if upon the winding up, dissolution and termination of the Partnership any Clawback Amount, calculated pursuant to the terms of this Agreement in effect immediately prior to the delivery of notice of removal hereunder, would be payable to the Partnership (for the avoidance of doubt, treating all distributions to the removed General Partner pursuant to Section 9.1(f)(iii) as distributions of Carried Interest for purposes of this Agreement), then (A) the removed General Partner, as a former general partner of the Partnership, and the successor general partner shall contribute, respectively, to the Partnership their respective portions of the Clawback Amount, which portions shall be satisfied solely out of and to the extent of their respective prior distributions of Carried Interest and which portions shall be in the same ratio as: (x) with respect to the removed General Partner, the Clawback Amount calculated in accordance with the assumptions set forth in clause (x) and (y) of Section 9.1(f)(iii) hereof; and (y) with respect to the successor general partner, the remainder of the Clawback Amount; and (B) if after the application of the foregoing clause (A) the Partnership has not yet received the full Clawback Amount, then in proportion to the removed General Partner's and the successor general partner's relative cumulative distributions of Carried Interest (not previously returned pursuant to Section 3.8 and this Section 9.1(f)(iv); and

(v)     the successor general partner shall: assume and fund in cash any unpaid portion of the General Partner and/or its affiliates' aggregate Capital Commitment, which funding shall be at such times and in such amounts as are required pursuant to the terms of this Agreement in effect immediately prior to the time at which notice of removal was served pursuant to this Section 9.1(f).

Any direct or indirect amendment on or after the effective date of the removal of the General Partner to the provisions of this Section 9.1(f) or any other provision of this Agreement that adversely affects the removed General Partner's or Indigo's rights under this Section 9.1(f) (including any amendment to this Agreement that would adversely affect the General Partner's Carried Interest or other distributions hereunder or require it to make any further capital contributions or payments on or after such removal or increase its share of the Clawback Amount) shall require the written consent of the removed General Partner acting in its capacity as a special Limited Partner.

9.2     <u>Transfers or Substitutions by Limited Partners</u>.

(a)     A Limited Partner may not Transfer its Interest in whole or in part to any Person without the prior written consent of the General Partner, which consent may be given or withheld in the sole discretion of the General Partner.  In addition, in no event shall a Transfer be made unless in the opinion of counsel reasonably acceptable to the General Partner, and satisfactory in form and substance to the General Partner (which opinion may be waived, in whole or in part, by the General Partner):

(i)     such Transfer would not violate the Securities Act, any state securities or "Blue Sky" laws or any other securities laws applicable to the Partnership or the Interest to be Transferred;

(ii)     such Transfer would not cause the Partnership to lose its status as a partnership for U.S. federal income tax purposes or cause the Partnership to become subject

to the Company Act;

      (iii)    such Transfer would not cause the Partnership to be treated as a "publicly traded partnership" within the meaning of Section 7704 of the Code and the regulations promulgated thereunder; and

      (iv)    such Transfer would not cause (A) all or any portion of the assets of the Partnership (i) to constitute "plan assets" (under ERISA, the Code or the applicable provisions of any Similar Law), or (ii) to be subject to the provisions of ERISA, the Code or any applicable Similar Law, or (B) the General Partner to become a fiduciary pursuant to ERISA or the applicable provisions of any Similar Law, or otherwise.

The General Partner may in its sole discretion withhold its consent to any Transfer that would otherwise cause the Partnership or its Affiliates to violate applicable law and may require that any Transfer be effective only at the end of a Fiscal Quarter. All transfers of interest will be handled by the Partnership's outside counsel. Each transferring Limited Partner agrees that it will pay all reasonable expenses, including attorneys' fees, incurred by the General Partner or the Partnership in connection with a Transfer or any proposed Transfer of an Interest by such Limited Partner, except to the extent that the assignee or transferee thereof (a "Transferee") agrees to bear such expenses.

      (b)    The General Partner shall not unreasonably withhold its consent to any Transfer by a Limited Partner of all or a portion of its Interest to a Person if such Person: (i) is an Affiliate of such Limited Partner (which includes affiliated pension plans and investment funds, and investment funds otherwise managed by or under direct or indirect common management with such Limited Partner) the ultimate beneficial ownership of which is substantially identical to such Limited Partner; (ii) if such Limited Partner is a trust or a trustee or fiduciary, is a successor trust (or a successor or additional trustee or fiduciary in the case of the same trust) with the same ultimate beneficial ownership or a successor trustee or fiduciary (it being understood that a Limited Partner making such a Transfer shall thereafter remain liable for its Unpaid Capital Commitment, unless released therefrom by the General Partner in its sole discretion); (iii) is a successor governmental agency with respect to such Limited Partner; or (iv) is an institutional investor known to, and in good standing with, the General Partner; provided, that the General Partner reasonably concludes that the conditions of numbered clauses (i) through (iv) of Section 9.2(a) above have been satisfied; and provided, further, that the General Partner's consent shall not be deemed to be unreasonably withheld or delayed if the General Partner's consent to any Transfer requires that such Transfer be effective only at the end of a Fiscal Quarter. No Transferee of an Interest of a Limited Partner may be admitted as a substitute Limited Partner in the Partnership without the consent of the General Partner, which consent may be given or withheld in its sole discretion; provided, that if such Transferee is a Person described in any of clauses (i) through (iv) of this Section 9.2(b), such consent shall not be unreasonably withheld. A Transferee of an Interest that is not admitted as a substitute Limited Partner shall be entitled only to allocations and distributions with respect to that Interest and shall have no rights to vote such Interest, to participate in the management of the Partnership or to any information or accounting of the affairs of the Partnership and shall not have any of the other rights of a Partner pursuant to this Agreement.

      (c)    Any attempted Transfer or substitution not made in accordance with this Section 9.2 shall be null and void.

(d)     The General Partner or its Affiliates may acquire an Interest of a transferring Limited Partner as a Transferee.

9.3     Further Actions.  The General Partner shall cause this Agreement to be amended to reflect as appropriate the occurrence of any of the transactions referred to in this Article IX as promptly as is practicable after such occurrence.

9.4     Admissions and Withdrawals Generally.  Except as expressly provided in this Agreement (including Section 3.2(a) and Section 3.2(b)), no Partner shall have the right to withdraw from the Partnership or to withdraw any part of its Capital Account and no additional Partner may be admitted to the Partnership.  Each new Partner shall be admitted as a Partner upon the execution by or on behalf of it of an agreement pursuant to which it becomes bound by the terms of this Agreement.  The names of all Persons admitted as Partners and their status as a General Partner or a Limited Partner shall be maintained in the records of the Partnership.

## ARTICLE X

## Term and Dissolution of the Partnership

10.1     Term.  The existence of the Partnership commenced on the date of the filing of the Certificate pursuant to the Act and shall continue until the Partnership is dissolved and subsequently terminated, which dissolution shall occur upon the first of any of the following events (each an "Event of Dissolution"):

(a)     The expiration of the term of the Partnership as defined in Section 1.7;

(b)     The occurrence of a Disabling Event with respect to the General Partner; provided, that the Partnership shall not be dissolved if, within ninety (90) days after the Disabling Event, Limited Partners representing a Majority in Interest of the Limited Partners agree in writing to continue the business of the Partnership and to the appointment of another General Partner which shall agree to purchase the Interest of the disabled General Partner in the manner specified in Section 9.1(d);

(c)     After the Investment Period, at the time as of which the Partnership has disposed of all of its Portfolio Investments;

(d)     The determination by the General Partner that such earlier dissolution and termination is necessary or advisable due to a change in applicable law or regulation which the General Partner, in good faith, believes is likely to cause the General Partner or the Partnership to be in violation of such law or regulation with materially adverse consequences to the General Partner or the Partnership, including any change in law or regulation which would require registration of the Partnership under the Company Act;

(e)     The determination by the General Partner at any time that such earlier dissolution and termination would be in the best interests of the Partners; provided, that any such determination is consented to by either the Advisory Committee or a Majority in Interest of the Limited Partners;

(f)     The effective date of dissolution pursuant to Section 9.1(b);

(g)     At any time that there are no limited partners of the Partnership, unless the business of the Partnership is continued in accordance with the Act; or

(h)     The entry of a decree of judicial dissolution under Section 17-802 of the Act.

10.2   <u>Winding-up</u>.  Upon the occurrence of an Event of Dissolution, the Partnership shall be wound up, liquidated and subsequently terminated.  The General Partner or, if there is no general partner, a liquidator appointed by a Majority in Interest of the Limited Partners, shall proceed with the Dissolution Sale and the Final Distribution. In the Dissolution Sale, the General Partner or such liquidator shall use its reasonable efforts to reduce to cash and cash equivalent items such assets of the Partnership as the General Partner or such liquidator shall deem it advisable to sell, subject to obtaining fair value for such assets and any tax or other legal or contractual considerations.

10.3   <u>Final Distribution</u>.  After the Dissolution Sale, the proceeds thereof and the other assets of the Partnership shall be distributed in one or more installments in the following order of priority:

(a)     to pay all creditors of the Partnership (including the payment of the expenses of the winding-up, liquidation and dissolution of the Partnership), including Partners who are creditors of the Partnership, to the extent otherwise permitted by law, either by the payment thereof or the making of reasonable provision therefor (including the establishment of reserves, in amounts established by the General Partner or such liquidator);

(b)     The remaining proceeds, if any, plus any remaining assets of the Partnership, shall be applied and distributed to the Partners in accordance with the positive balances of the Partners' Capital Accounts, as determined after taking into account all adjustments to Capital Accounts for the Partnership taxable year during which the liquidation occurs, by the end of such taxable year or, if later, within ninety (90) days after the date of such liquidation; <u>provided</u>, that, notwithstanding anything to the contrary herein, liquidating distributions shall be made in the same manner as distributions under <u>Section 3.5</u> if such distributions would result in the Partners receiving a different amount than would have been received pursuant to a liquidating distribution based on Capital Account balances.  For purposes of the application of this <u>Section 10.3</u> and determining Capital Accounts on liquidation, all unrealized gains, losses and accrued income and deductions of the Partnership shall be treated as realized and recognized immediately before the date of distribution.

ARTICLE XI

<u>Miscellaneous</u>

11.1   <u>Confidentiality</u>.

(a)     Each Limited Partner will maintain the confidentiality of, and not disclose information that is, non-public information furnished by the General Partner, the Investment Manager or their respective Affiliates regarding the General Partner, the Investment Manager, their respective Affiliates and the Partnership (including information regarding any Person in which the Partnership holds, or contemplates acquiring, any Portfolio Investments) received by such Limited Partner (including in connection with any meeting of the Advisory Committee or any meeting of

the Partners), except: (i) as otherwise required by governmental regulatory agencies (including tax authorities in connection with a review or other similar examination of such Limited Partner), self-regulating bodies, law or legal process (provided, any disclosure that is either: (A) not to such a governmental regulatory agency; or (B) not on a confidential basis, shall require prior notice thereof to the General Partner); or (ii) to directors, employees, representatives and advisors of such Limited Partner and its Affiliates who need to know the information and who are informed of the confidential nature of the information and agree to keep it confidential.  Without limitation of the foregoing, each Limited Partner acknowledges that notices and reports to Limited Partners (including any information provided in connection with any meeting of the Advisory Committee or any meeting of the Partners) may contain material non-public information and agrees not to use such information other than in connection with monitoring its investment in the Partnership and agrees in that regard not to trade in Securities on the basis of any such information.

(b)     Notwithstanding the obligation of confidentiality set out in this Section 11.1, to comply with Treasury Regulation Section 1.6011-4(b)(3)(i), each Limited Partner (and any employee, representative, or other agent of such Limited Partner) may disclose to any and all Persons, without limitation of any kind, the U.S. federal income tax treatment and tax structure of the Partnership or any transactions contemplated by the Partnership under this Agreement. However, any such information relating to the tax treatment or tax structure is required to be kept confidential to the extent necessary to comply with any applicable federal or state securities laws. For purposes of the two preceding sentences, tax treatment and tax structure shall not include, and such Limited Partner (or employee, representative or agent thereof) shall not disclose: (i) the name of, or any other identifying information regarding, the Partnership or any existing or future investor (or any Affiliate thereof) in the Partnership, or any investment or transaction entered into by the Partnership and any information regarding the specific economic terms of the Partnership (including the amount of any fees and the percentages used in calculating Carried Interest); (ii) any performance information relating to the Partnership or its investments; or (iii) any performance or other information relating to other funds or investments sponsored or managed by Indigo.

(c)     In order to preserve the confidentiality of certain information disseminated by the General Partner or the Partnership under this Agreement that a Limited Partner is entitled to receive pursuant to the provisions of this Agreement, including quarterly, annual and other reports (other than the IRS Forms 1065, Schedule K-1s) and information provided at the Partnership's informational meetings, the General Partner may: (i) provide to such Limited Partner access to such information only on a website maintained by Indigo in password protected, non-downloadable, non-printable format; and (ii) require such Limited Partner to return or destroy any copies of information provided to it by the General Partner or the Partnership, subject to Section 11.1(b).

(d)     To the extent that the Freedom of Information Act, 5 U.S.C. § 552, ("FOIA"), any state public records access law, any state or other jurisdiction's laws similar in intent or effect to FOIA, or any other similar statutory or regulatory requirement would potentially cause a Limited Partner or any of its Affiliates to disclose information relating to the Partnership, its Affiliates or any Portfolio Investment, such Limited Partner hereby agrees that, in addition to compliance with the notice requirements set forth in Section 11.1(a) above, such Limited Partner: (x) shall take commercially reasonable steps to oppose and prevent the requested disclosure unless: (i) the General Partner does not object in writing to such disclosure within ten (10) Business Days (or such lesser time period as stipulated by the applicable law) of such notice; or (ii) such disclosure consists solely of the Partnership's name, the Partnership's aggregate performance information

(i.e., cash contributed, distributions received, remaining value (as reported by the General Partner in the Partnership's quarterly reports), investment multiple, overall "IRRs" and other, similar, rate of return measures for such Limited Partner's investment), the year of formation of the Partnership, and such Limited Partner's own Capital Commitment and Unpaid Capital Commitment, and does not include: (A) copies of this Agreement and related documents or (B) any other information not referred to in clause (ii) above; and (y) acknowledges and agrees that notwithstanding any other provision of this Agreement the General Partner may in order to prevent any such potential disclosure that the General Partner determines in good faith is likely to occur withhold all or any part of the information otherwise to be provided to such Limited Partner other than the Partnership's aggregate performance information specified in clause (x)(ii) above and the IRS Forms 1065, Schedule K-1s.

(e)     Any obligation of a Limited Partner pursuant to this Section 11.1 may be waived by the General Partner in its sole discretion.

(f)     A Limited Partner may by giving notice to the General Partner elect not to receive copies of any document, report or other information that such Limited Partner would otherwise be entitled to receive pursuant to this Agreement and is not required by applicable law to be delivered. The General Partner agrees that it shall make any such documents available to such Limited Partner at the General Partner's offices (or, at the request of such Limited Partner, the offices of counsel to the Partnership) on terms and conditions set forth in Section 8.1.

11.2     Power of Attorney.  Each Limited Partner hereby irrevocably constitutes and appoints the General Partner, with full power of substitution, the true and lawful attorney-in-fact and agent of such Limited Partner, to execute, acknowledge, verify, swear to, deliver, record and file, in its or its assignee's name, place and stead, all in accordance with the terms of this Agreement, all instruments, documents and certificates which may from time to time be required by the laws of the State of Delaware, the United States of America or any other jurisdiction in which the Partnership conducts or plans to conduct its affairs, or any political subdivision or agency thereof to effectuate, implement and continue the valid existence and affairs of the Partnership, including the power and authority to execute, verify, swear to, acknowledge, deliver, record and file:

(a)     all certificates and other instruments, including any amendments to this Agreement or with respect to the Certificate any filing of a statement of changes in registered particulars of the Partnership which the General Partner deems appropriate to form, qualify or continue the Partnership as a limited partnership (or a partnership in which the limited partners have limited liability) in the State of Delaware and all other jurisdictions in which the Partnership conducts or plans to conduct its affairs;

(b)     any amendments to this Agreement or any other agreement or instrument which the General Partner deems appropriate to: (i) effect the addition, substitution or removal of any Limited Partner or the General Partner pursuant to this Agreement; or (ii) effect any other amendment or modification to this Agreement adopted in accordance with the terms hereof;

(c)     all conveyances and other instruments which the General Partner deems appropriate to reflect the dissolution and termination of the Partnership pursuant to the terms hereof, including the writing required by the Act to cancel the Certificate;

(d)     all instruments relating to the admission of any new or substitute Limited Partner, any transfer documents on behalf of Defaulting Partners pursuant to Section 3.3 and any documents reasonably necessary to consummate any transactions provided for by Section 2.2;

(e)     certificates of assumed name and such other certificates and instruments as may be necessary under the fictitious or assumed name statutes from time to time in effect in the State of Delaware and all other jurisdictions in which the Partnership conducts or plans to conduct its affairs; and

(f)     any election pursuant to Section 954(b)(4) of the Code to exclude income of a "controlled foreign corporation" from classification as "subpart F income."

Such attorney-in-fact and agent shall not, however, have the right, power or authority to amend or modify this Agreement when acting in such capacities, except to the extent authorized herein.  The power of attorney granted herein shall be deemed to be coupled with an interest and is intended to secure a proprietary interest of the donee and/or the performance of an obligation owed to the donee under this Agreement, shall be irrevocable, shall survive and not be affected by the dissolution, bankruptcy or legal disability of the Limited Partner and shall extend to its successors and assigns; and may be exercisable by such attorney-in-fact and agent for all Limited Partners (or any of them) by listing all (or any) of such Limited Partners required to execute any such instrument, and executing such instrument acting as attorney-in-fact.  Any Person dealing with the Partnership may conclusively presume and rely upon the fact that any instrument referred to above, executed by such attorney-in-fact and agent, is authorized, regular and binding, without further inquiry.  If required, each Limited Partner shall execute and deliver to the General Partner within five (5) days after the receipt of a request therefor, such further designations, powers of attorney or other instruments as the General Partner shall reasonably deem necessary for the purposes of giving effect to the foregoing limited power of attorney.  The General Partner shall promptly notify each Limited Partner of its use of the power of attorney provided for in this Section 11.2 with respect to such Limited Partner, which notice shall include a copy of each document executed on such Limited Partner's behalf.

11.3    Amendments; Voting.

(a)     Except as required by law, this Agreement may be amended or supplemented by the written consent of the General Partner and sixty-six and two-thirds percent (66 2/3%) in Interest of the Limited Partners; provided, that no such amendment shall: (i) increase any Limited Partner's Capital Commitment, reduce its share of the Partnership's distributions, income and gains, increase its share of the Partnership's losses or increase its share of the Management Fee payable by such Limited Partner hereunder, without the written consent of each such Limited Partner so affected; (ii) change the percentage of interests of Limited Partners (the "Required Interest") necessary for

46

any consent required hereunder to the taking of an action unless such amendment is approved by Limited Partners who then hold interests equal to or in excess of the Required Interest for the subject of such proposed amendment; (iii) amend this Section 11.3 without the consent of each Limited Partner adversely affected by such amendment; or (iv) make any amendment where this Agreement expressly requires that any amendment or change herein requires a higher percentage of the Limited Partners than a Majority in Interest to effect such amendment or change absent the written consent of such higher percentage of the Limited Partners.  No amendment may be made indirectly (by means of or in connection with a conversion, merger or similar transaction) unless the requisite consents and approvals needed to authorize such amendment pursuant to this Section 11.3 have also been obtained.  Subject to the foregoing clauses (i) through (vi) of this Section 11.3(a), but otherwise notwithstanding any other provision hereof, this Agreement may be amended by the General Partner without the consent of the Limited Partners to: (w) change the name of the Partnership pursuant to Section 1.2 hereof; (x) correct or supplement any provision hereof which is incomplete or inconsistent with any other provision hereof or correct any printing, stenographic or clerical error or omissions; (y) amend Section 5.2 to Section 5.5 pursuant to Section 5.5; and (z) make any changes negotiated with a Limited Partner admitted at a Subsequent Closing so long as such changes do not adversely affect the rights and obligations of any existing Limited Partner taken as a whole.  The General Partner shall promptly notify the Limited Partners of any amendment made pursuant to this Section 11.3.

(b)     The General Partner shall have the right to amend this Agreement without the approval of any other Partner to the extent the General Partner reasonably determines, based upon written advice of tax counsel to the Partnership, that the amendment is necessary to provide assurance that the Partnership will not be treated as a "publicly traded partnership" under Section 7704 of the Code and the regulations promulgated thereunder; provided, that: (i) such amendment shall not change the relative economic interests of the Partners, reduce any Partners' share of distributions, or increase any Partner's Capital Commitment or its liability hereunder; (ii) the General Partner provides a copy of such written advice and amendment to the Limited Partners at least twenty (20) Business Days prior to the effective date of any such amendment; and (iii) a Majority in Interest of the Limited Partners shall not have made a reasonable objection to such amendment prior to the effective date of such amendment.

(c)     With respect to any voting rights that the Limited Partners may have under this Agreement or under the Act, the Limited Partners shall vote as a single class.  In connection with any matters submitted for any vote, approval or consent of the Limited Partners, the General Partner shall promptly notify each Limited Partner of the respective aggregate percentages in interest (but not the identity) of all Limited Partners voting in favor, consenting to or otherwise approving, and all Limited Partners voting against, refusing to consent or otherwise disapproving of, any such matter.

11.4    Consents and Approvals.  Except where a different period of time for the granting of any consent or approval is specified herein, when any provision of this Agreement provides for the consent or approval of any Person, such consent or approval shall be exercised within a reasonable period of time after receipt of a written request therefore, and in the event that no response to such request has been provided within fifteen (15) Business Days following the date of notice of such request (or such later date as may be specified in the notice requesting such consent or approval), then approval or consent (as appropriate) shall have been deemed given with respect to such request; provided, that such deemed consent or approval shall only occur if the request prominently notifies the recipient that the failure to reply within such fifteen (15) Business

Day period (or longer period as specified in the notice) shall be deemed to constitute consent or approval.

11.5    Notices.

(a)    All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if made in writing and: (i) delivered by hand or courier service; (ii) mailed, registered mail, first-class postage paid; (iii) transmitted via telegram, telex or facsimile; or (iv) delivered by electronic mail or other form of electronic transmission, if to any Partner, at such Partner's address or electronic mail address or to such Partner's facsimile number, as applicable and as set forth in such Partner's Subscription Agreement, and if to the Partnership, to the General Partner at the General Partner's address or electronic mail address, or to the General Partner's facsimile number, as applicable, or to such other Person or address as any Partner shall have last designated by notice in accordance with this Section 11.5 to the Partnership, and in the case of a change in address by the General Partner, to the Limited Partners.  The date of giving or making of any such notice or demand shall be the earlier of: (w) the date of actual receipt; (x) eight (8) days after such notice or demand is sent; (y) if sent in accordance with clause (iii), the Business Day next following the day such notice or demand is actually transmitted provided the sending party received confirmation of receipt dated by such day; and (z) if sent in accordance with clause (iv), the Business Day next following the day such notice or demand is actually transmitted.

(b)    Notices to the General Partner may be made to the following address or electronic mail address:

> IGI Partners II, LLC
> 5318 East 2nd Street #502
> Long Beach, CA 90803
> United States of America
> ir@indigoca.com

(c)    Notwithstanding the foregoing provisions of Section 11.5, financial statements and other routine communications of the Partnership may be sent by first-class mail, postage prepaid, or electronic mail or other form of electronic transmission, and distribution checks may be sent by first-class mail, postage prepaid; provided, that if the Limited Partner provides to the General Partner sufficient instructions prior to the time of any distribution, the cash distribution shall be sent to such Limited Partner by wire transfer of immediately available funds.

11.6    Computation of Time.  In computing any period of time under this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included, unless it is a Saturday, Sunday or legal holiday in the United States of America, in which event the period shall run until the end of the next Business Day.

11.7    Entire Agreement.  This Agreement and the other agreements referred to herein constitute the entire agreement among the Partners with respect to the subject matter hereof and supersede any prior agreement or understanding among or between them with respect to such subject matter.  The representations and warranties of the Limited Partners in, and the other provisions of, the Subscription Agreements shall survive the execution and delivery of this

Agreement. The parties hereto acknowledge that the Partnership and/or the General Partner, without any further act, approval or vote of any Partner, may enter into side letters or other writings with individual Limited Partners which have the effect of establishing rights under, or altering or supplementing, the terms of, this Agreement. The parties hereto agree that any rights established, or any terms of this Agreement altered or supplemented, in a side letter with a Limited Partner shall govern solely with respect to such Limited Partner notwithstanding any other provision of this Agreement.

11.8    Severability. Each provision of this Agreement shall be considered severable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable and contrary to the Act or existing or future applicable law, such invalidity shall not impair the operation of or affect those provisions of this Agreement which are valid. In that case, this Agreement shall be construed so as to limit any term or provision so as to make it enforceable or valid within the requirements of any applicable law, and in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid or unenforceable provisions.

11.9    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware. In particular, the Partnership is formed pursuant to the Act, and the rights and liabilities of the Partners shall be as provided therein, except as herein otherwise expressly provided. If any provision of this Agreement shall be held to be invalid, the remainder of this Agreement shall not be affected thereby. Any action or Proceeding against the parties relating in any way to this Agreement may be brought and enforced in the courts of the State of Delaware located in the United States District of Delaware, to the extent subject matter jurisdiction exists therefor, and the parties irrevocably submit to the non-exclusive jurisdiction of each of those courts in respect of any such action or proceeding; provided, that with regard to any actions brought against the General Partner or its Affiliates and employees, such jurisdiction shall be exclusive unless otherwise expressly agreed by the General Partner.

11.10   Successors and Assigns. Except with respect to the rights of Indemnified Parties hereunder, none of the provisions of this Agreement shall be for the benefit of or enforceable by the creditors of the Partnership or the General Partner. This Agreement shall be binding upon and inure to the benefit of the Partners and their legal representatives, heirs, successors and permitted assigns.

11.11   Counterparts. This Agreement may be executed in one or more counterparts, all of which shall constitute one and the same instrument.

11.12   Interpretation. Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa. The use of the word "including" in this Agreement shall be by way of example rather than by limitation. The use of the words "or," "either" and "any" shall not be exclusive. Reference to any agreement, document or instrument means such agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof. All references to dollars or the sign "$" refer to United States dollars. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

11.13  <u>Headings; Internal References</u>.  When a reference is made in this Agreement to Sections, Annexes, Exhibits or Schedules, such reference shall be to a Section, Annex, Exhibit or Schedule to this Agreement unless otherwise indicated.  The table of contents, index of defined terms and headings contained in this Agreement are for convenience and reference purposes only and shall not be deemed to alter or affect in any way the meaning or interpretation of any provisions of this Agreement.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

11.14  <u>Partnership Status</u>.  The Partnership shall be treated as a partnership for U.S. federal income tax purposes and no election to the contrary shall be made.  The General Partner will use its reasonable best efforts to ensure that the Partnership will not be treated as a publicly traded partnership for purposes of Section 7704 of the Code.

11.15  <u>Counsel to the Partnership</u>.  Counsel to the Partnership may also be counsel to the General Partner and the Investment Manager.  The General Partner may execute on behalf of the Partnership and the Partners any consent to the representation of the Partnership that counsel may request pursuant to the applicable rules of professional conduct in any jurisdiction ("Rules of Conduct").  The Partnership has initially selected Winston & Strawn LLP (the "Partnership Counsel") as legal counsel to the Partnership.  Each Limited Partner acknowledges that the Partnership Counsel does not represent any Limited Partner in the absence of a clear and explicit agreement to such effect between the Limited Partner and the Partnership Counsel (and then only to the extent specifically set forth in that agreement), and that in the absence of any such agreement the Partnership Counsel shall owe no duties directly to a Limited Partner.  In the event any dispute or controversy arises between any Limited Partner and the Partnership, or between any Limited Partner or the Partnership, on the one hand, and the General Partner or the Investment Manager that the Partnership Counsel represents, on the other hand, then each Limited Partner agrees that the Partnership Counsel may represent either the Partnership, the General Partner or the Investment Manager, or each of them, in any such dispute or controversy to the extent permitted by the Rules of Conduct, and each Limited Partner hereby consents to such representation.  Each Limited Partner further acknowledges that the Partnership Counsel has not represented the interest of any Limited Partner in the preparation and negotiation of this Agreement.  Notwithstanding the foregoing, all or any portion of the foregoing shall not apply to a Limited Partner to the extent that the foregoing is inconsistent with an established policy of such Limited Partner, and such Limited Partner notifies the General Partner of such policy in writing prior to such Limited Partner's admission to the Partnership.

11.16  <u>Partnership Name</u>.  IGI Partners II, LLC has granted to the Partnership the right to use the mark "Indigo" pursuant to <u>Section 1.2</u>.  The Partnership's use of the name is exclusively governed by the terms of such license agreement.  No value shall be placed upon the name of the Partnership or the goodwill attached to it for the purpose of determining the value of any Partner's Capital Account or interest in the Partnership.

11.17  <u>Discretion</u>.

(a)     To the fullest extent permitted by law, unless otherwise expressly provided for herein, (i) whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or a Limited Partner, on the other hand, or (ii) whenever this Agreement or any other agreement contemplated herein or therein provides that

the General Partner shall act in a manner which is, or provides terms which are, fair and reasonable to the Partnership or any Limited Partner, the General Partner shall resolve such conflict of interest, take such action or provide such terms, considering in each case the relative interest of each party, including its own interest, to such conflict, agreement, transaction or situation and the benefits and burdens relating to such interests, any customary or accepted industry practices, and any applicable generally accepted accounting practices or principles.

(b)     To the fullest extent permitted by law and notwithstanding any other provision to the contrary in this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, whenever in this Agreement, a Person is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, such Person shall be entitled to consider its own interest as well as the interests of the Partners as a whole, or (ii) in its "good faith" or under another express standard, then such Person shall act under such express standard and shall not be subject to any other or different standards.

11.18   No Waiver.  The rights and remedies of the parties to this Agreement are cumulative and not alternative.  Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.

11.19   Waiver of Partition and Accounting.  Except as may be otherwise required by law, each Partner hereby irrevocably waives any and all rights that it may have to maintain an action for an accounting or for partition or any similar action of any of the Partnership's property.

11.20   No Appraisal Rights.  No Limited Partner shall have any appraisal rights with respect to its interest in the Partnership under any circumstances, including circumstances in connection with (i) any amendment of this Agreement, (ii) any merger or consolidation to which the Partnership is a party, or (iii) the sale of all or substantially all of the Partnership's assets.

11.21   Tax Information; Related Matters.

(a)     The General Partner shall use commercially reasonable efforts to provide a Limited Partner, at such Limited Partner's written request, with such non-confidential information or documentation available to the Partnership or the General Partner as the Limited Partner may reasonably request (i) in order for such Limited Partner to file any tax returns or reports or to respond to any inquiry from any taxing authority with respect to any taxes imposed on such Limited Partner as a result of its interest in the Partnership; or (ii) in order for such Limited Partner to obtain any available refunds of or exemptions from any withholding taxes or with respect to any taxes imposed on the Limited Partner as a result of their ownership of an interest in the Partnership. Any expenses relating to the Partnership's compliance with any such request shall be borne by such Limited Partner.

(b)     The General Partner will use commercially reasonable efforts (consistent with the objective of pursuing the most attractive investment available and taking into account the timing requirements of completing any particular Portfolio Investment) to structure each Portfolio Investment to minimize or, if feasible, to eliminate any tax, including withholding taxes, on the anticipated income or capital gain to the Limited Partners from each Portfolio Investment; provided, that the General Partner shall not be required to consider the tax position of any specific Limited Partners when determining how to structure a Portfolio Investment as distinguished from the overall tax position in relation to the Limited Partners generally.

(c)     At the written request of any Limited Partner, the General Partner will promptly notify such Limited Partner of any taxes paid during the preceding calendar year by the Partnership to jurisdictions with respect to which the Partnership had attributable income, together with the names of such jurisdictions and such Limited Partner's share of such taxes.

(d)     The General Partner agrees to use its reasonable best efforts not to cause the Partnership to engage in transactions that might be considered "listed transactions" or "prohibited reportable transactions" as defined in Section 4965(e) of the Code.  If the Partnership becomes aware that it has engaged in any such transactions, the General Partner shall provide prompt notice of such occurrence to each Limited Partner who has previously requested such notice.

11.22   Notice of Certain Proceedings.  The General Partner will inform the Advisory Committee, as soon as reasonably practicable, of any actual regulatory enforcement proceedings, governmental investigations regarding material violations of law or regulations of any governmental agency and any material litigation relating to the Partnership, the General Partner, the Investment Manager, the Key Person or any of their respective Affiliates.

11.23   Compliance with Anti-Money Laundering Requirements.

(a)     Notwithstanding any other provision of this Agreement to the contrary, the General Partner, in its own name and on behalf of the Partnership, shall be authorized without the consent of any Person, including any other Partner, to take such action as it determines in its sole discretion to be necessary or advisable to comply with any anti-money laundering or anti-terrorist laws, rules, regulations, directives or special measures, including the actions contemplated by any subscription agreements with Limited Partners.

(b)     The General Partner confirms that it will use its reasonable best efforts to avoid any investment in the Partnership by, and to cause the Partnership to avoid transactions (a) in violation of any relevant anti-money laundering legislation, rule, regulation or order administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, including Subtitle B, Chapter V of Title 31 of the U.S. Code of Federal Regulations, in each case as amended from time to time, or (b) with, (i) any Person appearing on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control in the United States Department of the Treasury, (ii) any other Person with whom a transaction is prohibited by Executive Order 13224, the USA PATRIOT Act, the Trading with the Enemy Act or the foreign asset control regulations of the United States Treasury Department, in each case as amended from time to time, (iii) any Person known by the Partnership (after reasonable inquiry) to be controlled by any Person described in the foregoing items (i) or (ii) (with ownership of 20% or more of outstanding voting securities being presumptively a control position), or (iv) any Person having its principal place of business, or the majority of its business operations (measured by revenues), located in any country

described in the foregoing item (ii).  For purposes of the foregoing, the Partnership's reliance on a representation or warranty made by a counterparty at or prior to the time of a Partnership investment or transaction will constitute reasonable inquiry.  The General Partner also agrees that neither it nor the Partnership will make any payment to any Person in violation of the U.S. Foreign Corrupt Practices Act (as amended from time to time), or any other applicable anti-money laundering statute or regulation.

[the remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as a deed on the date and year first written above.

GENERAL PARTNER:

IGI PARTNERS II, LLC, a Delaware limited liability company

By: _____
Name: Brent E. Carey
Title:  Company Officer

INITIAL LIMITED PARTNER (solely to reflect his withdrawal from the Partnership in accordance with Section 2.1):

By: _____
Brent E. Carey

LIMITED PARTNERS:

All Limited Partners admitted pursuant to powers of attorney granted to the General Partner

By: IGI Partners II, LLC, as attorney-in-fact for the parties subscribing for Interests and hereby admitted as Limited Partners as set forth in the books and records of the Partnership

By: _____
Name: Brent E. Carey
Title:  Company Officer

[SIGNATURE PAGE TO INDIGO OPPORTUNITIES FUND II, L.P. LIMITED PARTNERSHIP AGREEMENT]

Annex A

## **DEFINITIONS**

As used in the Agreement, the following terms shall have the following meanings:

"Act" shall have the meaning set forth in the Preamble.

"Advisers Act" means the Investment Advisers Act of 1940, as amended.

"Advisory Committee" shall have the meaning set forth in Section 7.4(a).

"Affiliate" means with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with such Person; provided, however, that Holding Entities shall not be considered Affiliates of the General Partner.  The term "control" (including the term "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management or investment policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" shall have the meaning set forth in the Preamble.

"Appraisal Firm" shall have the meaning set forth in Section 6.8(c).

"Appraised Value With Discounted Carry" means with respect to the purchase of the General Partner's interest in the Partnership upon the removal of the General Partner for Cause, the occurrence of a Disabling Event or dissolution pursuant to Section 9.1(b), a price equal to the value of the General Partner's interest in the Partnership as of such date (exclusive of 50% of any potential Carried Interest payments to the General Partner) based upon the General Partner's pro rata share (based upon Capital Contributions for Portfolio Investments) of the Fair Value of the Portfolio Investments and with the amount of the Partnership's other assets and liabilities determined in accordance with U.S. generally accepted accounting principles.

"Assets under Management (AUM)" means Funds ownership percentage of the SPV and all related subsidiaries.

"BHC Act" means the United States Bank Holding Company Act of 1956, as amended.

"BHC Partner" shall have the meaning set forth in Section 7.1(c).

"Business Day" means a day which is not a Saturday, Sunday or a day on which banks in Los Angeles, California are authorized by law to close.

"Capital Account" shall have the meaning set forth in Section 5.1(a).

"Capital Call" shall have the meaning set forth in Section 3.1(a).

"Capital Commitment" means, with respect to any Partner, the amount set forth in such Partner's Subscription Agreement (or the Partnership's books and records) with respect to the

General Partner), as accepted by the General Partner and as reflected in the books and records of the Partnership as its Capital Commitment. The General Partner may, in its sole discretion, elect to reduce the Capital Commitment of a Limited Partner with respect to such Limited Partner's Excluded Capital.

"Capital Contribution" means as to any Partner at any time, the amount of capital actually contributed to the Partnership by such Partner pursuant to Section 3.1(a) (and, without duplication, Section 7.2(b)) or deemed contributed pursuant to Section 3.4(g) or Section 2.2.

"Carried Interest" means all amounts distributed to the General Partner pursuant to Section 3.5(b)(iii) and Section 3.5(b)(iv)(A) including such portion of the tax distributions made pursuant to Section 3.6 and the liquidating distributions pursuant to Section 10.3 as the General Partner reasonably determines to be attributable to distributions that the General Partner would otherwise have received pursuant to Section 3.5(b)(iii) and Section 3.5(b)(iv)(A).

"Carrying Value" means with respect to any Partnership asset, the asset's adjusted basis for U.S. federal income tax purposes, except that the Carrying Values of all Partnership assets shall be adjusted to equal their respective fair values (as determined by the General Partner), in accordance with the rules set forth in Treasury Regulations Section 1.704-1(b)(2)(iv)(f), except as otherwise provided herein, immediately prior to: (a) the date of the acquisition of any additional Partnership Interest by any new or existing Partner in exchange for more than a de minimis Capital Contribution; (b) the date of the distribution of more than a de minimis amount of Partnership property (other than a pro rata distribution) to a Partner; or (c) any other date specified by Treasury Regulations; provided, that adjustments pursuant to clauses (a), (b) or (c) above shall be made only if the General Partner determines in good faith that such adjustments are necessary or appropriate to reflect the relative economic interests of the Partners. The Carrying Value of any Partnership asset distributed to any Partner shall be adjusted immediately prior to such distribution to equal its Fair Value. In the case of any asset that has a Carrying Value that differs from its adjusted tax basis, the Carrying Value shall be adjusted by the amount of depreciation calculated for purposes of the definition of "Profits and Losses" rather than the amount of depreciation determined for U.S. federal income tax purposes.

"Cause" shall have the meaning set forth in Section 9.1(b).

"Certificate" shall have the meaning set forth in the Preamble.

"Clawback Amount" means the aggregate amounts required to be contributed by the General Partner pursuant to Section 3.8.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Act" shall mean the Investment Company Act of 1940, as amended.

"Default" shall have the meaning set forth in Section 3.3(a).

"Defaulting Partner" shall have the meaning set forth in Section 3.3(a).

"Disabling Event" means the General Partner ceasing to be the general partner of the Partnership as a result of a withdrawal from the Partnership other than as permitted by Section 9.1(a) or pursuant to a removal and replacement of the General Partner as provided in Section 9.1(b) or Section 9.1(f).

"Dissolution Sale" means all sales and liquidations by or on behalf of the Partnership of its assets in connection with or in contemplation of the winding-up of the Partnership.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Event of Dissolution" shall have the meaning set forth in Section 10.1.

"Excluded Capital" means the amount of (a) that portion of any Limited Partner's Unpaid Capital Commitment cancelled pursuant to Section 3.2(c), (b) any Defaulted Amount pursuant to Article III and (c) the Unpaid Capital Commitment of any withdrawing Limited Partner pursuant to Article III.

"Existing Clients" means any existing client or pooled investment vehicle managed by the General Partner, the Investment Manager or their affiliate as of the Initial Closing.

"Fair Value" shall have the meaning set forth in Section 6.8(a).

"FATCA" shall have the meaning set forth in Section 3.4(f)(iv).

"Final Closing" shall have the meaning set forth in Section 2.2.

"Final Distribution" means the distribution described in Section 10.3.

"Fiscal Quarter" means the calendar quarter or, in the case of the first fiscal quarter of the Partnership, the period commencing on the date of this Agreement and ending on the last day of the calendar quarter which includes such date, and, in the case of the last fiscal quarter of the Partnership, ending on the date on which the winding up of the Partnership is completed, as the case may be.

"Fiscal Year" shall have the meaning set forth in Section 1.9.

"FOIA" shall have the meaning set forth in Section 11.1(d).

"Follow-On Investment" means an additional or follow-on investment in an existing Portfolio Investment.

"Follow-Up Investment" means a Portfolio Investment with respect to which, prior to the expiration of the Investment Period, the Partnership has entered into a letter of intent, written agreement in principle or definitive agreement to invest.

"Full Investment" means the time at which the aggregate Capital Contributions which have been made and the amounts invested, called, committed or reserved by the Partnership in good faith for Partnership Expenses and Portfolio Investments (including, for the avoidance of any doubt, Follow-Up Investments and Follow-On Investments) are equal to at least seventy-five percent (75%) of the aggregate Capital Commitments.

"General Partner" means IGI Partners II, LLC, a Delaware limited liability company, or any other Person which becomes a successor or an additional general partner of the Partnership as provided herein, in such Person's capacity as general partner.

"General Partner Expenses" shall have the meaning set forth in Section 4.2.

"Holding Entity" shall have the meaning set forth in Section 6.3.

"Incapacitated" means, as to any Person, (a) the adjudication of incompetence or insanity, the filing of a voluntary petition in bankruptcy, the entry of an order of relief in any bankruptcy or insolvency proceeding or the entry of an order that such Person is a bankrupt or insolvent, (b) the death of such Person, (c) the physical or mental disability of such Person (for a period reasonably expected to exceed six (6) months), which would have the effect of rendering such Person unable to perform those tasks required to be performed by the General Partner, (d) the suspension of any privilege or right of such Person by the Securities and Exchange Commission or any similar body administering the United States federal securities laws which would have the effect of rendering such Person unable to perform those tasks required to be performed by the General Partner, (e) the conviction of such Person of a felony involving moral turpitude by a court in the United States of competent jurisdiction, (f) any involuntary proceeding seeking liquidation, reorganization or other relief against such Person under any bankruptcy, insolvency or other similar law now or hereafter in effect that has not been dismissed one hundred twenty (120) days after the commencement thereof, (g) such Person becoming or being subject to a "statutory disqualification with respect to membership or participation in, or association with a member of a self-regulatory organization" pursuant to Section 3(39) of the Securities Exchange Act of 1934, as amended, (h) such Person shall have committed a material act of fraud or willful misconduct with respect to the Partnership, the General Partner or the Investment Manager, or (i) such Person is subject to a final judgment or order issued by either a court of competent jurisdiction or the Securities and Exchange Commission (which shall not include a consent decree or settlement in which such Person neither admits nor denies guilt with respect thereto) which finds such Person to have materially violated any federal or state securities laws (which judgment or order shall not have been subsequently reversed, suspended or vacated).

"Indemnified Party" shall have the meaning set forth in Section 6.4(a).

"Indigo" means the companies directly affiliated with the General Partner, but excluding the Partnership and its Holding Entities, the Existing Clients and their Holding Entities, any Separate Accounts and Successor Funds.

"Initial Agreement" shall have the meaning set forth in the Preamble.

"Initial Closing" shall have the meaning set forth in Section 2.1.

"Initial Closing Date" shall have the meaning set forth in Section 2.1.

"Initial Limited Partner" means Brent E. Carey.

"Interest" means the entire limited partnership interest owned by a Limited Partner in the Partnership at any particular time, including the right of such Limited Partner to any and all benefits to which a Limited Partner may be entitled as provided in this Agreement, together with

the obligations of such Limited Partner to comply with all the terms and provisions of this Agreement.

"Invested Amount" shall have the meaning set forth in Section 4.1(b)(ii).

"Investment Management Agreement" means an investment advisory agreement between the General Partner and the Investment Manager.

"Investment Manager" means Indigo Global Advisors, LLC, a Delaware limited liability company.

"Investment Period" means the period commencing upon the Initial Closing Date and ending on the earlier of (a) the date which is eighteen (18) months prior to the end of the Term, provided that if the Term is extended prior to the end of the Investment Period, the eighteen (18) month-period referred to above shall be calculated based on the extended Term, , (b) the date on which the Investment Period is terminated pursuant to Section 6.10, Section 6.12 or Section 9.1(b) and (c) the date on which the obligation of Limited Partners to make Capital Contributions for Portfolio Investments is cancelled pursuant to Section 3.2(c).  For the avoidance of any doubt, cancellation of the Investment Period shall not affect any Limited Partner's obligation to make Capital Contributions in respect of Partnership Expenses.

"Key Person Event" shall have the meaning set forth in Section 6.12.

"Key Person Plan" shall have the meaning set forth in Section 6.12.

"Key Person" means Brent E. Carey.

"Limited Partners" means the parties listed as limited partners in the Partnership's books and records or any Person who has been admitted to the Partnership as a substituted or additional Limited Partner in accordance with this Agreement.

"Liquidating Share" means, with respect to a Limited Partner, the amount which would be distributed to such Limited Partner if the Partnership were dissolved, its affairs wound up and its assets sold for cash equal to their respective Fair Values, all Partnership liabilities were satisfied (limited with respect to each nonrecourse liability to the Fair Value of the assets securing such liability), and the net assets of the Partnership were distributed in accordance with Article III to the Limited Partners.  For purposes hereof, the liquidation of the Partnership shall assume the like liquidation of each Portfolio Investment in which the Partnership has, directly or indirectly, an interest.

"Majority (or other specified percentage) in Interest" means, at any time, the Limited Partners holding a majority of the total limited partnership interests then entitled to vote in the Partnership as determined on the basis of Capital Commitments.  Any other specified percentage in Interest of the Limited Partners means, at any time, the Limited Partners holding the specified percentage of the total limited partnership interests then entitled to vote in the Partnership, as determined on the basis of Capital Commitments.

"Management Fee" means the management fee payable pursuant to Section 4.1(a).

"Memorandum" means the confidential private placement memorandum for the

Partnership.

"Net Losses" means the Partnership's Losses for a fiscal period: (i) increased by the amount of Organizational Expenses paid in such fiscal period which (x) are not deductible in such fiscal period for US federal income tax purposes; and (y) may be amortized for US federal income tax purposes, including pursuant to an election under Section 709 of the Code, and with respect to which such an election has been made; and (ii) decreased by the amount, if any, of the Organizational Expenses described in clause (i) which are taken into account by the Partnership in such fiscal period pursuant to Section 709 of the Code; provided, that anything herein to the contrary notwithstanding, the cumulative decreases pursuant to clause (ii) shall in no event exceed the cumulative increases pursuant to clause (i).

"Nonrecourse Deductions" shall have the meaning as defined in Treasury Regulations Section 1.704-2(b). The amount of Nonrecourse Deductions for a Fiscal Year equals the net increase, if any, in the amount of Partnership Minimum Gain during that Fiscal Year, determined according to the provisions of Treasury Regulations Section 1.704-2(c).

"Non-United States Jurisdiction" shall mean any country or other jurisdiction which is not a constituent part of the United States of America.

"Non-United States Limited Partner" means a Limited Partner that has represented in its Subscription Agreement that such Limited Partner is not a "United States Person" as such term is defined pursuant to Section 7701(a)(30) of the Code. Any Limited Partner that is treated as a flow-through vehicle for United States federal income tax purposes and that itself has any partners that are not "United States Persons" (as such term is defined pursuant to Section 7701(a)(30) of the Code) may elect to be considered a "Non-United States Limited Partner" for all purposes under this Agreement by providing notice to that effect to the General Partner on or prior to the closing date for such Limited Partner's subscription for Interests or as otherwise agreed by the General Partner in its sole discretion.

"Non-Voting Interests" shall have the meaning set forth in Section 7.1(c).

"Offering Expenses" means the costs and expenses (other than those specifically treated as Organizational Expenses) of offering the Interests, including all costs to produce marketing materials, and any placement or other distribution fees payable to any Person in connection with the offering of Interests.

"Organizational Expenses" means all costs and expenses incurred by the General Partner or its Affiliates in connection with the organization of the Partnership and the General Partner, such as legal, accounting, filing, printing, postage, accommodations and all travel costs (whether of the General Partner, its members or Affiliates, or any amounts reimbursed to any Person acting on their behalf in connection with the organization of, or offering of the interests in, the Partnership), fees and expenses and other similar costs.

"Origination Fee" means the fee payable by the Partnership to the Originator for originating investments for the Partnership to cover (i) the commissions earned by the Originator's employees, representatives and agents and (ii) the Originator's non-commission expenses, in both cases, which are associated with originating such investments. The Origination Fee is determined based on an arm's length negotiation and must be at market rates and on other terms no less favorable than those available from unaffiliated third parties for a comparable level of quality and service. The determination of any amount payable by the Partnership under clause (i) above must be approved in advance by the Advisory Committee.

"Originator" means the party responsible for the origination of transactions that the Investment Manager selects for origination services, which may be affiliated with Indigo.

"Other Clawback Amount" shall have the meaning set forth in Section 7.2(d).

"Parallel Fund" means a collective investment vehicle or other arrangement formed in order to facilitate investment by certain investors, notwithstanding the provisions of Section 6.7. Each Parallel Fund will, subject to applicable legal, tax, regulatory or other considerations, generally: (a) invest proportionately, on the basis of relative capital commitments, in all Portfolio Investments on effectively the same terms and conditions as the Partnership in all material respects; (b) share proportionately in expenses (including Organizational Expenses), other than expenses specially attributable in the good faith discretion of the General Partner to the Partnership or a particular Parallel Fund; and (c) dispose of investments proportionately with the Partnership, on terms no more favorable than the Partnership and at the same time as the Partnership.

"Partner Nonrecourse Debt Minimum Gain" means an amount with respect to each partner nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(b)(4)) equal to the Partnership Minimum Gain that would result if such partner nonrecourse debt were treated as a nonrecourse liability (as defined in Treasury Regulations Section 1.752-1(a)(2)) determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"Partner Nonrecourse Deductions" shall have the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"Partners" means the General Partner and the Limited Partners.

"Partnership" shall have the meaning set forth in the Preamble.

"Partnership Counsel" shall have the meaning set forth in Section 11.15.

"Partnership Expenses" shall have the meaning set forth in Section 4.3.

"Partnership-Level Expenses" shall mean the reasonable expenses related to the management and operation of the Partnership and/or the Partnership's handling of the Portfolio Investments of the Partnership that are not otherwise specifically classified herein, including without limitation:

(a)     Custody expenses for securities, other investment administration costs, fees and expenses actually incurred in connection with making, holding or disposing of Portfolio Investments;

(b)    fees, costs and expenses of tax advisors, legal counsel, accountants, auditors, consultants and other advisors and professionals and all ordinary out-of-pocket administrative expenses related to the operation, administration or liquidation of the Partnership, including the preparation and distribution of reports, the holding of meetings of the Partnership (and the General Partner's reasonable travel costs incurred in connection with meetings with Partners; for the avoidance of doubt, not to include amounts incurred by the General Partner in connection with fundraising for the Partnership) and any costs, fees and expenses related to performing a financial review or accounting services for the Partnership;

(c)    the costs, fees and expenses of any litigation, Partnership, directors and officers liability or other insurance and any indemnification or extraordinary expense or liability relating to the affairs of the Partnership;

(d)    expenses of liquidating the Partnership;

(e)    any taxes (except as provided in Section 3.4(f)), fees or other governmental charges levied against the Partnership and all expenses incurred in connection with any tax audit, investigation, settlement or review of the Partnership;

(f)    any expenses related to the making of Temporary Investments; and

(g)    the costs and expenses of the Advisory Committee.

"Partnership Minimum Gain" shall have the meaning set forth in Treasury Regulations Section 1.704-2(b)(2) and 1.704-2(d).

"Payment Date" shall have the meaning set forth in Section 3.1(a).

"Percentage Interest" means with respect to any Partner and any Portfolio Investment, the ratio of such Partner's Capital Contribution to that Portfolio Investment to the total Capital Contributions of all Partners to that Portfolio Investment; provided, that Capital Contributions of each Partner with respect to a Portfolio Investment shall be adjusted to reflect any return of Capital Contributions pursuant to a Subsequent Closing; and provided, further, that for these purposes (but not for the purpose of determining Unpaid Capital Commitments) the Capital Contribution of each Partner to a Portfolio Investment shall be adjusted to reflect any changes to the Capital Account of each such Partner as a result of: (i) any reduction in the Capital Account of a Defaulting Partner pursuant to Section 3.3 or of a withdrawing Limited Partner pursuant to Article IX; and (ii) with the consent of the Advisory Committee, any other adjustments that in the discretion of the General Partner are reasonably necessary or appropriate to effect the terms of this Agreement.

"Person" means any individual, partnership, corporation, limited liability company, unincorporated organization or association, trust (including the trustees thereof, in their capacity as such) or other entity.

"Plan Asset Rules" means the regulations issued by the Department of Labor at Section 2510.3-101 of Part 2510 of Chapter XXV, Title 29 of the Code of Federal Regulations, as modified by Section 3(42) of ERISA.

"Portfolio Investments" shall have the meaning set forth in Section 1.4(a).

"<u>Portfolio Loan Costs</u>" mean the costs incurred by the Originator, the Investment Manager and the Servicer in connection with each investment in a Portfolio Loan, which shall be paid directly by the Partnership or reimbursed to the Originator, Investment Manager and the Servicer, as applicable, by the Partnership. Specifically, the Originator incurs due diligence costs; loan creation, acquisition, trading or disposition-related expenses; costs for evaluating collateral or guarantees and existing documentation; and costs related to amending any related transaction documents and preparing reports for the Originator's clients in respect of the Portfolio Loans. In addition, the Investment Manager and the Servicer may incur fees and expenses related to the creation, acquisition, trading, disposition and management of Portfolio Loans, including but not limited to, interest on borrowings, all loan creation, acquisition, trading or disposition-related expenses, Portfolio Loan servicing fees and expenses, portfolio collateral monitoring and appraisal, fees and expenses, portfolio-related legal fees, accounting, brokerage and consulting fees and expenses, Portfolio Loan collateral based protective advances made to preserve collateral and other collateral protection and preservation related expenses and expenses incurred by the Investment Manager or the Servicer for due diligence and portfolio management purposes, including any travel costs related to specific Portfolio Investments in respect of the Portfolio Loans.

"<u>Portfolio Loans</u>" shall have the meaning set forth in <u>Section 1.4(a)</u>.

"<u>Preferred Return</u>" means an 8.0% per annum return (cumulative, compounded annually). With respect to each Limited Partner, the Preferred Return payable shall accrue on its Capital Contributions from the later of: (i) the applicable Payment Date or Payment Dates on which such Capital Contributions were due; and (ii) the date or dates on which such Capital Contributions were actually received by the Partnership through the relevant date or dates on which a distribution in return of such Capital Contributions (or accrued and unpaid Preferred Return) was made to such Limited Partner pursuant to this Agreement. For the avoidance of doubt, amounts refunded and restored to Unpaid Capital Commitments pursuant to <u>Section 2.2</u> hereof in connection with a Subsequent Closing shall not be taken into account for purposes of determining such Limited Partner's Preferred Return (and amounts paid to such Limited Partner computed in the same manner as interest hereunder shall likewise be ignored) but shall be treated, in accordance with <u>Section 2.2</u>, as having been made by those Limited Partners being issued new or additional Limited Partner interests at such Subsequent Closing, at the time such amounts were originally contributed to the Partnership, and accordingly will be taken into account in computing such subsequently admitted Limited Partner's Preferred Return.

"<u>Pre-Removal Investments</u>" shall have the meaning set forth in <u>Section 9.1(f)</u>.

"<u>Proceeding</u>" means any legal action, suit or proceeding by or before any court, arbitrator, governmental body or other agency.

"<u>Profit and Losses</u>" means for each Fiscal Year or other period, the taxable income or loss of the Partnership, or particular items thereof, determined in accordance with the accounting method used by the Partnership for U.S. federal income tax purposes with the following adjustments: (a) all items of income, gain, loss or deduction allocated pursuant to <u>Section 5.3</u> shall not be taken into account in computing such taxable income or loss; <u>provided</u>, that adjustments analogous to those provided for below in this definition shall be made to the items allocated pursuant to <u>Section 5.3</u>; (b) any income of the Partnership that is exempt from U.S. federal income taxation and not otherwise taken into account in computing Profits and Losses shall be added to

such taxable income or loss; (c) if the Carrying Value of any asset differs from its adjusted tax basis for U.S. federal income tax purposes, any gain or loss resulting from a disposition of such asset shall be calculated with reference to such Carrying Value; (d) upon an adjustment to the Carrying Value of any asset pursuant to the definition of Carrying Value (other than an adjustment in respect of depreciation), the amount of the adjustment shall be included as gain or loss in computing such taxable income or loss; (e) if the Carrying Value of any asset differs from its adjusted tax basis for U.S. federal income tax purposes, the amount of depreciation, amortization or cost recovery deductions with respect to such asset shall for purposes of determining Profits and Losses be an amount which, except as otherwise expressly required by applicable Treasury Regulations, bears the same ratio to such Carrying Value as the U.S. federal income tax depreciation, amortization or other cost recovery deductions bears to such adjusted tax basis (provided, that if the U.S. federal income tax depreciation, amortization or other cost recovery deduction is zero, the General Partner may use any reasonable method for purposes of determining depreciation, amortization or other cost recovery deductions in calculating Profits and Losses); and (f) except for items in (a) above, any expenditures of the Partnership not deductible in computing taxable income or loss, not properly capitalizable and not otherwise taken into account in computing Profits and Losses pursuant to this definition shall be treated as deductible items.

"Required Interest" shall have the meaning set forth in Section 11.3(a).

"Rules of Conduct" shall have the meaning set forth in Section 11.15.

"Securities" or "Security" means and includes common and preferred stock and interests therein (including warrants, rights, put and call options and other options relating thereto or any combination thereof), general and limited partnership interests, limited company and limited liability company interests or units, certificates of interest or participation in any profit sharing agreements, voting trust certificates, investment contracts, notes, bonds, debentures, trust receipts, mortgages, and other obligations, instruments or evidences of indebtedness and all combinations thereof, certificates, receipts and other instruments representing rights to receive, purchase, sell or subscribe for any of the foregoing or representing any other rights or interest therein and any and all property or interests not included above which are or may hereafter be commonly regarded as securities and any property, real or personal, tangible or intangible, which is distributed in respect of the ownership of a Security.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Separate Account" shall have the meaning set forth in Section 6.7(c).

"Servicer" means Indigo Investment Servicing, LLC, a Delaware limited liability company.

"Servicing Cost" means the monthly loan servicing fee that the Partnership (or a wholly owned special purpose vehicle of the Partnership) pays the Servicer, for services related to the billing, collecting and loan account reporting services, at the beginning of each calendar month, which is expected to be the sum of (i) (A) approximately 0.0832% (1.0% per annum) of the principal balances of the underlying loans or mortgages, (B) the capitalized lessor's cost for any leases and (C) the current value of properties held by the Partnership as of the first business day of the calendar month, subject to a minimum monthly amount approved by the General Partner in its sole discretion, and (ii) fees related to special assets servicing, specialty loan management services, property management costs and any loan-collateral handling costs that the Servicer

incurred or charged during the immediately preceding calendar month. The Servicing Cost is determined based on an arm's length negotiation and must be at market rates and on other terms no less favorable than those available from unaffiliated third party servicing and specialty loan management companies for a comparable level of quality and service.

"Similar Law" means any U.S. federal, state, local, non–U.S. or other law or regulation that contains one or more provisions that are: (x) similar to any of the fiduciary responsibility or prohibited transaction provisions contained in Title I of ERISA or Section 4975 of the Code; and (y) similar to the provisions of the Plan Asset Rules or would otherwise provide that the assets of the Partnership could be deemed to include "plan assets" under such law or regulation.

"Subscription Agreements" means the Subscription Agreements between the Partnership and each of the Limited Partners.

"Subscription Period" shall have the meaning set forth in Section 2.2.

"Subsequent Closing" shall have the meaning set forth in Section 2.2.

"Subsequent Closing Interest Charge" shall have the meaning set forth in Section 2.2.

"Successor Fund" shall have the meaning ascribed thereto in Section 6.7(a).

"Temporary Investments" mean: (i) marketable direct obligations issued or unconditionally guaranteed by the United States government or an agency thereof maturing within one hundred eighty (180) days and having a rating not lower than A-1 or P-1 (or the equivalent) by Standard and Poor's Corporation or Moody's Investor Services; or (ii) interest bearing deposits in United States banks with an unrestricted capital surplus of at least $250 million and having a rating not lower than A-1 or P-1 (or the equivalent), maturing within one hundred eighty (180) days.

"Terminated Partner" shall have the meaning set forth in Section 3.3(b).

"Transfer" means any direct or indirect sale, exchange, transfer, assignment, pledge, creation of a security interest in, or encumbrance on, or other disposition by a Limited Partner of all or any portion of its interest in the Partnership or any economic interest therein (including by means of any participation or swap transaction).

"Transferee" shall have the meaning set forth in Section 9.2(a).

"Unpaid Capital Commitment" means with respect to any Partner as of any date, an amount equal to such Partner's Capital Commitment, less all Capital Contributions made by such Partner on or prior to such day, and further adjusted as provided in Section 2.2, Section 3.1(a), and Section 3.4(g) hereof.

"Valuation Opinion" shall have the meaning set forth in Section 6.8(c).

Annex B

## **LIMITED PARTNERS**

| Partner's Name | Capital Commitment | Address |
| --- | --- | --- |
| | | |

Total